# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF VIRGINIA

FRED HANEY, MARSHA MERRILL,
SYLVIA RAUSCH, STEPHEN SWENSON,
and ALAN WOOTEN, individually, and on
behalf of all others similarly situated,

       *Plaintiffs*,

v.

GENWORTH LIFE INSURANCE
COMPANY and GENWORTH LIFE
INSURANCE COMPANY OF NEW
YORK,

       *Defendants*.

**Civil Action No.:**  <u>**3:22cv55**</u>

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Fred Haney, Marsha Merrill, Sylvia Rausch, Stephen Swenson, and Alan Wooten ("Plaintiffs") bring this Class Action Complaint, individually and on behalf of the proposed Class of Genworth long term care insurance policyholders defined below, against Defendants Genworth Life Insurance Company ("GLIC") and Genworth Life Insurance Company of New York ("GLICNY") (collectively "Genworth," the "Company," or "Defendants"). Plaintiffs allege the following based upon information and belief and the investigation of their undersigned counsel, except for those allegations that pertain to themselves, which are based on Plaintiffs' personal knowledge.

## INTRODUCTION

1.     This lawsuit alleges a course of conduct by Genworth that is very similar to that alleged in *Skochin v. Genworth Life Ins. Co.*, No. 19-cv-00049-REP (E.D. Va. 2019) and *Halcom v. Genworth Life Ins. Co.*, No. 3:21-cv-00019-REP (E.D. Va. 2021), but on behalf of policyholders that were not included in those prior lawsuits.

2.     Plaintiffs and the Class each purchased Long Term Care ("LTC") insurance policies from Genworth. Specifically, those policies are the Genworth LTC products that include Choice 2, Choice 2.1, California CADE, California Reprice, or California Unbundled policies, and State variations of those policies issued in any of the fifty (50) States of the United States or the District of Columbia during the Class Period. These are referred to herein as the "Class Policies." These policies were first sold nationwide in 2003 and are no longer sold by Genworth.

3.     Since 2013, Genworth has steadily and substantially increased the premiums on these policies. To be clear, this case does not challenge Genworth's contractual right to increase these premiums, or its need for premium increases given changes in certain of Genworth's actuarial assumptions and the historical experience of this policy block. Nor does this case ask the Court to reconstitute any of the premium rates or otherwise substitute its judgment for that of any insurance

regulator in approving the increased rates.  Rather, this case seeks to remedy the harm caused to Plaintiffs and the Class from Genworth's partial disclosures of material information when communicating the premium increases, and the omission of material information necessary to make those partial disclosures adequate.  Without all of this material information, Plaintiffs and the Class could not make informed decisions in response to the premium increases and ultimately made policy option renewal elections they never would have made had the Company adequately disclosed the staggering scope and magnitude of its internal rate increase action plans in the first place.

4.      LTC is expensive.  So, too, is LTC insurance.  LTC insurance is intended to help defray the cost of home care, assisted living care, nursing home care, and other specialized skilled facility care required when an individual becomes unable to perform the basic activities of daily living (such as dressing, eating, toileting, continence, or transferring – getting in and out of a bed or chair).

5.      When a consumer evaluates a LTC insurance policy for purchase, they compare the premium rates to the coverage options they are provided and choose a plan that is affordable while providing adequate future benefits.  Since the consumer is committing to make decades of premium payments before they ever plan to make a claim on the policy, it is important that the premiums they pay will continue to be affordable for the life of the policy.  After all, under any LTC policy that lacks a non-forfeiture provision, if a policy holder can no longer afford the premiums, they may walk away from the policy with *nothing*; perhaps after paying tens of thousands of dollars in premiums.

6.      To keep premium levels lower, consumers generally begin shopping for LTC insurance in their 50s or 60s.  As noted by the WALL STREET JOURNAL in 2014, "[f]or each year

applicants in their 50s delay buying coverage, carriers typically raise premiums by 3% to 4%, simply because they are a year older … [but], for every year someone in their 60s waits, they can expect to pay an additional 6% or more." Anne Tergesen, *Mistakes to Avoid When Shopping for Long-Term-Care Insurance*, WALL ST. J. (Apr. 13, 2014), https://www.wsj.com/articles/ SB10001424052702304756104579449482245063704 (last visited January 26, 2022).

7.    While LTC contracts are guaranteed renewable, most allow the provider to increase premiums if: (1) the increases will be made across the entire policy class; and (2) those new rates are first approved by the policyholder's state insurance regulator.

8.    Although the decision to pay an increased rate can be characterized as a renewal of the existing contract, a rate increase actually restructures all the essential terms of the policy. Facing a premium increase, a policyholder must evaluate anew whether the increased premiums remain justified expenses in exchange for the same level of benefits, or whether a reduction in benefits and premiums is preferable.  To do this, they must also evaluate the likelihood of any future premium increases, the frequency of those increases, and the amount of those increases. They will also want to reassess the provider's financial stability and whether that provider needs to obtain additional and substantial future rate increases to remain solvent.  These are all material data points that insureds first considered when they purchased their policy and which they must reevaluate in light of the new premiums that will be charged.

9.    To allow policyholders to make informed decisions, any insurance company that raises premiums must inform their insureds of all material information in its possession regarding these important recalculations.  Only a full-disclosure of all these material data points will allow insureds to fairly evaluate the new policy terms in light of a rate increase.

**Summary of the Claims**

3

10.     Plaintiffs and the Class purchased their Genworth LTC policies prior to 2012 and paid stable premiums to Genworth for the first several years of their policies.  But, by 2013, Genworth began to recognize that some premium rate increases would be needed on this policy block.  As early as 2012, serious cracks in Genworth's stability began to show *inside* Genworth that would necessitate considerable rate increases on all the policies at issue in this case for years to come.

11.     As part of a "deep dive" into its LTC claim reserves, the Company acknowledged internally that it had a substantial shortfall in its LTC reserves, much larger than it ever anticipated. While GLIC continued to pay dividends to its holding company parent, a hole in its claims reserves was growing exponentially.

12.     In 2014, Genworth completed an asset adequacy test and determined that its loss recognition testing margin,[1] an important indicator of insurer solvency, had shrunk from $3.2 billion at the end of 2013 to *negative $2.6 billion* by the end of 2014 (a deficit that exceeded its LTC premium revenue from that year).  According to Genworth, the decrease was "driven by changes to assumptions and methodologies primarily impacting claim termination rates … and benefit utilization rates."

---

[1] Loss recognition testing is an impairment test, mandated by U.S. Generally Accepted Accounting Principles ("GAAP"), that requires insurance companies to recognize reserve deficiencies as they occur.  Loss recognition testing is the GAAP analog to statutory cash flow testing with the exception that, while the present value of future surplus is the key deficiency metric on a statutory basis, loss recognition is performed using a gross premium valuation method, which considers not the ending surplus, but the sum of the present value of liabilities throughout the projection period of the product being tested.  The loss recognition testing margin is the deficiency metric for loss recognition testing and is equal to the sum of the present value of liabilities offset by the present value of any profits throughout the projection period of the product being tested – here, LTC insurance.

13. To right the ship and plug the growing hole in its reserves, Genworth created a series of internal action plans known as the "In-Force Management Project," later the In-Force Rate Actions II and III ("IFA II" and "IFA III"), and culminating with the Multi-Year Rate Increase Action Plan (the "MYRAP") and its subsequent iterations. These internal plans called for significant premium rate increases systematically across virtually all of its policy classes, including the Class Policies that play a prominent role in the MYRAP.

14. These future rate increases, however, would not be recognized in Genworth's asset adequacy testing until that increased revenue began flowing into its reserves over the next decade. So as to avoid reporting a current negative loss recognition testing margin, Genworth instead began to utilize in its actuarial testing assumptions for "significant anticipated (*but not yet filed*) future premium rate increases or benefit reductions" to increase its reported loss recognition testing margin by *$4.9 billion*. *See* Genworth Financial, Inc.'s ("GFI") Form 10-K for the period ending Dec. 31, 2014 at 61, 128 & 240 (emphasis added). To put that in perspective, Genworth's annual revenue from its entire LTC insurance operation was only $3.5 billion in 2014.

15. In other words, *Genworth relied almost entirely upon billions of dollars in anticipated future (**but not yet filed**) rate increases to plug this massive hole in its reserves*. And it was so confident in its ability to achieve these rate increases that it relied on them in its then-current financial reporting and when paying executive compensation bonuses that were tied to successful execution of these plans.

16. This material information about Genworth's plan for (and need for) massive future rate increases, however, was never shared with Genworth's policyholders who would be required to pay the increases.

17.     Between 2014 and 2021, Genworth continued to adjust its assumptions to claim termination and benefit utilization rates, resulting in continued decreases in its loss recognition testing margin.  As of December 31, 2016, Genworth's assumptions for "significant anticipated (but not yet filed) future premium rate increases or benefit reductions" had exploded to a reported **$7.3 billion**.  By the end of 2019, that number had grown to **$7.6 billion**.  This is the ever-escalating amount of future premium increases that would largely fall upon Plaintiffs and the Class.

18.     None of the details of this massive rate increase plan, however, were shared with policyholders.  For example, when announcing substantial rate increases throughout the Class Period, Genworth said only that "in accordance with the terms of your policy, we reserve the right to change premiums and it is possible that your premium rate will increase again in the future." Although Genworth acknowledged future rate increases were "possible," it made no further attempt to inform policyholders that not only were they possible, they were part of the Company's internal rate increase action plans to raise rates substantially and repeatedly for years to come.

19.     For a policyholder, deciding whether to pay each *current* premium increase was decidedly different from buying into a *series* of sequential rate increases that would more than double the premiums they were then paying.  This is especially true because each of those increased rates would have to be absorbed into the policyholder's financial planning for years or decades to come.  These nationwide rate increase action plans were material information about future LTC policy terms that Genworth withheld from its insureds in each premium increase notice the Company sent to the Class.

20.     Genworth knew throughout the Class Period that it needed substantial and successive premium rate increases to remain solvent.  It planned to push these rate increases through state insurance departments whenever it could and for as much as possible.  Since the

beginning of the Class Period, Genworth's actuarial testing demonstrated that increases of perhaps over 100% would be required on all policies that are the subject of this lawsuit.  It never disclosed this material information to Plaintiffs or any member of the Class.  The statements it did make about the possibility of future rate increases were not adequate, omitted material information necessary to make the partial disclosures adequate, and resulted in Plaintiffs and the Class making policy renewal elections they never would have made.

21.     Plaintiffs and the Class seek, among other relief, rescission of the policy renewal elections they made, an adequate, forthright, and full disclosure of Genworth's current financial condition and plan for future rate increases, and an opportunity to decide, with the benefit of that material information, what policy renewal options they will elect going forward.

### JURISDICTION AND VENUE

22.     This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiffs purchased their policies in Oregon, New York, Ohio, and Arkansas, and currently reside in and are citizens of Oregon, Florida, and Arkansas. Defendant GLIC has its principal place of business in Virginia.  Defendant GLICNY has its principal place of business in New York.  The amount in controversy exceeds $5,000,000, and there are more than 100 members in the Class.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant GLIC regularly conducts business in this District, has its administrative offices in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

**A.**    **Plaintiffs**

24.    **Plaintiff Fred Haney** resides in and is a citizen of Tigard, Oregon.  On May 10, 2004, Plaintiff Haney purchased a LTC insurance policy from Genworth.  The policy he purchased was one of the Class Policies offered on Form 7044 et al.

25.    **Plaintiff Marsha Merrill** currently resides in and is a citizen of Riviera Beach, Florida.  On January 29, 2007, when living in New York, New York, Plaintiff Merrill purchased a LTC insurance policy from GLICNY.  The policy she purchased was one of the Class Policies offered on Form 51014 et al.

26.    **Plaintiff Silvia Rausch** currently resides in and is a citizen of  Punta Gorda, Florida.  On September 18, 2004, while living in Pataskala, Ohio, Plaintiff Rausch purchased a LTC insurance policy from Genworth.  The policy she purchased was one of the Class Policies offered on Form 7044 et al.

27.    **Plaintiff Stephen Swenson** resides in and is a citizen of Bend, Oregon.   On February 25, 2008, Plaintiff Swenson purchased a LTC insurance policy from Genworth.  The policy he purchased was one of the Class Policies offered on Form 7042 et al.

28.    **Plaintiff Alan Wooten** resides in and is a citizen of Fayetteville, Arkansas.  On July 1, 2009, Plaintiff Wooten purchased a LTC insurance policy from Genworth.  The policy he purchased was one of the Class Policies offered on Form 7044 Rev et al.

**B.**    **Defendants**

29.    Defendants GLIC and GLICNY are related entities that issue Genworth LTC insurance, including the Choice 2/2.1 policies at issue here.

30.    Genworth's business is divided into two divisions: Global Mortgage and U.S. Life Insurance.  The U.S. Life Insurance Division includes its LTC insurance business unit.  As

Genworth's Chief Executive Officer acknowledged during a September 25, 2013 investor conference, "our core business is long-term care."  Genworth began selling LTC insurance in 1974, and today is the largest LTC insurance provider in the country.  Between 2010 and 2014, over 50% of Genworth's U.S. Life Insurance revenues came from its LTC insurance business unit.

31.     Genworth's corporate structure is set forth in the following graphic.



32.     Genworth's headquarters for LTC insurance is located in this District, in Richmond, Virginia.

33.     Defendant GLIC is an indirect subsidiary of GFI and is organized under the laws of Delaware with its main administrative office in Richmond, Virginia.  Among other products, GLIC issues LTC insurance policies nationwide.

34.     Defendant GLICNY is a subsidiary of GLIC.  GLICNY is organized under the laws of New York.  GLICNY issues insurance policies, including LTC insurance policies that are filed in and issued from New York, and most of its policyholders reside in New York.  However, some of its policyholders currently reside in states other than New York.  For example, GLICNY typically receives around $500,000 in annual LTC premiums from policyholders residing in Virginia.

## FACTUAL BACKGROUND

**A.**   **LTC Insurance Background**

     **1.**   **LTC Insurance Basics**

35.   LTC insurance is a long duration insurance contract that insures the policyholder against the costs of assisted living care in the event they become unable to perform the basic activities of daily living.  In such event, the LTC policy will reimburse the policyholder for costs incurred for care and treatment in assisted living facilities, nursing homes and/or in connection with home health assistance and related expenses.  Some LTC insurance contracts have daily, annual, or lifetime limits that cap the exposure of these costs.

36.   LTC insurance shares characteristics of both life insurance and property and casualty insurance.  Like life insurance, LTC insurance covers the insured over the course of a long-time period, making the financial health and security of the insurer a material concern for the policyholder.  However, like property and casualty insurance, LTC insurance covers a risk that is uncertain to occur.  Indeed, if a policyholder dies suddenly or otherwise never requires the type of care covered by their LTC insurance policy, no claim is ever made by the policyholder.

37.   Premiums for LTC insurance are based on underwriting factors as well as the age of the insured at the time the policy is issued.  The latter accounts for the fact that premiums paid in the early years of the policy funds claims incurred later.

38.   Purchasing LTC insurance at a younger age typically results in lower annual premiums.  This is because almost all LTC policies are intended to have level premiums payable for life, meaning that premiums do not increase because of the policyholders' increased age or changes in health condition.  Thus, claims are expected to be less than premiums paid in the early years and will exceed premiums in later years as depicted in the chart below.



39. As a LTC policyholder ages, the expected incurred claims will increase over and above the premium that would be paid by the policyholder if the LTC policy contract were entered into earlier in life. Thus, individuals who delay purchase of a LTC policy, or who seek to change providers, typically have to pay a far higher premium than they would have been required to pay had they obtained LTC insurance earlier in life. In other words, once obtained and after the policyholder pays premiums for a number of years, the likelihood that the policyholder would be able to find alternative insurance at a lower price than his or her existing policy trends to zero.

40. As a result of this dynamic, reserves build in the early years of a block of business and release to claimants in later years.



41.     Over 95 percent of LTC policyholders in the United States are age 45 or older.

42.     According to a Genworth presentation dated February 11, 2015 (revised February 27, 2015) and titled "Long Term Care Insurance Annual Margin Testing," the average LTC policyholder in Genworth's blocks of business acquired their policy between 57 and 65 years of age, depending on the block.

### 2.     An Insurance Company's Financial Condition and Expertise in LTC Insurance Are Important Considerations for Insureds When Maintaining a Policy or to New Insureds Looking to Purchase a Policy

43.     When purchasing LTC insurance, consumers place a large degree of trust in their insurance provider.

44.     In a LTC insurance contract, the insured is required to make modal payments with the expectation that the insurance provider will be there years down the road when an insured's claim might eventually accrue.

45.     Consumers of LTC insurance, like Plaintiffs and the Class, often purchase their policies years or decades before they anticipate making any claim on the policy.  LTC insurance is typically characterized by a long-term outlook such that policyholders pay premiums, on

average, for 20 to 25 years before making a claim. The typical LTC policyholder is issued the policy at 58 to 60 years of age and, if they make a claim at all, it is typically between the ages of 80 and 85.

46.     Due to this long time horizon, a primary consideration in choosing a LTC insurance provider is the insurer's financial condition and stability.

47.     In addition, while LTC insurance is intended to have level premiums, they are not guaranteed—*i.e.*, premiums can change over time based on insurer experience that deviates from previous assumptions but otherwise stays the same. As a result, consumers of LTC insurance, like Plaintiffs and the Class, consider the LTC insurance provider's purported expertise in devising accurate assumptions to accrue appropriate reserves and minimize shocks associated with rate increases on existing policies.

48.     The financial condition and stability of an insurer is reflected, in part, in a company's financial statements and in financial ratings, as issued by ratings agencies such as A.M. Best, Moody's Investor Services ("Moody's"), Standard & Poor's Ratings Services ("S&P"), or Fitch Ratings ("Fitch").

49.     State insurance commissioners, through their websites, specifically advise consumers to consider such financial information when choosing an insurance provider.

50.     For example, in its Guide to Consumers on LTC policies (*revised January, 2014*) the California Insurance Commissioner advises, "[a]n insurance company's financial standing and track record are important in choosing a long-term care insurance policy" and "[a] company's size and ratings are important factors to take into consideration when making your long-term care insurance choice."

51.     The New York Insurance Commissioner offers similar advice, suggesting (http://www.dfs.ny.gov/consumer/ratings_stability.htm):

**Insurance Company Ratings and Stability**

When selecting an insurance policy, you are also selecting an insurance company and you may wish to know how stable that company is financially. Many firms rate the financial soundness of insurance companies … Each firm has a different rating scale and firms may differ in the conclusions they reach about a specific insurance company. Therefore, you may wish to check with more than one firm before selecting an insurance company.

52.     The NAIC is the United States standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories.

53.     In its publication *A Shopper's Guide to Long-Term Care Insurance*, the NAIC advises:

**Check the financial stability of the insurance company.**

Insurer ratings can show you how analysts see the financial health of individual insurance companies. Different rating agencies use different rating scales. Be sure to find out how the agency labels its highest ratings and the meaning of the ratings for the companies you're considering.

54.     In addition to the financial condition and stability of the insurance company, potential LTC policyholders consider an insurer's experience and expertise in setting premiums and accruing reserves.

55.     Insurance companies conduct periodic experience studies (examinations of their historical experience and how it compares to the assumptions the insurer used at pricing) to evaluate its assumptions and make confident decisions in the development of future products and the underwriting of its business.

56.     Companies with more experience—*i.e.*, with larger blocks of policies in force over longer time periods—have more data to use in creating more accurate assumptions.

57.     Consumers rightfully consider the breadth and duration of an insurer's experience in the LTC market as a material factor in selecting an LTC insurance carrier.

**B.      Genworth's Conduct with Regard to Its LTC Business**

**1.      Genworth Marketed its Financial Strength, Sound Reserves and Breadth of Experience**

58.     Genworth, and its predecessor GE, marketed its experience and financial condition to induce new policyholders to purchase LTC policies and to keep its LTC policyholders renewing their policies.

59.     For example, in its 2004 marketing materials, GE asked "Why Choose General Electric Capital Assurance Company?"  The answer according to the pamphlet:

> Selecting a long term care insurance company is an important decision. You need to find a company you can trust to help protect your assets and lifestyle as you grow older.  A company that's respected and recognized as a leader in quality service and products.  A company with an innovative portfolio of plans that offer comprehensive benefits, and with a proven track record of paying its claims.

> General Electric Capital Assurance Company gives you all this and more.  Our Long Term Care Division pioneered the development of long term care insurance over 28 years ago and we've been an industry leader ever since.  Over the years we have continued to meet our customers' changing needs by improving and updating our policies and staying one step ahead in the long term care insurance industry.  We believe that our experience and expertise set us apart from the rest and make us your best choice for helping to protect your future.

> General Electric Capital Assurance Company is a member of the General Electric Company family.  We practice the principles that give GE its good name. You can depend on us to provide you with excellent service and quality long term care insurance plans.

60.     In another brochure to potential LTC insureds, Genworth noted that the NAIC's Model Regulations "require[] professional actuaries to certify that the initial filed rate schedule is sufficient to cover anticipated costs under moderately adverse experience, and is reasonably expected to be sustainable over the life of the policy form filed, with no future premium increases

anticipated.  The actuaries must certify that policy design, coverages, and underwriting and claims adjudication processes have been considered; that the contract reserves assumptions include reasonable margins for adverse experience; and that benefits are reasonable in relation to premiums, with sample calculations provided, among other things."

61.     While noting that its LTC insurance contracts permit future rate increases "providing the new rates are filed with the appropriate insurance regulatory authorities," Genworth emphasized, "Our goal has been to price our long term care insurance policies so that premiums will remain at original levels for the duration of the policies."

62.     At around this time, General Electric Capital Assurance Company, including its LTC division, was being spun off to create GFI.  In an announcement to existing policyholders and consumers then shopping for insurance, Genworth introduced itself ensuring everyone knew the new company still adhered to all the things that made GE attractive to consumers.  It stated,

> Genworth is a new public insurance holding company comprised of the businesses you know from GE Financial and GE Mortgage Insurance. We are an established global company – and we are something new.
>
> Over the years, as part of the GE family, we built financial strength, operational discipline and a reputation for integrity.  Now, as we become an independent company, we have the benefit of drawing on this heritage to make sure we are there for our customers throughout their lives, when they need us most.
>
> While our name is changing, our commitments are clear.  We will honor our policies. We will continue to help protect our customers' lifestyles, to help them during difficult times and to help make their dreams come true.  And while we are in a complex industry, we will strive to make things clear and simple.
>
> "Built on GE Heritage" clearly signals our strong foundation. As we begin to roll out our brand in the coming months, you will see the Genworth Financial name become more prominent in our marketing and communications.
>
> **STRENGTH AND STABILITY**

> We are among the largest U.S. Insurance companies, with an expanding global presence.  Built on a tradition of innovative products, customer services and an extensive distribution network, we are dedicated to providing the best for our business partners and customers.

63.     In a 2012 brochure, Genworth boasted, "[t]here is no substitute for experience [and that] Genworth Life helped pioneer long term care insurance in **1974** and is an industry leader." (emphasis original).  Genworth also notes in its marketing materials that it's "years of experience have allowed [it] to design products and services to fit [its] customers' needs and a range of budgets."

64.     Genworth has also routinely touted its financial health.  For example, in a March 2011 PowerPoint presentation for insurance brokers and agents, Genworth boasted that it had been "Setting Aside Assets to Pay Future Claims for 37 [y]ears" by putting reserve funds into: "investment grade bonds", "corporate securities", "treasury bonds, etc.," and represented a $17.91 billion reserve fund that it built while incurring only $6.7 billion in claims.



2.  **Genworth Claims to Buck Industry Trends and Sets Itself Apart From the
    Rest of the LTC Insurance Market**

65.     Between 1988 and 1998, "long-term care insurance ha[d] emerged as the fastest
growing type of insurance coverage in the United States, with sales increasing at 20% to 25% a
year."[2]  By the late 1990's over 100 carriers were aggressively competing for new policyholders
in the LTC insurance market.

66.     By 2012, however, the LTC market had deteriorated and several large carriers had
exited the market.  As a February 10, 2012 Fitch report explained, "[t]he long-term care insurance
market continues to be plagued by adverse claims experience and poor overall results, which has
led to rate instability, insurer solvency concerns, and market exits by several insurers."  A July
2013 United States Department of Health and Human Services study of the LTC market noted that
half of the companies who exited the market left after a "new evaluation/assessment of the risk of
the product and market."

67.     In the midst of this market upheaval, Genworth consistently denounced any such
effects on its own large book of LTC policies.  It attributed its success in the market to its vast
experience with the product, and routinely cited its extensive actual claims experience to assure
policyholders and potential new customers that its management of its LTC products was superior
and not in distress.

68.     Genworth emphasized the importance of its own robust database covering over 40
years of actual claims experience – data which included information on the age and gender of
policyholders, the rate of claims, the cause of claims, the duration of claims, the amount paid on
claims, and so on.

---

[2] Evan Simoff, "LTC Goes Mainstream," Financial Planning (Sept. 1, 1998).

69.     For example, in December 2013, Genworth stated it had "very credible experience" data, as a result of it having the "largest insured long-term care database and claims history in [the] industry [with] 190,000 claims processed, $9.8B benefits paid, [and] $5MM paid every business day."  Similarly, in a March 20, 2014 Genworth presentation, its CEO boasted "we're the best in the business, we know more about the business, we have more data, and more experience, than anybody else."

70.     Genworth essentially bragged that its depth of experience and large book of business continued to set it apart from other LTC insurance providers that were struggling to keep afloat in the face of changing claims experience.

## C.     The Unraveling of Genworth's LTC Business and the Need for Substantial Future LTC Premium Increases

71.     Despite public statements to the contrary, as early as 2012 Genworth had recognized that it needed significant premium increases on its LTC policies in order to shore up its reserves.

72.     On October 30, 2013, Genworth held a press conference for investors and analysts to announce the Company's third quarter financial results.  The market was anxious to hear how Genworth's flagging LTC business was faring.  Genworth's CEO told his audience that the Company "had beg[u]n an intensive, very broad and deep review of all aspects of [our] long-term care business about 4 months ago," and that "[t]he first area of focus for us was our reserving." He explained, "we have been assessing our long-term care reserves under both GAAP and statutory reporting, and determining whether to make any changes" and that review "consider[ed] all important aspects" including "[t]he assumptions, best estimates and also a detailed review of our statutory reserves."

73.     By this time, Genworth had already instituted its first wave of premium increases on the policies at issue in this litigation.

74.     On July 29, 2014, while still reporting a profit, Genworth announced to investors – *but not its policyholders* – that its operating income on its LTC insurance business was just $6 million.  Genworth noted that claims on its long-term care policies were more "severe," *i.e.* had a longer duration and were more expensive than reflected in its carefully monitored reserve calculations.

75.     On July 30, 2014, the Company shockingly admitted (albeit not to its LTC policyholders) that, despite its earlier statements to the contrary, its reserves had "really been based on experience we had up through about 2010," experience that showed the average claim duration was only 2.2 years.  Even then though, as analysts were shocked that the "deep dive" into all aspects of the company's LTC business and reserves appeared to be a smokescreen, Genworth explained that everyone "seem[ed] to be missing a very big point:  This is an issue around our **claim reserve**," *i.e.,* not an issue with its **active life reserves** (which is the far larger reserve component).  Genworth's CEO later confirmed the upcoming reserve review would be focused only on the claim reserve and reiterated "the review would not impact the Company's assessment of its **active life reserves** or margins" and that "we have a much larger **active life reserve**, which is the reserve we hold for the bulk of the 1.2 million policyholders, and that reserve is about five times [larger than] the [disabled life reserves]."

76.     But by September 2014, Genworth began acknowledging publicly that the review of its disabled life claims reserve could "require a corresponding or related change" to the Company's active life reserves.

77.     On November 5, 2014, Genworth revealed that its post-2010 claims data showed the Company's **active life reserves** were materially under-reserved to the tune of **$531 million**. In its slide presentation explaining this new information, Genworth acknowledged that its new reserve calculations were based on updated data showing a claim duration of 2.9 years, as opposed to the 2.2 years that had previously been used to set reserves and determine operating income.

78.     As a result of this announcement, Genworth's consolidated risk-based capital ratio fell from 490% at the end of the second quarter of 2014 to 445% at the end of the third quarter of 2014 and continued to fall to 370% at the end of the second quarter of 2016 to approximately 229% currently at the end of 2020.

79.     Unbeknownst to Plaintiffs and the Class, this shortfall in reserves was going to be filled primarily from one source: **significant future rate increases on existing LTC policies**. As described hereafter, this reserve shortfall was only the tip of the iceberg. As Genworth internally began recognizing the reserve shortfall continued to grow almost exponentially, those ever-increasing shortfalls would require even more severe LTC rate increases. None of this information, however, was shared with Genworth's LTC policyholders.

**3.     Facing a Growing Hole in Reserves, Genworth Initiates A Plan For Significant Rate Increases on its LTC Policies**

80.     The discovery of inaccurate claim duration assumptions revealed staggering projected losses in future years. To account for this, Genworth instituted a plan to significantly increase premiums rates across all policies at issue in this litigation.

81.     In Genworth's Annual Report for 2012, filed with the SEC on Form 10-K on February 28, 2013, the Company disclosed that,

> **In the third quarter of 2012, we initiated another round of long-term care insurance in-force premium rate increases with the goal of achieving** an average premium increase in excess of 50% on the older generation policies and **an average premium increase in excess of 25%**

**on an earlier series of new generation policies over the next five years.** Subject to regulatory approval, this premium rate increase is expected to generate approximately $200 million to $300 million of additional annual premiums when fully implemented. **We also expect our reserve levels, and thus our expected profitability, to be impacted by policyholder behavior which could include taking reduced benefits or non-forfeiture options within their policy coverage.** The goal of these rate actions is to mitigate losses on the older generation products **and help offset higher than priced-for loss ratios due to unfavorable business mix and lower lapse rates than expected on certain newer generation products.** As of December 31, 2012, this round of rate action had been filed in 49 states and we have approvals representing approximately 20% of the expected additional annual premiums of $200 million to $300 million once fully implemented.

82.    In Genworth's Annual Report for 2013, filed with the Securities and Exchange Commission on Form 10-K on March 3, 2014, the Company again discussed its action plan for future rate increases, telling *investors*,

> In our U.S. Life Insurance business, **we are focused on the execution of our longterm care insurance strategy, which includes: obtaining significant premium rate increases on our older generation inforce blocks of longterm care insurance to improve profitability and reduce the strain on capital; requesting smaller rate increases more proactively on newer inforce blocks of longterm care insurance as needed**; and introducing new products with appropriate price benefits, using more conservative assumptions.

*       *       *

> **In the third quarter of 2012, we initiated a round of longterm care insurance inforce premium rate increases with the goal of achieving** an average premium increase in excess of 50% on the older generation policies and **an average premium increase in excess of 25% on an earlier series of new generation policies.** Subject to regulatory approval, this premium rate increase is expected to generate approximately $250 million to $300 million of additional annual premiums when fully implemented. **We also expect our reserve levels, and thus our expected profitability, to be impacted by policyholder behavior in cases where policyholders elect to take reduced benefits or nonforfeiture options within their policy coverage.** The goal of our rate actions is to mitigate losses on the older generation products **and help offset higher than priced for loss ratios due to unfavorable business mix and lower lapse rates than expected on certain newer generation products which remain profitable but with**

**returns lower than in pricing assumptions**. As of December 31, 2013, this round of rate actions had been approved in 41 states representing approximately $195 million to $200 million of the targeted premium increase when fully implemented in 2017.

(emphasis added).

83.     The company then reiterated this rate action plan in each annual report thereafter. For example, in Genworth's Annual Report for 2016, filed with the Securities and Exchange Commission on Form 10-K on February 27, 2017, the Company again discussed its future rate increase plans, telling *investors*,

> **In-force rate actions**
>
> **As part of our strategy for our long-term care insurance business, we have been implementing, and will continue to pursue, significant premium rate increases on our in-force blocks of business, as needed. The goal of our rate actions already implemented, as well as future rate actions, is to mitigate losses on our older generation policy series and help offset higher than priced-for loss ratios and lower returns on newer generation products**. Our approved premium rate actions may cause fluctuations in our loss ratios during the period when reserves are adjusted to reflect policyholders taking reduced benefits or non-forfeiture options within their policy coverage. For all of these rate action filings, we received 96 filing approvals from 25 states in 2016, representing a weighted-average increase of 28% on approximately $719 million in annualized in-force premiums. We also submitted 79 new filings in 32 states in 2016 on approximately $834 million in annualized in-force premiums.

(emphasis added).

84.     In Genworth's Annual Report for 2017, filed with the Securities and Exchange Commission on Form 10-K on February 28, 2018, the Company again described its future rate increase plans, telling investors,

> **In-force rate actions**
>
> As part of our strategy for our long-term care insurance business, we have been implementing, and expect to continue to pursue, significant premium rate increases on older generation blocks of business in order to bring those

blocks closer to a break-even point over time and reduce the strain on earnings and capital. **We are also requesting premium rate increases on newer blocks of business, as needed, some of which may be significant, to help bring their loss ratios back towards their original pricing.** Our approved premium rate actions may cause fluctuations in our loss ratios during the period when reserves are adjusted to reflect policyholders taking reduced benefits or non-forfeiture options within their policy coverage. For all of these rate action filings, we received 114 filing approvals from 36 states in 2017, representing a weighted-average increase of 28% on approximately $714 million in annualized in-force premiums. We also submitted 226 new filings in 45 states in 2017 on approximately $1.3 billion in annualized in-force premiums.

(emphasis added).

### 4.   Genworth's Internal Asset Adequacy and Cash Flow Testing Confirms the Need for Significant Future Rate Increases

85.   Genworth has performed asset adequacy and cash flow tests on its LTC business on a nearly annual basis since 2014.

86.   As a result of those tests, claim termination rates were lowered in 2014 and again in 2016.  As a result, Genworth was required to significantly strengthen its Disabled Life Reserves (DLR) on existing claimants.  Strengthening the DLR resulted in a corresponding magnified effect on its projections, as claimants were increasingly expected to stay on claim for longer periods and therefore use more of their available benefits than Genworth had previously assumed.  Genworth also continued to recognize that more policyholders were surviving to claim than was previously assumed.  In other words, Genworth's internally projected future earned premiums based on existing premium rates were not adequate to offset its revised projections for future incurred claims.

### 5.   Genworth Relies Upon its Rate Increase Action Plan to Stabilize Its LTC Reserves

87.   In Genworth's annual reports, the Company warned its investors, but not its policyholders, that "[t]he continued viability of our long-term care insurance business and GLIC

and GLICNY **is based on our ability to obtain significant price increases or benefit reductions**, as warranted and actuarially justified. **The adequacy of our current long-term care insurance reserves also depends significantly on various assumptions and our ability to successfully execute our in-force management plan through increased premiums or reduced benefits as anticipated**." (Emphasis added)

88.    Those "assumptions," Genworth explained, rely heavily on "assumptions for significant anticipated (**but not yet filed**) future premium rate increases or benefit reductions" (emphasis added).  In other words, Genworth admitted to investors that it must obtain these significant rate increases or its LTC reserves, and indeed its LTC business, will be significantly imperiled.

89.    In Genworth's Annual Report for 2020, filed with the Securities and Exchange Commission ("SEC") on Form 10-K in February, 2021, the Company explained:

> ### *Future policy benefits*
>
> The liability for future policy benefits is equal to the present value of expected future benefits and expenses, less the present value of expected future net premiums based on assumptions including projected interest rates and investment returns, health care experience, policyholder persistency or lapses, insured mortality, insured morbidity and expenses, all of which are locked-in at the time the policies are issued or acquired. **In our long-term care insurance business, our assumptions used in loss recognition testing also include significant premium rate increases and associated benefit reductions that have been filed and approved or are anticipated to be approved (including premium rate increases and associated benefit reductions not yet filed).** The liability for future policy benefits is reviewed at least annually as a part of our loss recognition testing using current assumptions based on the manner of acquiring, servicing and measuring the profitability of the insurance contracts. Loss recognition testing is generally performed at the line of business level, with acquired blocks and certain reinsured blocks tested separately. Changes in how we manage certain polices could require separate loss recognition testing and could result in future charges to net income. If loss recognition testing indicates a premium deficiency, the liability for future policy benefits is measured using updated assumptions, which become the

new locked-in assumptions utilized going forward unless another premium deficiency charge is recorded.

90.     To illustrate the magnitude of Genworth's staggering rate increase action plan, one can look at the material impact Genworth estimated premium increases would have on the Company's LTC reserves.

91.     For example, in Genworth's Annual Report for 2014 the Company reported that its "loss recognition testing of our long-term care insurance reserves under U.S. GAAP and asset adequacy testing of our statutory long-term care insurance reserves" included "assumptions for significant **anticipated (but not yet filed) future premium rate increases or benefit reductions**" and that the "assumption for future anticipated rate actions [] increased our margin by approximately **$4.9 billion**." (emphasis added)

92.     In 2015, GFI reported that Genworth was in an even deeper hole. At that point, the Company reported a Margin of $2.5 billion to $3.0 billion, but included an assumption of **$6.0 billion** in "**anticipated (but not yet filed) future premium rate increases or benefit reductions**." (emphasis added)

93.     The Company's 2016 Form 10-K reports a further deepening hole. GFI reported that Genworth had a Margin of only $800 million to $1.3 billion, but included a staggering assumption of **$7.3 billion** in to-be-filed premiums.

94.     The Company's 2017 Form 10-K reports shows no end in sight, reporting "[a]s of December 31, 2017, the assumption for future anticipated rate actions increased our U.S. GAAP long-term care insurance margin by approximately **$8.0 billion**." (emphasis added)

95.     The ratio of the recognized value of the to-be-filed rate increases to the Margin has increased over time as well. Indeed, that ratio was zero in 2013, 2.13 in 2014, between 2 and 2.4 in 2015 and between 5.6 and 9.13 in 2016.

96.     Even after Genworth benefited from several years of staggering rate increases across its LTC policy blocks, by December 31, 2020, the Company's "assumption for future in-force rate actions (anticipated to be approved, including premium rate increases and associated benefit reductions not yet filed)" remains at **$8.0 billion**.

97.     **In other words, Genworth has recognized that the only way to keep from sinking further into the hole is for it to rely upon even greater premium increases on policies that were already substantially increased.**

98.     Even accounting for the to-be-filed rate increases, Genworth's Margin has seen a staggering decline.  Since 2013, the reported Margin has declined by as much as 75%.



99.     As shown above, Genworth's reliance on to-be-filed rate increases has been used to backfill a massive decline in the future prospects of its LTC book of business.

100.    Genworth's rate increase action plan was not just aspirational.  The Company has admitted to its shareholders that executing this rate increase plan is a critical component of

Genworth's future viability in the LTC insurance industry. The Company's assumptions for future approvals of truly massive premium increases has been a material part of Genworth's asset adequacy testing and financial reporting since 2012. Genworth has known throughout that period that it will either attain massive and successive premium increases, or it faces a material risk of not being able to support the policies it has written. Genworth shared none of this information with Plaintiffs or the Class members during the relevant time.

101.    It bears repeating that Plaintiffs do not challenge Genworth's need for these rate increases. They challenge Genworth's *failure to inform policyholders* of its rate increase action plan that calls for successive and substantial rate increases, and the need for even more increases in the future. Genworth has already pushed through massive LTC premium increases on the Class. They did so piecemeal and without ever informing Plaintiffs or the Class members of the Company's reliance upon these increases and *future increases* just to rebuild adequate reserves.

102.    Full disclosures as early as 2013 of the massive reserve hole Genworth needed to fill with rate increases would have afforded policyholders material information about the first wave of increases, the need for more immediate increases, and the staggering size of the increases needed in the future. Genworth also failed to warn policyholders of the effect not getting those increases approved might have on the future viability of their LTC insurer, and the impact that its need for additional rate increases already had on its financial condition and financial rating.

### 6.    To Ensure Execution of its Rate Increase Action Plans, Genworth Ties Executive Compensation to Rate Increase Approvals

103.    To motivate the executives in charge of executing Genworth's internal rate increase action plans to execute those plans quickly and fully, Genworth ties aspects of those executives' compensation to approvals of the rate increases themselves.

104.    For example, in Genworth's 2019 Annual Proxy Statement filed with the SEC on November 1, 2019, the Company featured for its shareholders the "2018 Company Performance Highlights," which included "**Continued progress on multi-year LTC rate action plan – with $400 million incremental annual premium increases approved in 2018, with an N[et] P[resent] V[alue] of over $2 billion**" and "**Cumulative NPV of $10.5 billion of approved LTC rate actions since 2012**." (emphasis added)  To be clear, this was the staggering aggregate amount of premium increases Genworth had obtained (in part on the policies at issue in this litigation) since 2012.

105.    Genworth also acknowledged to its shareholders that while it still experienced "[n]egative performance in U.S. Life Insurance driven by actuarial assumption updates on legacy LTC and life insurance policies," it promised them **"[w]e expect to manage these businesses within their existing capital and future LTC premium rate actions, with no further plans to infuse or extract capital**." (emphasis added)  In other words, Genworth reassured its investors that it had no plans to bolster flagging LTC reserves with any more cash from the Company, **and would instead rely entirely on future premium rate increases on Class members and other policyholders to bring these reserves to adequate levels**.

106.    Explaining how its executive compensation was then directly tied to successful execution of these rate increase action plans, Genworth stated, "[o]ur executive compensation program supports our business strategy through program design that links executive compensation to achievement of business and financial growth goals," noting "[a] significant portion of our targeted executive pay (79% or more in 2018) is variable and covers annual and multi-year performance periods."

107.     Lest there be any doubt that these performance goals included execution of the multi-year rate increase action plans, Genworth stated that the "financial objectives" for its named executive officers included a metric specifically for "Gross incremental premiums for LTC in-force rate actions."   And while Genworth noted that "at the request of certain state insurance regulators, the company did not set specific incremental LTC premium increase financial targets for Genworth's Chief Executive Officer," his compensation does include "U.S. Life Insurance: Operating Income metrics" which, on information and belief, still accounts for premium increases that add income to each current fiscal year.

108.     For fiscal year 2018, Genworth reported that it "exceeded our internal targets for premium rate increases on our unprofitable legacy blocks of LTC insurance, and continued execution of our multi-year rate action filing plan."   As a result, Genworth's "2016-2018 performance stock unit ("PSU") awards paid out above target, driven by strong mortgage insurance performance **and LTC rate action achievements**." (emphasis added).   In other words, Genworth was even more successful than internally forecast at achieving rate increases on Class members' policies, and as a result, Genworth paid significant additional compensation to its named executives.

109.     To justify the enhanced compensation to its executives in 2018, Genworth also quantified for investors the success it achieved, noting "[i]n our U.S. life insurance companies, we measured incremental premiums approved for LTC insurance in-force actions and operating income metrics."   Its "2018 Target" for "Gross incremental premiums approved for LTC in-force actions" was $304 million.   But Genworth was actually successful in recognizing $394 million from premium increases in 2018, **a 30% positive variance from its target**.   This means that not

only was Genworth successfully executing its rate increase action plans, it was actually far surpassing its internally forecast targets.

### D.    The Parable of Penn Treaty

110.    One need not look far to find an example of the what looms in policyholders' future if they continue to pay staggering premium increases, but even those increases prove inadequate to shore up Genworth's reserves.

111.    On March 2, 2017, Commonwealth Court Judge Mary Hannah Leavitt in Pennsylvania ordered the liquidation of Penn Treaty Network America Insurance Company and American Network Insurance Company (together, "Penn Treaty"), insurance companies primarily in the business of issuing LTC insurance policies (more than 98% of Penn Treaty's policies were LTC policies).  Penn Treaty had 76,000 policyholders nationwide.  At its peak, in 2000, Penn Treaty had about 250,000 policies in force and $363 million in annual premium revenue.  But by October 2008, the company had ceased to sell new policies and was in dire financial straits, rather similar to Genworth's position today if its plan for staggering future rate increases is frustrated.

112.    In January 2009, the Commonwealth Court placed Penn Treaty into rehabilitation and appointed the Pennsylvania Insurance Department ("PID"), the regulator in Penn Treaty's domiciliary state, as the rehabilitator.  Following various analyses, PID sought to liquidate Penn Treaty.  Immediately prior to the rehabilitation in 2008, Penn Treaty had $1.1 billion in admitted assets and $1.2 billion in liabilities.  By 2015, the company's assets had dwindled to $656 million and its liabilities had ballooned to $4.4 billion.  At liquidation in 2017, Penn Treaty had $500 million in assets to cover LTC claims projected to be $4.6 billion.

113.    By the time PID got involved, it was too late for Penn Treaty policyholders. Although signs of Penn Treaty's insolvency were apparent in the mid-2000s, the Pennsylvania regulators did not take action until 2009.

114.     Genworth's problems might run even deeper and affect a far larger group of policyholders.

115.     For its part, Genworth cites the Penn Treaty episode as support for regulators to approve pending and future rate increases.  In a November 2016 article, Genworth's CEO chided regulators for failing to approve premium increases that would assist in keeping insurers solvent, citing the Penn Treaty issues.  *Genworth says higher LTCI rates beat liquidation*, LifeHealthPro.com (Nov. 4, 2016), http://www.lifehealthpro.com/2016/11/04/genworth-says-higher-ltci-rates-beat-liquidation.

116.     Premium increases may be warranted when actuarial experience justifies them and regulators approve them.  Again, this case does not challenge Genworth's LTC premiums. A problem arises, though, when policyholders elect to renew their policies for years at substantially increased premiums rates, only to see the insurer still fold.  In that instance, the policyholders are merely throwing good money after bad.  Genworth owes its insureds a candid and full disclosure of its current financial condition, the role future premium increases play in achieving financial stability, and the magnitude of future increases necessary to ensure that stability.  Genworth has offered none of this to Plaintiffs and the Class.

## E.     At First, Genworth Internally Recognizes the Need to be Transparent with its Rate Increase Plan

117.     In an internal PowerPoint presentation, Genworth described the need for rate increases across several of its major LTC policy Classes, including those at issue here.  In line with what it told investors, Genworth explained that its "actuaries lead a team to perform in-depth review of our in-force long term care insurance business."  The Company summarized its findings as follows:

> We continue to see higher than expected persistency among the older blocks
> of our in-force long term care insurance products. While this demonstrates

that policyholders value their coverage, it is one of our pricing challenges. Because more people than expected are retaining coverage, we are seeing a higher number of claims than expected when the product was priced. Prior rate increases partially mitigated these impacts. We have adjusted for this persistence with our newer products, priced with updated lapse rates assumptions of 1% or less.

118. Genworth then laid out its plan to address these findings,

In conjunction with this ongoing review process, Genworth has adopted a more proactive strategy in managing our long term care business. First, we will continue to work closely with regulators to implement rate increases on certain older blocks of long term care business in an attempt to bring these blocks closer to break even going forward. **Second, we will continue to evaluate the experience of our newer blocks of long term care insurance business. If the actual or projected experience warrants, we will seek a premium rate increase earlier in the product lifecycle. And third, we will continue to leverage our more than 40 years of experience to develop new products that are both innovative and incorporate our most current pricing assumptions.**

(emphasis added).

119. Genworth then further described the inforce rate action plans, several of which are the subject of this lawsuit (those covering the "Classic Select" and "Privilege Choice" policies which are the "Choice 2/2.1" policies included in this lawsuit) as follows:

**In-Force Management Project (IFMP)**

In 2007, after identifying a higher than anticipated persistency rate, Genworth implemented a rate increase of 8-12% on 3-Day, PrePCS, PCS I and PCS II policies.

**In-Force Rate Action I (IFA I)**

In 2010, Genworth applied an 18% increase on PCS I and PCS II policies.

**In-Force Rate Action II (IFA II)**

In 2012, Genworth applied rate increases on Pre-PCS, PCS I, PCS II and Choice I policies. During IFA II we applied larger increases to policies with lifetime benefit periods. Among other things, this is because lifetime benefits can correlate to longer claim durations. The average claim on a policy with lifetime benefits lasts 45% longer than the average limited

duration policy claim.  Lifetime policies represent a greater, less predictable risk because the maximum benefit is uncapped.

**In-Force Rate Action III (IFA III)**

In the third quarter of 2013, Genworth began filing rate increases on Privileged Choice and Classic Select policies. **Our intent is to intervene earlier in the life of the products to avoid larger increases in the future and provide greater transparency to our policyholders and distribution partners.**

(emphasis added).

120.    Genworth also included the following slide outlining then extent of its various rate increase actions:

| Policy Series (Years Sold) | Requested Rate Increase Amount (Year Increase Requested) | | | | |
|---|---|---|---|---|---|
| | FMP (2007) | IFA I (2010) | IFA II Limited (2012 Benefit Period) | IFA II Lifetime (2012 Benefit Period) | IFA III (2013) |
| 3-Day (1974 - 1988) | 8% | - | - | - | |
| Pre-PCS (1988 - 2003) | 9% | - | 35% | 88% | |
| PCS I (1993 - 2005) | 12% | 18% | 60% | 95% | - |
| PCS II (1997 - 2005) | 11% | 18% | 63% | 78% | - |
| Choice I (2001 - 2008) | - | - | 44% | 60% | - |
| Classic Select (2003 - 2013) | - | - | - | - | 5% - 12.8% |
| Privileged Choice (2003 - 2013) | - | - | - | - | 5% - 12.8% |

121.    In subsequent slides, Genworth explained,

Our understanding of policyholder behavior has deepened considerably since our first rate increase in 2007. Specifically, very few policyholders

34

lapse their policies in connection with a rate increase. This demonstrates that policyholders value their coverage.

**However, we recognize that policyholders are increasingly frustrated by the potential lack of transparency into possible future increases. For this reason, Genworth adopted a different approach in connection with IFA II, specifically for rate actions requested in 2012.**

**In situations where the state approves the entire amount requested, whether implemented completely in the first year or over a multi-year period, we intend to not seek additional increases for at least five years from the time a state approves the premium rate increase.**

**We believe this approach allows our policyholders to plan and gives them the time and information necessary to understand and fully consider options**.

(emphasis added).

122.    Addressing the admitted need for transparent communication of its rate increases to policyholders, Genworth stated,

We recognize the impact rate actions have on our policyholders and distribution partners, and we are committed to providing dedicated support throughout the process. As states approve requested rate increases, we communicate by:

*          *          *

3. Mailing initial notices to impacted policyholders at least 60 days before their anniversary billing dates.

123.    Genworth also fully appreciated the conundrum significant rate increases foist upon policyholders,

Although policies with increased premiums still provide considerable value in light of the significant benefits they provide, **some clients may not be in a financial position, or be willing, to pay for the same level of coverage at the new rates.** There are several options available to clients who want to maximize the value of their coverage while keeping premiums at approximately the same level. Many of these options may be used together to balance policyholders' coverage needs with their budgets. Policyholders have 60 days from the date Genworth receives their benefit change

confirmation to return to their original benefits, should they change their minds.

(emphasis added).

124.    Of course, for LTC policyholders to make informed decisions about which of these various options to choose in light of the rate increases, they need a complete picture of Genworth's reserves on these policies and what future rate increases will be required.  They also need to know what future rate increases Genworth intends to seek, including the magnitude and timing of those increases.  Finally, they need to understand how Genworth solvency depends upon obtaining substantial future rate increases and how that need for additional rate increases has already impacted the Company's financial condition and financial rating.

125.    Genworth then noted, "**We continue to make tough but smart decisions designed to give our policyholders transparency into rate increases, coverage options and greater predictability of premiums**." (emphasis added).

126.    Unfortunately, critical information about Genworth's plans for future rate increases was *not* included in letters sent to Plaintiffs or Class members until 2018.  As illustrated in the Plaintiffs' experiences below, none of them were provided material information that would have afforded them the necessary transparency into Genworth's future rate increase plans that would have, in turn, allowed them to make informed decisions.  Nor were any of them afforded information about Genworth's dependence on future rate increases to remain solvent and how the need for these rate increases had already substantially reduced the Company's credit rating.  The omission of this material information is central to their claims.

**F.    Other LTC Providers Disclose Information About Future Rate Increases While Genworth Remains Silent**

127.    Other LTC providers have afforded their policyholders information about their future rate increase requests, recognizing this information must be provided to allow policyholders

to adequately consider their election options in response to each rate increase and thus avoid frustrating their ability to make informed elections.

128.    For example, in a letter informing its policyholders of a recently approved 10% rate increase, John Hancock explained

> We do want you to know that, based on our analysis, *we had determined there was a need for a 46.54% increase and this was the amount we filed with the New York Insurance Department*.  However, the rate increase we are able to implement at this time is 10%.  *As a result, we anticipate that we will be requesting further premium increases in the future, and your premiums may be affected.  Please note that due to the delayed implementation of the full rate increase, the total future increase amount that we request may change.*

129.    That information explained to John Hancock's policyholders the extent of the increase it had initially sought and that having only a small portion of the increase approved meant that future rate increase requests would be forthcoming.  It also informed policyholders that since the full request had not been approved and would need to be phased in, that future rate increase requests might be even larger than initially requested.

130.    But John Hancock made a further disclosure.  On page 2 of the same letter, John Hancock also included the following "**Important Notice**",

> *Following a more recent analysis of our business in 2016, we have determined a need for a premium rate increase in addition to the remaining balance of the current increase described on page 1.  The additional rate increase has been or will be filed.*  Although the final amount and timing of the additional rate increase to be implemented is not known at this time, we are requesting an average increase of approximately 30% across all of our policy series, which is in addition to the remaining balance of the current increase described on page 1.

This disclosure further informed policyholders that John Hancock's recent internal analysis determined the need for even greater increases than had been initially requested.

131.     Genworth possessed the same information about its own needs and plans for future rate increases as John Hancock.  Instead of disclosing that information, however, Genworth withheld it from its policyholders.

132.     When John Hancock sent its next rate increase announcement, it informed policyholders that "[w]e do want you to know that this premium rate increase *only represents a portion of the total requested rate increase we filed with the applicable Insurance Department*. As a result, we *will be* requesting further premium increases in the future, and your premiums may be affected." Ex. A, p. 1 (emphasis added).

133.     These are precisely the type of disclosures Genworth had a duty to make but did not.

## G.     Experience of the Class

134.     Genworth began selling Class Policies throughout the country in 2003.  The policies were generally sold on Genworth policy form numbers 7035AX, 7037C, 7037CRev, 7042 et al, 7044 et al., 7042Rev et al, and 7044Rev et al. Genworth had nearly 370,000 Class Policy insureds at the end of 2020.

135.     Like the experience of other Genworth long term care policy blocks, these policyholders were subjected to the same type of serial rate increases beginning after 2012 which were all rolled out pursuant to Genworth's internal rate increase actions plans. And like other policy blocks, these policyholders were not afforded any information about Genworth's internal plans for future rate increases.

### First Wave of Rate Increases

136.     Class policyholders all paid level premiums until 2013, when Genworth began requesting 12.8% premium increases from state insurance regulators for most Class Policies

nationwide.  When making these requests, Genworth told regulators that the increases it could justify were more than twice what it was requesting, explaining for example, "[t]he maximum allowable rate increase under the 58%/85% test of the Rate Stability regulation is 30.4%, which is larger than the 12.8% requested in this filing. Genworth has limited this rate increase request to the rate at which 99.0% of the policies to which this rate increase applies nationwide meet the rate comparison requirements of the Rate Stability regulation."

137.    Genworth also informed regulators, but not policyholders, that "[p]olicies to which this rate increase filing applies may also be subject to future rate increases if future experience exceeds a 10% margin for adverse experience. For this purpose, [Genworth] define[d] 'exceeding a 10% margin' as any change that results in a lifetime loss ratio greater than projected in Exhibit III of this memorandum, which includes a 10% margin for adverse experience."

138.    Aware that the rate increase requests Genworth needed were more than twice the increases it was applying for nationwide, Genworth knew that additional rate increase requests would be made in the near future.

139.    The vast majority of states approved the requested 12.8% rate increases in full.

**Second Wave of Rate Increases**

140.    In 2016, Genworth began seeking the next wave of rate increases on the Class Policies.  In these filings, Genworth reminded regulators that the prior rate increase request of 12.8% "was limited by the new business rate comparison requirement of Section 20 of the Long Term Care Insurance Model Regulation (hereinafter referred to as the Rate Stability regulation) and was based on GLIC's best estimate actuarial assumptions at the time. *Without the new business rate comparison limitation, GLIC would have pursued the maximum allowable rate increase under the 58%/85% test of the Rate Stability regulation of 30.4%.*"  This, of course, meant that even

when the initial 12.8% rate increases were requested, Genworth knew that additional future rate increases would be needed.

141.     In this next round, Genworth was now seeking roughly a 50% increase in most states.   For example, in Oregon, where Plaintiff Haney resides, Genworth told the insurance commissioner, "In this filing, GLIC requests a premium rate increase of 48.3% on the above-mentioned policy forms. We demonstrate below that this revised requested premium rate increase satisfies both the Long Term Care regulatory requirements of Oregon and the Rate Stability regulation. This new filing is based on emerging experience and updated assumptions, which were revised following a comprehensive Long Term Care assumption reviews in 2014 and 2015."

142.     Genworth further explained to regulators, but not policyholders, that "[d]elays in filing or approving warranted premium rate increases will require higher percentage increases to fewer policyholders in the future in order to obtain the same Lifetime Loss Ratio."  Expanding on this, Genworth stated:

> If experience emerges as currently expected, *timely implementation of the requested 48.3% premium rate increase should prevent the need for future premium rate increases. However, if rate increases are delayed, due to late filings or approvals, less future premium capacity remains in these blocks to absorb the rate increase*. As a result, a higher percentage of future premium rate increase must be applied to fewer policyholders in order to obtain the same Lifetime Loss Ratio.  The calculations below assume a delay in premium rate increases but no other change.
>
> *Note that, if the requested 48.3% premium rate increase is delayed six years, the increase necessary to achieve the same Lifetime Loss Ratio roughly doubles*.

(emphasis added).

143.     According to its actuarial memorandum, even a one-year delay in approval of the full increase requested would require an *additional* 12.5% increase.  In other words, for any state

that did not *immediately approve* the *full* increase requested, Genworth *knew* that additional future rate increases would be needed and justified.

144.    In Oregon, for example, where Plaintiffs Haney and Swenson purchased their policies, the insurance commissioner approved only a 28.98% increase, roughly half of the 48.3% increase Genworth sought, more than a year after it was requested.  As a result, Genworth knew that future rate increases would be sought, and it knew this *before* it sent rate increase notifications to Oregon policyholders.  Nevertheless, Genworth stated in those notifications only that "we reserve the right to change premiums and it is possible that your premium will increase again in the future."

145.    Likewise, in Ohio, where Plaintiff Rausch purchased her policy, the insurance commission approved only a 15% increase, far below the 46.4% increase Genworth sought, six months after it was requested.  Again, as a result Genworth knew that future rate increases would be sought, and it knew this *before* it sent rate increase notifications to Ohio policyholders.  Nevertheless, Genworth stated in those notifications only that "we reserve the right to change premiums and it is possible that your premium will increase again in the future."

146.    Similarly, in Arkansas, where Plaintiff Wooten purchased his policy, the insurance commissioner approved only a 25% increase, roughly half of the 49.4% increase Genworth sought, three months after it was requested.  Again, because the full increase had not been approved immediately, Genworth knew that future rate increases would be sought, and it knew this *before* it sent rate increase notifications to Arkansas policyholders.  Nevertheless, Genworth stated in those notifications only that "we reserve the right to change premiums and it is possible that your premium will increase again in the future."

147.     Additionally, Genworth recognized at this time that its newer block of Class Policies faced the same extreme challenges that were necessitating staggering increases on its older blocks of business, like the PCS, PCS II and Choice 1 policy blocks that are the subject of separate litigations.  For example, Genworth noted in its correspondence with regulators:

> "Choice 2 and 2.1 morbidity trends are troubling. Not only are more policyholders persisting to longer policy durations, but actual claims are trending higher than originally expected. In updating assumptions during 2014 and 2015, GLIC considered both Choice 2 and 2.1 claim trends *as well as more credible claims experience data from older blocks of business with policyholders at more advanced ages and with longer duration claims. Based on this analysis, future claim severity assumptions increased during 2014.*"

(emphasis added).

148.     These updated claim severity assumptions, along with Genworth's updated cash flow testing models, all clearly showed the immediate need for additional future rate increases beyond those being requested in 2016.  Again, policyholders were never afforded this information.

### Third Wave of Rate Increases

149.     Right on track with its internal rate increase action plains, in 2017 Genworth began seeking the third wave of nationwide increases on the Class Policies.   Genworth reminded regulators, "In our prior filing [] we stated our intention to seek the remainder of the requested rate increase if it was not approved in full."

150.     For example, in connection with its rate increase request in Oregon, Genworth recounted:

> On March 10, 2014, GLIC requested a 12.8% on the above-referenced policy forms and on April 18, 2014, Oregon approved a 12.8% premium rate increase (SERFF #GEFA-129136839).  On May 27, 2016, GLIC requested a 48.3% on the above-referenced policy forms and on June 8, 2017, Oregon approved a 28.98% premium rate increase (SERFF #GEFA-130591978). **As anticipated in our prior filing, since Oregon has not approved the prior requested rate increase in full, as justified by our experience, the above policies are subject to an additional rate increase.**

In this filing, GLIC requests a premium rate increase of 27.8% on the above-mentioned policy forms. We demonstrate that this premium rate increase satisfies the Long Term Care regulatory requirements of Oregon and the Rate Stability regulation. This new filing is based on emerging experience and updated assumptions, which were revised following comprehensive Long Term Care assumption reviews in 2015 and 2016.

(emphasis added).

151.    Likewise in Ohio, where Genworth sought another 15% rate increase in 2017, the

company explained:

On April 16, 2015, Ohio approved a 15% premium rate increase (SERFF #GEFA-129136837). On June 7, 2016, GLIC requested a 46.4% on the above-referenced policy forms and on November 16, 2016, Ohio approved a 15% premium rate increase (SERFF #GEFA-130470413). **As anticipated in our prior filing, since Ohio has not approved the prior actuarially justified rate increase in full, as justified by our experience, the above policies are subject to an additional rate increase.**

\*     \*     \*

In this filing, GLIC could actuarially justify a rate increase of 41.1% on the above-mentioned policy forms. We demonstrate below that this premium rate increase satisfies the Long Term Care regulatory requirements of Ohio and the Rate Stability regulation. This new filing is based on emerging experience and updated assumptions, which were revised following comprehensive Long Term Care assumption reviews in 2015 and 2016. However, per the phone call received on October 14, 2016 from the Ohio Department of Insurance on filing no. GEFA-130470413, GLIC requests a premium rate increase of 15% on the above-mentioned policy forms, which will enhance premium adequacy but will not be sufficient to meet GLIC expected obligations. Further rate increases are anticipated on these policy forms.

**With the limitation of a rate increase at 15% per year, the table below illustrates the fact that it will take an additional two years of rate increases, following this one, in order for GLIC to achieve the same lifetime loss ratio. This will result in an accumulated rate increase of 44.7% over the three years**.

(emphasis added).

152.    Similarly, in Arkansas, where Genworth sought another rate increase of 31.3%, the

Company explained:

> On November 14, 2013, GLIC requested a 12.8% on the above-referenced policy forms and on January 27, 2015, Arkansas approved a 12.8% premium rate increase (SERFF #GEFA-129136807). On May 16, 2016, GLIC requested a 49.4% on the above-referenced policy forms and on August 16, 2016, Arkansas approved a 25% premium rate increase (SERFF #GEFA-130574485). **As anticipated in our prior filing, since Arkansas has not approved the prior requested rate increase in full, as justified by our experience, the above policies are subject to an additional rate increase.**
>
> *     *     *
>
> In this filing, GLIC requests a premium rate increase of 31.3% on the above-mentioned policy forms. We demonstrate below that this premium rate increase satisfies the Long Term Care regulatory requirements of Arkansas and the Rate Stability regulation. This new filing is based on emerging experience and updated assumptions, which were revised following comprehensive Long Term Care assumption reviews in 2015 and 2016.

(emphasis added).

153.     As before, Genworth also warned regulators that any approval delays, or failure to approve the full amount requested, would result in additional rate action requests in the future.

154.     Following these 2017 increase requests, Oregon did not approve the request until 2020, three years after it was made.  And even though Oregon approved an increase *greater* than Genworth requested, within 9 months Genworth made another rate increase request seeking an additional 38.6% increase.  Ohio approved another 15% increase, which was well below the 41.4% Genworth told Ohio was actuarially justified.  Arkansas approved only a 25% increase, which too was less than Genworth had requested.  In each instance, because the regulator had failed to approve the increase Genworth had requested, or failed to approve any increase for several years, Genworth knew that additional future rate increases would be forthcoming.

155.     After these increases were approved, Genworth sent notices to policyholders that were subject to rate increases again explaining only "we reserve the right to change premiums and it is possible that your premium will increase again in the future."

**Subsequent Waves of Rate Increases**

156. Genworth has now issued at least six waves of rate increases on the Class Policies and, on information and belief, has several more waves planned in the future. The timing and amount of these rate increase requests have begun to depend more particularly on the treatment of past rate increase requests by each state's insurance commission. In some states that have not approved all of Genworth's past rate increase requests in full, Genworth is still playing "catch-up." In other states that have tended to approve all of the requested rate increases, Genworth in some instances has reduced the frequency of those subsequent requests. In all states, however, Genworth is still planning additional future rate increase requests in line with its internal MYRAP, but it has not adequately disclosed its plans or need for these future rate increases to policyholders.

**Genworth Withheld Material Information From All Class members Throughout the Class Period**

157. Each time Genworth raised premium rates, it sent each effected policyholder a rate increase announcement letter. In these notices Genworth uniformly told policyholders only, "please note that in accordance with the terms of your policy, we reserve the right to change premiums and it is *possible* that your premium will increase again in the future." (emphasis added).

158. While these disclosures reiterate Genworth's "right" to increase premiums and note future premium increases are "possible," they do not begin to afford policyholders material information about the inevitability of future increases or Genworth's need for them. *First*, they fail to inform policyholders that Genworth initially requested approval for significantly higher increases and having only a partial increase approved all but ensured successive rate increases in the very near future as the initial increase requested was "phased-in." Even in states that approved the initial rate increase requests in full, the disclosures do not even mention that Genworth was already planning to request significant additional rate increases in the immediate future. *Second*,

they fail to inform policyholders of the sheer magnitude of the first rate increase initially requested (if it were not granted in full) and the staggering increases that were to come. *Third*, they fail to disclose to policyholders that Genworth had initiated a rate increase action plan that would require substantial additional rate increases above the current premium rates at certain points. *Fourth*, they fail to inform policyholders that Genworth's asset adequacy testing and financial reporting depended upon these massive rate increases to ensure reserves were adequate to pay future claims. *Fifth*, they failed to inform policyholders that Genworth's need for future rate increases had already substantially reduced its credit rating.

159.    Genworth even included a form Frequently Asked Questions ("FAQ") insert with some of the rate increase announcement letters, but even this document failed to provide the material information noted above. In the FAQ insert, Genworth stated generally

> **Q:     The letter states that Genworth "reserves the right to change premiums and it is likely that you premium rate will increase again in the future."  What does that mean?**
>
> A:     Your policy form gives us the right to increase your premium on a class-wide basis.  Therefore, we reserve the right to change premiums again in the future, on a class-wide basis, if our claims experience warrants an increase.  We routinely send you a brochure entitled *Important Information About Long Term Care Insurance Premiums*, reminding policyholders that premiums can be increased on a class-wide basis.  Since the estimated claims over the life of your policy form are significantly higher today that we originally anticipated when it was priced, it is likely that your premium rate will increase again in the future.

160.    Again, this statement omits the material information about the magnitude, frequency and necessity of future rate increases in the near-term and the other material information set forth above.

161.    Genworth also periodically sent policyholders a document entitled "Important Information About Long Term Care Insurance Premiums." This form notice to policyholders has consistently addressed Genworth's right to change premiums but has not offered any substantive

discussion of Genworth's plans to do so.  Some of these notices contain the following discussion of rate increases:

> **Can premiums increase over the life of my policy?**
>
> They could.  Insurers have the right to change their rates on existing policies at any point in time, providing the new rates are implemented in accordance with state regulatory requirements.  Your long term care insurance policy is "guaranteed renewable" which means you have the right to continue your policy in force as long as you pay the premiums that are due in a timely manner, during which time we may not unilaterally change any terms of your policy, or decline to renew it, except to increase premium rates.  Our goal has been to price our long term care insurance policies so that premiums will remain at original levels for the duration of the policies.  Nonetheless, it is possible that rates may have to be increased for all policies in the same state and class (i.e., with a policy similar to yours).  Your policy's premiums will not increase just because of your age, deteriorating health or individual claims experience.  Any increase will be implemented in accordance with your state's requirement, and the Company will give you reasonable advance notice (at least 30 days) of the change.
>
> The NAIC Long Term Care Insurance Model Regulation also includes a rigorous process for rate increase filings.  Actuaries must explain which pricing assumptions are not being realized and why, and cite any other actions being taken by the insurer.  It generally requires significantly higher loss ratio assumptions for the increased premiums than for the original premiums, and reporting of actual to projected results for three years.  Based on these reports, a regulator could direct rate adjustments, special replacement offers or other indicated remedies.

162.    What is striking about this notice is what it lacks.  While Genworth went into great detail describing the regulatory process for rate increases, it said *nothing* about Genworth's internal plans to request a series of rate increase approvals from these regulators.  In fact, in another section of this notice, entitled "How do insurers determine the premium rates they charge?", Genworth describes:

> The National Association of Insurance Commissioners (NAIC) Long Term Care Insurance Model Regulation includes a rigorous process for new rate filings.  Although currently not implemented in many states, **the Model requires professional actuaries to certify that the initial filed rate schedule is sufficient to cover anticipated costs under moderately adverse experience, and is reasonably expected to be sufficient over the life of the policy form filed, with no future premium increases anticipated.**  The actuaries must certify that policy

design, coverages, and underwriting and claims adjudication processes have been considered; that the contract reserves assumptions include reasonable margins for adverse experience; and that benefits are reasonable in relation to premiums, with sample calculations provided, among other things.

(emphasis added).

163.    Again, while this notice describes what Genworth must do to obtain regulatory approval of a rate increase, it fails to provide *any* explanation to policyholders that Genworth's own rate increase applications specifically noted that rate increases at a level necessary to avoid the need for future rate increases were *not* being approved by regulators, and in some instances *could not even be applied for* under rate stabilization regulations in many states. Thus, Genworth *knew* that future rate increases would be necessary and justified when it sent these notices, but simply failed to alert policyholders to that material fact.

164.    Later notices contain the following discussion of rate increases:

**Can the premiums for my coverage increase over my lifetime?**

Yes, they could. Insurers have the right to change rates on existing coverage, subject to any rate guarantees in effect with your coverage, and provided that the new rates are implemented in accordance with state regulatory requirements. Rates would have to be changed for all coverage in the same state and class (i.e., all coverage similar to yours issued in the same state on the same policy form and considered by Genworth and the state regulator as part of the same class). In the event of a change, the insurer may not unilaterally change any terms of your coverage or decline to continue it.

The premium for your coverage will not change because of changes to your individual circumstances, including your age, changes to your health or your claims experience. If a rate increase is necessary, we will give you advance notice (at least 30 days) of such a change. Your premiums may increase at times over the life of your coverage.

165.    Once again, the notices to policyholders that specifically addressed premium rate increases failed to provide *any* information to policyholders about Genworth internal plans for future rate increases.

166.    When Genworth sold these policies to Plaintiffs and the Class members in the early 2000s, they emphasized the Company's long track record with LTC insurance and highlighted the fact that Genworth had never before raised rates.  When policyholders started receiving the first rate increase letters announcing increases of 12%, 18%, or even 40+%, they could have never imagined that successive increases in *greater* amounts would still be coming in the next 2-4 years.

167.    Genworth, though, possessed this material information when it sent the increase announcements to its policyholders.  Informing them that future increases were "possible" or even "likely" does not begin to afford its insureds all material information needed to make informed decisions.

168.    Each time a policyholder received an increase announcement, they were forced to make an election of various options that included paying the increased premiums to retain their current benefits, reducing benefits for a lesser premium, or walking away from the policy and retaining a "paid-up" benefit.  It essentially required the policyholders to purchase the insurance anew.  Most of the elections would be permanent.  For a policyholder that had already made a decade's worth of premiums payments, essentially investments in future benefits, these were not easy decisions.  Without the benefit of full information, policyholders simply could not make an informed decision.

169.    Genworth's need for rate increases was consistent across all policies in this litigation.  Genworth's reserves for this Class are not individual to any state, but are collective. These policyholders also all received the same form letters announcing the price increases and were shielded from the same material information about the need for significant and successive future rate increases.

## CLASS ACTION ALLEGATIONS

170.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of themselves and the following Class:

> All persons residing in the United States who have Choice 2, Choice 2.1,
> California CADE, California Reprice, or California Unbundled policies,
> and State variations of those policies issued in any of the fifty (50) States of
> the United States or the District of Columbia during the Class Period (the
> "Class").

171.    Excluded from the Class are: (1) those policyholders whose policies entered Non-

forfeiture Status[3] or Fully Paid-up Status[4] prior to January 1, 2014; (2) those policyholders whose

policy is Lapsed[5] or Terminated[6] and is outside any period Genworth allows for the policy to be

automatically reinstated with payment of past due premium,; (3) those policyholders who are

deceased at any time before relief is obtained for them in this action,; (4) Genworth's current

officers, directors, and employees; and (5) the Judge and the Judge's immediate family and staff.

---

[3] "Non-Forfeiture Status" means a status whereby a policyholder has exercised a "Non-Forfeiture Option." Non-Forfeiture Options include benefits under an optional Non-Forfeiture Benefit Rider, the Limited Benefits Upon Lapse Due to a Substantial Premium Increase, Contingent Non-forfeiture Benefit, the Limited Non-Forfeiture Option; the Optional Limited Benefit Endorsement, or the Limited Benefit with Payment for Partial Policy Disposition.

[4] "Fully Paid-Up Status" means a status whereby a Class Policy is continued in full force and effect and no further premiums are owed. A Class Policy in Fully Paid-Up Status does not include a Class Policy that is in a Non-Forfeiture Status.

[5] "Lapse" or "lapsed" means a status whereby a policy is no longer in force because premium was not paid as required. A lapsed policy terminates and cannot be reinstated if it is outside any period Genworth allows for the policy to be automatically reinstated with payment of past due premium. For purposes of this Agreement, a policy that goes on Non-Forfeiture Status is not a lapsed policy

[6] "Terminated" means a status whereby a policy is no longer in force and is unable to be automatically reinstated by the policyholder with payment of past due premium. It includes, for example, a policy that has lapsed beyond the period permitted for automatic reinstatement, a policy that has been cancelled, or a policy (including a policy in Non-Forfeiture Status) that is no longer in force because all available benefits have been exhausted.

172.    The Class Period is January 1, 2013 through the present.

173.    The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).

174.    The Class consists of hundreds of thousands of Class members and is thus so numerous that joinder of all members is impracticable.  For example, there are at least three hundred thousand (300,000) Choice 2/2.1 policyholders nationwide.

175.    Plaintiffs and each of the Class members have renewed their LTC policies with GLIC or GLICNY since 2012 and were damaged by Defendants' failure to adequately inform them of material information necessary to make important decisions about what policy options to elect at that time.  Plaintiffs are each members of the Class, and their claims are typical of the claims of the members of the Class.  The harm suffered by Plaintiffs and all other Class members was, and is, caused by the same misconduct by Genworth.

176.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions that may affect individual Class members.  Among the many questions of law and fact common to the Class are the following:

   • whether Genworth omitted information from the rate increase letters and other correspondence with the Class necessary to make their partial disclosures not misleading;

   • whether the omitted information was material;

   • whether Plaintiffs and the Class are entitled to a declaration that Genworth's prior correspondence omitted material information necessary to make their partial disclosures not misleading;

   • whether Genworth should be enjoined from further misconduct; and

   • the appropriate measure of damages or other relief to which Plaintiffs and the Class members are entitled.

177.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs do not have any interest antagonistic to, or in conflict with, the Class.

178.     Plaintiffs have retained competent counsel, who are experienced in consumer and commercial class action litigation, to further ensure such protection and who intend to prosecute this action vigorously.

179.     Class action status is warranted under Rule 23(b)(1) because the prosecution of separate actions by or against individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or because the prosecution of separate actions by or against individual Class members would create the risk of adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other Choice 2/2.1 policyholders that are not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

180.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

181.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class members are relatively small in comparison to the expense of this litigation, those expenses and the burden of individual litigation make it impractical for individual Class members to seek redress for the wrongful conduct asserted herein.  If class treatment of these claims were not available, Defendants would likely continue their wrongful conduct, would unjustly retain improperly obtained revenues, and/or would otherwise escape liability for their wrongdoing as asserted herein.

182.    Information relating to Defendants' alleged misconduct and the identity of the various Class members is available from Defendants' books and records, including, but not limited to, their policyholder records, financial statements, and other records and reports filed with the United States Securities and Exchange Commission, as well as financial statements, actuarial reports and memorandum, and correspondence filed with various state Insurance Commissions or Departments.

183.    Plaintiffs are not aware of any difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

184.    The prosecution of separate actions by individual Class members would run the risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendants.   Prosecution as a class action will eliminate the possibility of repetitious or inconsistent litigation.

185.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT ONE:  FRAUDULENT INDUCEMENT BY OMISSION
**(By Plaintiffs On Behalf of the Class Against Defendants GLIC and GLICNY)**

186.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

187.    Plaintiffs and the Class members each purchased guaranteed renewable Choice 2/2.1 LTC Insurance contracts from Genworth.

188.    The fact that the policies are "guaranteed renewable" means the policies renew annually, and Genworth cannot cancel the policies or change benefits due under the policies if the policyholder pays the full premium each year.

189.    Each time Genworth announced a premium rate increase in connection with a renewal, it materially restructured the terms of the contract to be renewed.  In each instance, it offered Plaintiffs and the Class members three choices for renewal: (1) pay the increased premiums to maintain the same level of benefits; (2) pay a lower premium for decreased benefits; or (3) elect the limited "non-forfeiture" option and pay no further premiums.

190.    When a policyholder decides whether to renew their LTC policy, the premium rate is a material term of the renewal.  Whether the insurer plans to increase rates in the future, the frequency of those planned increases, the amount of future increase needed by the insurer to remain financial stable, and the fact that needed future rate increases have already substantially reduced Genworth's credit rating are also material to all policyholders.

191.    While Genworth informed policyholders that future increases were "possible," it withheld from them material information about the frequency and amount of future increases it had already planned to seek, including the fact that Genworth knew with certainty at the time those statements were made that its claims experience *already warranted* additional increases and that Genworth *would be* seeking (or had *already sought*) additional future rate increases.

192.    More detailed allegations specifying what Genworth knew and did not disclose to its policyholders are set forth above at paragraphs 134 to 169.

193.    By offering only a partial statement about future rate increases, Genworth assumed a duty to provide a full and complete statement.  Considering the staggering premium increases Genworth planned to seek in the immediate future, and its reliance on these and other future rate

increases on LTC policies to remain financially stable, this information was highly material to Plaintiffs and the Class members' renewal decisions, and its disclosure was necessary to complete a full disclosure about the "possibility" of future rate increases.

194.    Genworth acknowledged internally that all this information was material, and that it needed to be "transparent" with policyholders about the future increases.  In the end, however, the Company intentionally withheld this material information from Plaintiffs and the Class members.

195.    Other LTC providers disclose information to policyholders about future rate increase requests, recognizing this information is material and must be provided to allow policyholders to adequately consider their election options in response to each rate increase and thus avoid frustrating their ability to make informed elections.

196.    More detailed allegations about what those insurance companies disclosed to their policyholders is set for above at paragraphs 127-133.

197.    By failing to adequately disclose material information about Genworth's rate increase action plans, current reliance on its planned future increases actually being approved, the risks to Genworth's solvency if such increases were not approved, and the impact those needed future rate increases already had on the Company's financial rating, Genworth withheld material information from Plaintiffs and the Class.

198.    Genworth intended that Plaintiffs and the Class members rely upon the incomplete information it did provide in the hope that policyholders would make policy elections that were in Genworth's best interest and not the policyholder's best interest.

199.    As a result, Plaintiffs and the Class members were unaware of the scope and magnitude of Genworth's entire rate increase action plan when they made their renewal elections.

They were also unaware of Genworth's reliance on this rate action plan, which included significant increases on other LTC policies, to build adequate reserves to pay Genworth's future claims.

200.    Without a complete picture of Genworth's massive rate increase plan, Plaintiffs and the Class members made certain elections in response to each rate increase announcement.  Had they known the full scope and magnitude of Genworth's rate action plans, and the Company's reliance on massive rate increases in the future to remain viable, they would have made different policy option elections.

201.    As a direct, proximate, and legal result of the aforementioned conduct, Plaintiffs and the Class members have suffered damages and are entitled to relief.

202.    Plaintiffs and the Classes seek the following relief:

a.      a finding that Genworth withheld material information from Plaintiffs and the Class regarding its plans for future rate increases; its reliance upon obtaining at least some portion of future rate increases to be able to pay future claims; and the impact that need for additional rate increases has already had on Genworth's financial rating;

b.      injunctive relief in the form of an adequate and corrective disclosure to Plaintiffs and the Class that reveals the omitted information, and the right to make new policy renewal elections in light of the new disclosures;

c.      if Genworth is found to have omitted material information, then rescission of Plaintiffs' and the Class' policy renewals each year since Genworth first made those omissions; and

d.      return of premiums paid for each year a renewal of the policy was rescinded.

203.    To avoid doubt, if the above relief is obtained, Plaintiffs and the Classes seek to be placed in the same position they were in before Genworth made the aforementioned omissions,

meaning they would still have the same guaranteed renewable LTC policies they had prior to the omissions, and must then decide whether to maintain their respective policies in light of the current premiums that would be due, or what level of coverage they prefer in light of the new premiums they would be charged.

## COUNT TWO:  DECLARATORY RELIEF
### (By Plaintiffs On Behalf of the Class Against Defendants GLIC and GLICNY)

204.    This Count is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

205.    The Declaratory Judgement Act states:

> In a case of actual controversy within its jurisdiction, …, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

206.    Here, there is an actual controversy: whether Genworth had a duty to disclose to each Class member, among other things, (1) the amount of future rate increases it planned to request for each class member's policy; (2) the timing of those requested increases; (3) Genworth's reliance on obtaining those increases to maintain claims paying ability; and (4) information about Genworth's current financial condition.

207.    Declaring that Genworth had a duty to make those disclosures would serve a useful purpose, in that it would resolve one of the primary issues in this litigation.  If the Court were to declare Genworth had a duty to disclose that information, injunctive relief would be necessary and warranted.  Specifically, a corrective disclosure to all class members providing this information would be required.  Genworth would also be required to allow policyholders to make new elections in response to this information and all prior elections should be nullified.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.      That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.      That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.      That Plaintiffs and the Class they represent be awarded compensatory, consequential, and general damages in an amount to be determined at trial;

D.      Injunctive relief as is warranted;

E.      Costs and disbursements of the action;

F.      Pre-and post-judgment interest;

G.      Reasonable attorneys' fees; and

H.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.


Dated: January 28, 2022                     Respectfully submitted,

                                                    _____/s/ Jonathan M. Petty_____

                                                    Jonathan M. Petty, VSB No. 43100
                                                    Brielle M. Hunt, VSB No. 87652
                                                    PHELAN PETTY LLC
                                                    3315 W. Broad Street
                                                    Richmond, VA 23230
                                                    (804) 980-7100 (telephone)
                                                    (804) 767-4601 (fax)

                                                    jpetty@phelanpetty.com

bhunt@phelanpetty.com

Brian Douglas Penny
GOLDMAN SCARLATO & PENNY, P.C.
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel. 484-342-0700
Fax 484-580-8747
penny@lawgsp.com

Stuart A. Davidson
Bradley M. Beall
ROBBINS GELLER RUDMAN
& DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
sdavidson@rgrdlaw.com
bbeall@rgrdlaw.com

Shanon J. Carson
Glen L. Abramson
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bm.net
gabramson@bm.net

*Counsel for Plaintiffs and the Proposed Class*