# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

## RICHMOND DIVISION

| | |
|---|---|
| FRED HANEY, MARSHA MERRILL, SYLVIA RAUSCH, STEPHEN SWENSON, and ALAN WOOTEN, individually, and on behalf of all others similarly situated, | |
| *Plaintiffs*, | |
| v. | Civil Action No.: 3:22-cv-00055-REP |
| GENWORTH LIFE INSURANCE COMPANY and GENWORTH LIFE INSURANCE COMPANY OF NEW YORK, | |
| *Defendants*. | |

**REDACTED PURSUANT TO THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT PRIVACY RULE (45 C.F.R. PART 160 ET SEQ. AND 45 C.F.R. PART 164 ET SEQ.)**

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

**TABLE OF CONTENTS**

<strong>PAGE</strong>

I.     INTRODUCTION ............................................................................................ 1

    A.    Putting the Settlement in its Proper Context............................................ 2

    B.    The *Skochin* Settlement Illustrates the Effectiveness of this Settlement Structure............................................................................................... 5

II.    ARGUMENT ................................................................................................. 7

    A.    Standards for Reviewing Objections to Class Settlements. .................... 7

    B.    The Objections to the Settlement Should Be Overruled......................... 8

        1.    The Settlement does not result in a "windfall" for Genworth. .................. 8

        2.    The benefits of this Settlement are commensurate with the merits of this Action compared to *Skochin* and *Halcom*...................................... 10

        3.    Because there were no viable LTC alternatives at the time of the alleged non-disclosures, Class Members have not—and cannot— prove that they were damaged by allegedly becoming "locked" into their policies during the Class Period. ................................................. 13

        4.    The Settlement fairly and adequately addresses Class Members who prefer to maintain their current benefits............................................. 16

        5.    The Special Election Options offer an adequate remedy......................... 18

        6.    The costs of the Settlement will not lead to higher premiums................. 20

    C.    The Objections to Attorneys' Fees and Service Awards Should be Overruled. .............................................................................................. 20

        1.    The attorneys' fees are earned and justified. ........................................... 20

        2.    Named Plaintiffs have earned their service awards. ................................ 24

    D.    Additional Objections ............................................................................. 25

        1.    Berg Objection ........................................................................................ 25

        2.    Dowler Objection.................................................................................... 26

        3.    Podoll Objection ..................................................................................... 27

4.      Hays Objection.......................................................................... 28

5.      Lang Objection........................................................................... 30

        a.      All Members of the proposed Settlement Class have been
                injured and thus have standing....................................... 30

        b.      Policyholders in NFO status are adequately represented.............. 33

6.      Belkin Objection ........................................................................ 35

7.      Moore Objection ........................................................................ 36

8.      Friedman et al. Objection............................................................ 37

9.      Davis/Freedlander Objection ....................................................... 38

10.     Haslett Objection ...................................................................... 39

        a.      The California Department of Insurance's statement
                submitted in the *Skochin* litigation does not bear on the
                fairness of this Settlement. ............................................. 39

        b.      Mr. Haslett's Objection about the Settlement's Special
                Election Options not being "actuarially sound" misses the
                mark in multiple respects. ............................................... 40

        c.      Data from the *Skochin* Settlement has not been withheld
                from Regulators or the Court. .......................................... 41

        d.      Disclosures regarding the Penn Treaty insolvency are not
                necessary to make the Settlement fair, reasonable, and
                adequate. .................................................................... 42

        e.      That policyholders from other insurance companies have
                maintained benefits amidst rate increases does not make the
                Settlement inadequate. ................................................... 43

        f.      Mr. Haslett's Focus on BIO. ............................................ 44

        g.      The $6,000 Cash Damages payment is adequate........................ 46

        h.      Alleged Partnership Plan issues do not make the Settlement
                inadequate. ................................................................. 46

11.     Mack Objection........................................................................... 48

12.     Dimiduk Objection...................................................................... 49

III.    CONCLUSION................................................................................................................ 50

# TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGE**

*1998 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins Co.*,
  28 F.4th 513 (4th Cir 2022) ......................................................................7, 14, 31, 41

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................................7

*Berry v. Schulman*,
  807 F.3d 600 (4th Cir. 2015) ............................................................................24

*Brown v. Wal-Mart Stores, Inc.*,
  No. 01L85, 2011 WL 12523823 (Ill. Cir. Ct. Sep. 14, 2011)...........................30

*Cole v. NIBCO, Inc.*,
  No. 3:13-cv-07871 (D.N.J. Apr. 5, 2019), ECF No. 223..................................30

*Edelson, PC v. Bandas Law Firm PC*,
  No. 1:16-cv-11057, 2019 WL 272812 (N.D. Ill. Jan. 17, 2019)..............................30

*Garber v. Off. of Comm'r of Baseball*,
  No. 12-CV-03704 (VEC), 2017 WL 752183 (S.D.N.Y. Feb. 27, 2017) ................................30

*Halcom v. Genworth Life Ins. Co.*,
  No. 21-cv-00019-REP (E.D. Va. June 28, 2022)............................................ *passim*

*In re Genworth Fin. Sec. Litig.*,
  210 F. Supp. 3d 837 (E.D. Va. 2016) ................................................................2, 12

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
  No. 13 Civ. 214 (RMB)(RLE), 2017 WL 2559230 (S.D.N.Y. May 22, 2017) ......................36

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales
  Pracs. & Prods. Liab. Litig.*,
  MDL No. 1:15-md-2627 (AJT/TRJ), 2018 WL 11203065 (E.D. Va. Oct. 9, 2018)...............50

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales
  Pracs. & Prods. Liab. Litig.*,
  952 F.3d 471 (4th Cir. 2020) ............................................................................7

*In re MicroStrategy, Inc. Sec. Litig.*,
  172 F. Supp. 2d 778 (E.D. Va. 2001) ................................................................22

*In re The Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) ........................................................................7

*In re Platinum & Palladium Commodities Litig.*,
    No. 10 Civ. 3617(WHP), 2015 WL 10853179 (S.D.N.Y. Feb. 27, 2015).............................36

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    No. 18-MD-2819 (NG) (LB), 2022 WL 3043103 (E.D.N.Y. Aug. 2, 2022) .........................36

*In re Royal Ahold N.V. Secs. & ERISA Litig.*,
    437 F. Supp. 2d 467 (D. Md. 2006)...........................................................................................36

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    MDL No. 2672 CRB (JSC), 2017 WL 2212780 (N.D. Cal. May 17, 2017),
    *aff'd*, 746 F. App'x 655 (9th Cir. 2018)..................................................................................36

*Robinson v. Carolina First Bank*,
    No. 7:18-cv-02927-JDA, 2019 WL 719031 (D.S.C. Feb. 14, 2019).........................................7

*Robinson v. Carolina First Bank*,
    No. 7:18-cv-02927-JDA, 2019 WL 2591153 (D.S.C. June 21, 2019) ......................................7

*Skilstaf, Inc. v. CVS Caremark Corp.*,
    669 F.3d 1005 (9th Cir. 2012) .................................................................................................36

*Skochin v. Genworth Fin., Inc.*,
    No. 3:19-cv-49, 2020 WL 6532833 (E.D. Va. Nov. 5, 2020) ........................................ *passim*

*Skochin v. Genworth Fin., Inc.*,
    No. 3:19-cv-49, 2020 WL 6536140 (E.D. Va. Nov. 5, 2020) .................................................24

*Torchia v. W.W. Grainger, Inc.*,
    304 F.R.D. 256 (E.D. Cal. 2014) .............................................................................................36

*UniSuper Ltd. v. News Corp.*,
    898 A.2d 344 (Del. Ch. 2006)..................................................................................................36

*Wedding v. Cal. Pub. Emps. Ret. Sys.*,
    No. BC 517444 (Cal. Super. Ct., Los Angeles Cnty.) ............................................................26

*Wittstadt v. Hosch*,
    No. CCB-16-2251, 2016 WL 7157417 (D. Md. Dec. 8, 2016) ...............................................36

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
    § 1715(a)(2) ..............................................................................................................................47
    § 1715(b)....................................................................................................................................47
    § 1715(f).....................................................................................................................................47

28 U.S.C
    § 1715...................................................................................................................1, 40, 47

Federal Rules of Civil Procedure
    Rule 23 ..........................................................................................................20, 22, 35
    Rule 23(e)....................................................................................................................6
    Rule 23(e)(5)(A) .......................................................................................................35

## SECONDARY AUTHORITIES

7A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 1790 (3d ed. 2020).......................16

Named Plaintiffs and Class Counsel respectfully submit this Reply Memorandum in further support of (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Memorandum in Support thereof (ECF Nos. 39 and 40) and (2) Class Counsel's Motion for an Award of Attorneys' Fees and Expenses and Service Awards to the Named Plaintiffs and Memorandum in Support thereof (ECF Nos. 41 and 42), and in opposition to each Objection to this class action settlement (the "Settlement").[1]

## I.    INTRODUCTION

The proposed Settlement is fair, adequate, and reasonable and has been well received by the Class, which consists of approximately 352,000 Class Members.  There were only 187 opt out requests and there were only 19 Objections (by 27 Class Members), representing only 0.061% of the Class.[2]  This result is lower than the 191 opt outs and 26 objections (by 35 class members) in *Skochin* (0.11% of the class) and the 94 opt outs and 11 objections (by 19 class members) in *Halcom* (0.078% of the class).  It also is notable that no Class Member objected to the adequacy of the Class Notice itself.  This is largely due to continued improvements the Parties made to the Class Notice and the Settlement structure, including a flat Cash Damages provision that provided clarity about the specific amount of Cash Damages a Class Member would receive under each Special Election Option.  Moreover, each State's Insurance Regulator received statutory notice of

---

[1]    All capitalized words herein are defined in the Parties' Settlement Agreement (ECF No. 33-1) unless otherwise noted.

[2] *See* Supplemental Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of Settlement Notice Plan at ¶16, attached as Exhibit 1 to the Declaration of Brian D. Penny in Support of Reply Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Penny Decl."), filed contemporaneously with this brief.

the proposed Settlement under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1715(b),[3] as well as a separate communication from Genworth requesting any feedback or input from the State regulators.  No State Regulator objects to the Settlement.

This Settlement tracks the claims Plaintiffs brought.  It provides the Disclosures that were sought in the Complaint, and then offers a series of valuable Special Election Options and monetary or other relief to every eligible Class Member.  The substance of many of the Objections raised here have already been considered and addressed by the Court in its rulings in the prior Genworth Settlements.  Those Objections and the few "new" issues raised here should be overruled because—when assessed against what this lawsuit was actually about and what the Settlement actually provides—none of the Objections raise a reasonable question about the fairness, adequacy, or reasonableness of the Settlement.  As the Court has explained before, the question at final approval is not whether every Class Member is completely satisfied, but whether the Settlement as a whole is a fair, adequate, and reasonable resolution of the claims asserted.  *Skochin v. Genworth Fin., Inc*., 2020 WL 6532833, at *18 (E.D. Va. Nov. 5, 2020) (citing *In re Genworth Fin. Sec. Litig*., 210 F. Supp. 3d 837, 839 (E.D. Va. 2016)).  The Settlement meets this standard and Named Plaintiffs and Class Counsel therefore respectfully urge the Court to overrule the Objections and approve the Settlement.

A.    **Putting the Settlement in its Proper Context.**

As in *Skochin* and *Halcom*, the value of the Settlement must be evaluated in the context of the actual claims alleged and relief potentially available.  Importantly, many of the Objectors base their Objection on their desire for redress for claims that were not and could not be brought in this

---

[3]    Emphasis added and citations, internal quotations, and footnotes omitted, unless otherwise noted.

Court, or they seek relief unrelated to the conduct alleged or otherwise unavailable as a remedy in a civil action.

Here, Plaintiffs alleged that, in or around 2013, Genworth recognized it had a sizeable hole in its reserves that needed to be filled by significant future rate increases across most of its LTC policies, including the first wave of rate increases on the Class Policies ("Choice 2" policies). Plaintiffs were prepared to show that Genworth had a two-pronged approach to fill its reserve hole: Genworth planned to seek regulatory approval for significant rate increases but did **not** intend to share with Policyholders the full scope of its internal rate increase action plans. In that way, Plaintiffs alleged, Genworth would get two benefits. First, Genworth knew that for each rate increase a number of Policyholders (roughly 10–15%) would reduce their benefits in order to avoid paying the higher premium, either because they could not afford to pay the increased rates, or because they no longer valued their full benefits in light of the cost to maintain them. However, by not sharing the full details of its internal rate action plans, Plaintiffs alleged Genworth would get a second benefit. In the absence of a disclosure that Genworth would be seeking significant additional rate increases in the future, many Class Policyholders would continue paying the full rate increases to maintain their current benefits, only to later be forced to reduce their benefits in response to those undisclosed (or under-disclosed) future rate increases. In this way, Plaintiffs alleged that Class Policyholders have been strung along, being coaxed to pay higher premiums in the interim before ultimately reducing their coverage at some future point.

Plaintiffs alleged that by limiting the dissemination of the material information about its internal rate increase action plans, Genworth created and unfairly leveraged its informational advantage. This is the conduct alleged in each of the Genworth litigations involving claims for fraudulent inducement by omission—namely, that by not sharing all material information with

Policyholders about its future rate increase plans and the impact of obtaining those future rate increases on the ability to pay future claims, Genworth induced them to make policy renewal decisions they may not have otherwise made, while paying higher premiums in the interim.

Importantly, Plaintiffs **did not** purport to challenge the propriety of the rate increases themselves, because (1) those claims would be barred by the filed rate doctrine, and (2) even if not barred, those claims would be destined to fail because each rate increase was (and is) duly approved by a Regulator after reviewing detailed, audited, and statutorily (or regulatory) required actuarial evidence submitted by Genworth to justify each rate increase request.  Against this backdrop, this case only challenged—and could only challenge—the materiality of the information that Genworth did not share with Policyholders and the effects **that informational imbalance** had on Policyholders' renewal elections.  Genworth vigorously disputed Plaintiffs' allegations of fraudulent omission and maintains that the information it provided to Policyholders was sufficient and not misleading, and its defenses and the associated risks to Plaintiffs in pursuing this litigation through trial are discussed in more detail below.  The salient point for framing evaluation of many of the Objections, however, is that this case was brought to address the alleged harm to Policyholders in not receiving enough information to in turn decide whether to reduce or cease paying premiums by lowering their LTC policy benefits.

The relief this Settlement affords aligns with that alleged harm.  First, the Settlement provides all Policyholders with the material information Plaintiffs alleged Genworth should have provided in the past (the Disclosures).  Second, the Settlement reasonably attempts to put the Policyholders in the position they would have occupied but for the alleged fraud, by providing Policyholders with an opportunity—but not a mandate—to make new policy premium and benefit elections based on the updated Disclosures.  Policyholders who want to keep their current premium

and benefit levels in light of the Disclosures can do so. And, for Policyholders who decide to reduce or cease their premium payments by reducing their coverage, the Cash Damages are designed to compensate them for the financial harm they suffered by not having the information necessary to make such decisions sooner.

As the Court found in approving a similar settlement in *Halcom*:

> [T]he terms of this settlement agreement . . . are keyed to the relief to which the plaintiff class would have been entitled had it prevailed on the merits as to the causes of action set forth in the CAC. . . . Because the scope of the COMPLAINT is restricted to the disclosures Genworth did and did not make in connection with its premium increases, the relief available to the plaintiffs is only the relief generally available in a fraud action: a return to the nearest possible approximation of the status quo ante. Because this settlement comes very near achieving that, the objections keyed to a dissatisfaction with the substance of what has been awarded to plaintiffs will be overruled.

*Halcom v. Genworth Life Ins. Co.*, No. 21-cv-00019-REP (E.D. Va. June 28, 2022), ECF No. 115 at 42.

### B.     The *Skochin* Settlement Illustrates the Effectiveness of this Settlement Structure.

While the *Skochin* settlement relates to a different set of policies and policyholders its structure is essentially the same as this Settlement, and the results of the *Skochin* settlement plainly confirm the effectiveness and value of the *Haney* Settlement structure. *Before* the *Skochin* Settlement, about 15–25% of policyholders reduced their benefits or elected a non-forfeiture option following rate increases. However, the majority of policyholders decided to pay the higher premiums to maintain their full coverage. Plaintiffs alleged that none of these policyholders— including those who made some reduction to the premium payments, or those who made no changes to their premium payments—had received a full and complete disclosure regarding Genworth's anticipated and planned future rate increases, and thus none of them were able to make

fully informed decisions about keeping or adjusting their coverage earlier.

Enter the *Skochin* Settlement. As a result of that Settlement, all policyholders were given more complete information about what additional rate increases Genworth was planning to pursue on their policies over the next several years and, importantly, the impact of Genworth obtaining (or not obtaining) those planned rate increases on Genworth's financial condition and ability to pay future claims. Armed with this new information, policyholders could decide if they wanted to reduce their coverage (including further than they already had) and obtain both lower (or no) premiums, certain benefit enhancements, and/or Cash Damages payments. Nearly 30% of the Class made the informed decision to elect one of the Settlement's Special Election Options. Other Class Members decided not to reduce their premiums or benefits in light of the additional information, but they too did so, for the first time, based on more complete information of what that coverage may cost in the future, Genworth's internal plans for pursuing rate increases, and the impact of obtaining those rate increases on its future claims-paying ability. In this way, **all** Class Members benefited from the *Skochin* Disclosures, and those who decided to reduce their benefits and premiums in light of the Disclosures were compensated for the additional harm they suffered by maintaining benefits they decided to reduce once they had more complete information. Even considering only the percentage of Class Members who affirmatively chose a Special Election Option, there can be no dispute that this "take rate" for the *Skochin* Settlement was, in the context of consumer class action settlements, nothing short of exceptional.

As a result of the *Skochin* settlement, Genworth disclosed to its Choice 1 policyholders its future premium rate increase plans and the impact of obtaining those rate increases on paying future claims, allowed them to make new elections based on this additional important information, and paid out Cash Damages of approximately **$240 million**, while providing more than a billion

dollars in additional paid-up coverage. The *Skochin* settlement provided tremendous value to that class, and this Settlement is similarly structured to achieve outstanding results for the Class.

## II.    ARGUMENT

### A.    Standards for Reviewing Objections to Class Settlements.

"The [Court's] inquiry . . . under Rule 23(e) . . . protects unnamed Class members from unjust or unfair settlements affecting their rights[,]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), while also accounting for the "strong judicial policy in favor of settlement to conserve scarce resources that would otherwise be devoted to protracted litigation[.]" *Robinson v. Carolina First Bank*, 2019 WL 719031, at *8 (D.S.C. Feb. 14, 2019).[4]

Courts generally view a low number of objections and opt outs to a class action settlement as additional indicia of the settlement's fairness. *See, e.g.*, *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 257 (E.D. Va. 2009). Indeed, as the Fourth Circuit recently explained, where "only 94 of the 178,859 Class members who responded to the class-action settlement notice opted out of the settlement (about 0.05%), and 12 Class members objected thereto (about 0.006%)[,] [t]hose figures provide further support for the settlement's adequacy." *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 952 F.3d 471, 485 (4th Cir. 2020). The objection and opt out rates for this Settlement are as low as those in *Lumber Liquidators*, with only approximately 0.0077% of the Class objecting and only 0.053% opting out.

Importantly, "an objector to a class settlement must state the basis for its objection with enough specificity to allow the parties to respond and the court to evaluate the issues at hand."

---

[4]    Final approval granted at *Robinson v. Carolina First Bank*, 2019 WL 2591153 (D.S.C. June 21, 2019).

*1998 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins Co.*, 28 F.4th 513, (4th Cir 2022). "The objectors to a class settlement generally bear the burden of proving any assertions they raise challenging the reasonableness of a class action settlement." *Skochin*, 2020 WL 6532833, at \*10.

### B.    The Objections to the Settlement Should Be Overruled.[5]

The Objections to the Settlement should be overruled because (1) the Settlement benefits the Class, and does not result in a "windfall" to Genworth, (2) the benefits of this Settlement are commensurate with the relative strength of the merits of this Action compared to *Skochin* and *Halcom*, (3) Class Members were not further damaged by being allegedly "locked into" their policies during the Class Period, (4) by requiring more fulsome rate increase Disclosures, the Settlement fairly and adequately addresses Class Members who prefer to maintain their current benefits, and (5) per the terms of the Settlement, the costs of the Settlement will not lead to higher premiums.

### 1.    The Settlement does not result in a "windfall" for Genworth.

Objections alleging the Settlement unfairly benefits Genworth are based on an incomplete understanding of what the Settlement accomplishes, the law, and what the landscape would look like without the Settlement. *See* Dowler Objection (Addendum), ECF No. 47 at 1; Bos Amended Objection, ECF No. 58 at 1–2; Haslett Objection, ECF No. 62 at 5–7; Friedman et al. Objection, ECF No. 73 at 2, 13–14.

First, the "benefit" to Genworth of reducing its long-term tail risk (by reducing available benefits) in relation to its reserves is **mutually beneficial to all Class Members** as such a result

---

[5]    Class Counsel address recurring objections in this section, followed by specific responses to stand-alone objections, organized by Objector, in Section II.D.  A chart of all Objections is attached hereto as Exhibit A.

will help Genworth improve its financial condition and its ability to pay future claims.  Further, as the Court recognized when approving the *Halcom* settlement, "it is no part of the law of class actions that the terms of a settlement must exclusively harm the defendant;" indeed, if there "were there such an expectation, Genworth would have little reason to agree to a settlement at all." *See Halcom*, ECF No. 115 at 41–42. Second, the Settlement offers, but in no way requires, a Class Member to take advantage of a Reduced Benefit Option ("RBO") and receive payment for his or her alleged inability to take such a RBO earlier.  The basis of the litigation itself and the Settlement is that such RBOs (and any resulting positive impact to Genworth of such RBOs) would have **already occurred** had Genworth provided the Disclosures sooner.  This Settlement puts the Class (and Genworth) in the same approximate position they would have been in had that information been made available earlier, including any resulting improvement to Genworth's financial condition by way of benefit reductions made as a result of the Disclosures.

Some Class Members (such as Ms. Black, ECF No. 46 at 1-3, the Langs, ECF No. 51 at 20-21, 25; and Mr. Haslett, ECF No. 62 at 3) also suggest that the value of the Cash Damages payments in the Settlement should be "offset" by the reductions in coverage.  But as explained above, Plaintiffs alleged these benefit reductions in many (if not most) cases would have naturally been made by Policyholders without the Settlement, **but only after** those Policyholders had made additional premium payments at higher amounts to maintain higher coverage levels that ultimately would be reduced in response to the future premium increases.  Moreover, the reduced premiums associated with the reduced-benefit Special Election Options are, in turn, based on the rate tables already approved by each State Regulator for those (reduced) levels of benefits.  That is, the reduced premiums reflect the approved and actuarially justified premium amounts for the reduced

benefit levels.  Thus, any reduction in benefits is compensated by the reduced premiums and no further "offset" would be justified.

Accordingly, Objections that the Settlement is a "windfall" for Genworth, that it benefits only the Defendants, or that the value of the Cash Damages payments should be "offset" by the "value" of benefit reductions are without merit and should be overruled.

### 2. The benefits of this Settlement are commensurate with the merits of this Action compared to *Skochin* and *Halcom*.

While the *Skochin*, *Halcom*, and *Haney* actions are based on similar theories, the benefits of this Settlement reflect that the merits of the *Haney* action are, in Class Counsel's estimate, not as strong as the prior cases.  Thus, the Objections by several Class Members that the *Haney* Settlement benefits are inadequate when compared directly to similar benefits in the *Skochin* and *Halcom* settlements should be overruled.  *See* Podoll Objection, ECF No. 48 at 4; Lang Objection, ECF No. 51 at 16, 19–24; Friedman et al. Objection, ECF No. 73 at 13–14; Bos Objection, ECF No 58.

In *Skochin*, the plaintiffs alleged, and were ready to prove, that Genworth failed to fully disclose the future rate increases it planned to seek under its Multi-Year Rate Action Plan ("MYRAP").  Plaintiffs alleged that the Choice 1 policies at issue in *Skochin* were subject to nearly a decade's worth of scheduled rate increase requests, with cumulative rate increase requests, spanning multiple planned rounds, of 250% or more.  Plaintiffs believed a fact finder would likely conclude that such a concrete, long-term plan to seek substantial rate increases was material, and would award damages within the statute of limitations period.[6]

---

[6]    As this Court is aware, in both *Skochin* and *Halcom*, the Parties negotiated a 4-year Cash Damages period, which took into account the time period over which Genworth's rate increases

This case presents a relatively weaker set of facts regarding Genworth's internal plans for future rate increases for a different and, importantly, **newer** class of policies. Based on discovery Genworth provided, Plaintiffs were concerned that Genworth's plans for future rate increases on the Choice 2 policies in *Haney* were not based on its definitive MYRAPs as in *Skochin* (Choice 1) and *Halcom* (PCS 1 and 2), but rather were *ad hoc* projections spanning only two to three years into the future (if at all). This was also significant because the Choice 2 policies have not required the same magnitude of rate increases as the older blocks and have not required the same extent of multi-year planning to secure cumulative rate increases.

Genworth maintained throughout the Parties' initial case evaluation, settlement negotiations, and discovery (and still maintains) that needed rate increases on the *Haney* Choice 2 policies (1) were re-evaluated annually, (2) were not even part of the MYRAP, and (3) were not the subject of any long-term plan for a series of future rate increases. Indeed, it appears that Genworth's Choice 2 plans were shorter in duration, called for fewer rounds of increase requests, and sought rate increases of much lower cumulative amounts than the rate action plans for the older policies at issue in *Skochin* and *Halcom*. Genworth's Choice 2 plans are thus arguably **less material** than those in *Skochin* and *Halcom*. As a result, proving Genworth had a duty to disclose those *ad hoc* plans would be considerably more challenging than proving the same materiality in the prior *Skochin* and *Halcom* cases. Moreover, given these facts a 4x (or four-year) Cash Damages multiplier from *Skochin* and *Halcom* would have been unlikely here. Had Plaintiffs attempted to negotiate the multiplier approach during mediation, any negotiated multiplier would logically have been lower than four, and perhaps considerably. None of the Objectors appear to

---

accompanied by allegedly incomplete disclosures occurred and relevant statutes of limitations that were most frequently 6 years.

appreciate these disparate facts.

The *Haney* Special Election Options are in line with the relative strengths of this case, and should not be compared directly, dollar-for-dollar, to the benefits in *Skochin* and *Halcom*. So for example, the Friedman Objectors' objection that the Enhanced Paid-Up Benefit Special Election Option "only" provides a 150% benefit amount enhancement as opposed to the 200% provided in *Skochin*, or their objection that the Cash Damages for electing Non-Forfeiture Option ("NFO") Status Class Members is "only" $1,000 as compared to the $2,500 in *Halcom*, should not be sustained because those comparatively lower amounts reflect the relative merits of this case. These benefits also ultimately are the product of a Settlement negotiated at arms-length, with the assistance of a mediator, over 3 days spanning over a three-month period. *See, e.g.*, *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 839 (E.D. Va. 2016) (in determining whether to approve a class action settlement, the test is whether the settlement, as a whole, is a fair, adequate, and reasonable resolution of the class claims asserted).

Even considering these challenges, the flat damages here are not materially different from a *Skochin*-style calculation of Cash Damages, particularly if a 3x multiplier is used instead of a 4x multiplier (to take into account the comparative weaknesses of *Haney*). For example:[7]

| *Haney* Special Election Option | *Haney* Flat Cash Damage Award | *Haney Skochin*-style 3x Multiplier Average Cash Damage Award |
|---|---|---|
| Basic Paid-Up Benefit 1 (*see* Settlement Agreement, App'x C, § I.A) | $10,000 | $10,522.50 |

---

[7]    These figures are approximations based on potentially eligible Policyholders electing the Special Election Options and the resulting average Cash Damages payments.

| Reduced Benefit Options 1-3 (*see id.* § I.B.1.a-c) | $6,000 | $4,729.50 |
|---|---|---|

Consideration of the *ad hoc* nature of the rate action plans at issue, as well as the limited potential damages period, illustrate that the current Settlement is fair, reasonable, and adequate, under the more challenging set of facts present here. These Objections are thus without merit and should be overruled.

> **3.    Because there were no viable LTC alternatives at the time of the alleged non-disclosures, Class Members have not—and cannot—prove that they were further damaged by allegedly becoming "locked" into their policies during the Class Period.**

Some Class Members object that the Settlement is not fair to certain Policyholders who are now allegedly "locked into" their policies. For example, Mr. Bos objected that the Settlement "is discriminatory toward policy holders that would have sought third-party replacement unlimited life long-term care insurance policies, if planned premium increases were timely shared" but "[b]ecause the information was allegedly withheld, policyholders aged into more costly insurance age brackets and potentially became uninsured [sic] during that delay, suffering loss of available alternatives due to Genworth's alleged grievous and intentional failure to disclose." ECF No. 35; *see also* Belkin Objection, ECF No. 53 (joining in the Bos objection). Similarly, Sol and Pam Resnikoff object that had they been given more information about Genworth's plans for future rate increases sooner, they would have looked at other options to cover future costs of long-term care sooner. ECF Nos 59 and 60.[8]

---

[8]    While not specifically objecting on these same grounds, Gary Davis and Lorraine Freedlander note in the body of their Objection that they are both now 70 years old with health issues that would likely prevent them from obtaining alternative coverage at an affordable cost. They do, however, explicitly object on behalf of "class members who for whatever reason have no choice

None of these Objectors have pointed to any policy or plan providing benefits identical or similar to their policies that was available to them at the time of their respective rate increases *and* would have been less expensive than their current Genworth policy (even at its increased rates).

In addition, these objections are entirely speculative; none of the Objectors have alleged that they actually considered obtaining different LTC coverage at the time of rate increases but did not due to reliance on Genworth's allegedly incomplete disclosures, nor has any of them demonstrated that they could have obtained the same or comparable coverage at an equal or lower price. As such, they have not carried their initial burden as Objectors. *See 1988 Tr. For Allen Children*, 28 F.4th at 520 (objections must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them).

These objections are also inconsistent with the LTC market existing at the time. Had Genworth fully disclosed its alleged plans for future increases as early as 2013 (the beginning of the Class Period), Mr. Bos and the Resnikoffs likely would not have been able to obtain the same or similar coverage from an alternative carrier because the LTC market offered little to no alternatives for comparable coverage—and not at comparable rates.[9]

---

but to maintain current coverage." Mr. Davis and Ms. Freedlander maintain that such Class Members and those similarly situated to themselves should receive at least equivalent and perhaps greater relief in the form of damages." Similarly, the Friedman et al. Objection asserts that there is no reasonable alternative for Class Members over 75 years of age, placing them in a significantly different situation than Class Members who are younger, and therefore such Class Members are a subclass that should be provided a settlement option to freeze premiums.

[9]    The accompanying Milliman Long Term Care Insurance Surveys are an annual review of long term care insurance published by BROKER WORLD magazine. *See* Penny Decl, Exhibits 2-7. The surveys compare products, report sales distributions, and analyze the changing marketplace as reported by a number of eight to fourteen insurers which Milliman estimates to be representative of approximately 75 to 92% of the total industry policies sold during various years.

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

Moreover, this particular Objection was already considered and overruled by this Court at the *Skochin* final approval hearing. *Skochin* objector Saul Jacobs argued that there should be a separate sub-class for class members who hold what he identified as "gold standard" policies, *i.e.*, policies that allow unlimited benefits and are protected by limiting inflation increases to 5%.[10] Jacobs Objection at 1, ECF No. 159. This Court overruled Jacob's objection stating:

> At the heart of both arguments is the assertion that the Settlement Agreement options do not adequately provide for the objectors' individual circumstances. Jacobs asserts that, had Genworth disclosed the information about the premium increases in 2014, he would have gone to the market in 2014 and gotten a better

────────────────────

[10] ████████████████████████████████    ██████████████.

long-term care plan. Jacobs maintains that the Settlement Agreement should have provided him with a different option that reflects this reality. Jacobs does not raise any issue that is unique to gold policy members that would justify creating a subclass. And, in reality, Jacobs is not objecting to the fairness of the settlement, but rather is arguing that the Settlement Agreement should provide him with a different type of relief. If Jacobs was unhappy with the Settlement Agreement, he could have opted-out and proceeded separately to obtain the requested relief to which he thought he was entitled. Further, if any gold class members want to keep their existing policy and benefits, this is an option available to them under the Settlement Agreement.

Similarly here, these Objectors take issue with the relief offered based on their own individual circumstance and fail to identify any issue or conflict that would justify creating a subclass or sustaining the objection. These Objectors may feel "stuck" in their current policy because they may be unable to obtain an identical or comparable policy at a better price from another insurer, but the reasons for feeling "stuck" can be one of many (e.g., having a so-called "gold standard" policy (lifetime unlimited benefits, compound BIO, etc.), being no longer "insurable" due to medical issues, etc.), but those circumstances do not impact the common issues at play in this case.

As this Court previously ruled in Skochin, "[s]ubclasses may be appropriate when class members seek different types of relief or where there are similar types of factual differences between the claims of different groups or class members. However, 'a class need not be subdivided merely because different groups within it have alternative legal theories for recovery or because they have different factual bases for seeking relief.' 7A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 1790 (3d ed. 2020)." *Skochin*, 2020 WL 6532833, at *21. For the reasons stated in both *Skochin* and herein, these objections should be overruled.

### 4. The Settlement fairly and adequately addresses Class Members who prefer to maintain their current benefits.

By providing updated Disclosures, the Settlement fairly and adequately provides for Class Members who choose to maintain their current coverage after review of those Disclosures.

- 16 -

Suggestions that such Class Members are entitled to additional relief—whether Cash Damages, premium freezes, or other means—are inappropriate for several reasons.  *See, e.g.*, Dowler Objection, ECF No. 45 at 1 (demanding monetary damages and/or a benefit pool equal to 150% premiums paid for Class Members who elect to maintain their current benefits); Belkin Objection, ECF No. 53 at 1–2 (same); Davis and Freedlander Objection, ECF No. 61 at 2 (same); Podoll Objection, ECF No. 48 at 2–4 (same, arbitrarily requesting Cash Damages "equal to a percentage, or multiplier, of [rate] increases during the Class Period"); Bos Objection, ECF No. 58 at 2 (arbitrarily demanding 50% return of premium and premium freeze for Class Members who elect to maintain their current benefits); Hays Objection, ECF No. 49 (the Settlement provides no benefit to policyholders that maintain their benefits); Arrowsmith Objection, ECF No 55 (same).

As a threshold matter, premium freezes are not possible because the filed rate doctrine would prohibit an attempt to question or restrict, through a civil action, State Regulator's authority to approve LTC rate increases, including an order to "freeze" future premium increases or roll back prior approved increases.  Moreover, there is a distinction between being "damaged" by the rate increases themselves and being damaged by Genworth's alleged failure to disclose material information about its plans for future rate increases; and this case does not (and cannot) challenge the rate increases themselves.  The scope of the Complaint is restricted to the disclosures Genworth did and did not make in connection with its premium increases.  Halcom, ECF No. 115, at 42 (noting, "Because the scope of the COMPLAINT is restricted to the disclosures Genworth did and did not make in connection with its premium increases, the relief available to the plaintiffs is only the relief generally available in a fraud action: a return to the nearest possible approximation of the status quo ante.").  The financial impact of increased premium rates for long term care is not at issue in this case and does not constitute damages for which the Class can be compensated.

- 17 -

Accordingly, the relief available to the Class Members is only the relief generally available in a fraud action:  putting the Class Members who elect a Special Election Option in the position they would have been in had they received the Disclosures, and consequently elected to reduce their benefits, earlier.  *Id.*  This case assumes, as it must, that any approved rate increases was actuarially justified, reviewed, and approved by the applicable Regulator and are therefore lawful.  The alleged harm here is Genworth's alleged failure to timely and sufficiently disclose its plans for future rate increases.  The equitable remedy of this Settlement—updated Disclosures—addresses that harm for all Class Members, including those who choose to maintain their current benefits.

Additional Cash Damages for policyholders who do not choose a Special Election Option are also inappropriate.  The Cash Damages here are intended to compensate Class Members who allegedly would have reduced their benefits, and thus premiums, sooner had Genworth earlier and more fully disclosed information regarding its plans for rate increases.  Thus, such Class Members who choose to keep their policies as-is, after having received the additional Disclosures, are not entitled to monetary compensation, because they have demonstrated that they did not pay higher premiums **as a result** of not having received the Disclosures.  As the Court recognized when approving the *Halcom* settlement,

> Policyholders who, upon receiving the disclosures, elect not to choose a reduced benefits option, are thereby treated as not having suffered cognizable harms over and above the fact of not having receive the disclosures to which they are alleged to be entitled. Those policyholders thus do not receive any damage payments and are treated as having been made whole by the new disclosures and opportunity to revise their past benefits elections.

*Halcom*, ECF No. 115, at 11–12.  These objections should be overruled.

### 5. The Special Election Options offer an adequate remedy.

To the extent that some Class Members, like Mr. Podoll, further object that there were not more Special Election Options offered, or that there is not an Option that allows Class Members

to maintain their 5% inflation protection, several points deserve consideration.  First, it is important to recognize that the Parties could not offer an unlimited number of settlement options to more than 350,000 Policyholders as the claims administration burden would be too great.  That level of complexity would not only over burden Genworth but would also unreasonably slow the administration of the Settlement to every Class Member.  To avoid this, Class Counsel sought to negotiate roughly 6 options to offer Class Members as part of the Settlement, similar to the prior *Skochin* and *Halcom* settlements.  In agreeing on which options to offer, Class Counsel attempted to balance several factors, including:  (1) providing benefit reduction options that were popular in the ordinary course (outside the Settlement), (2) providing options with rate tables that had already been Regulator-approved, (3) providing options that would be widely available to the Class based on then current benefit levels, and importantly, (4) providing options that would address the core concerns of this case.

On the last point, Class Counsel was aware that Class Members faced with the Disclosures of Genworth's plan to seek significant future rate increases and who want or need to reduce their premiums are likely seeking meaningful premium reductions that will allow them to cope with the potential significant future rate increases.  To obtain meaningful premium reductions based on filed rates, Policyholders must make meaningful benefit reductions.  Considering all these factors, Class Counsel negotiated the Options that would, in their judgment, be most meaningful for the Class in light of the claims alleged and options many policyholders have selected in the past following Genworth's rate increases.  The fact that some Class Members might prefer other options does not make the Settlement unfair, unreasonable, or inadequate.  *See Skochin* Order, Nov. 5, 2020, at 47 (stating, "It is true that the Settlement Agreement does not present class members with

every conceivable option, or even, the option in light of the particular circumstances faced by each class member. But that does not mean that the Settlement Agreement lacks value.").

> ### 6.    The costs of the Settlement will not lead to higher premiums.

In paragraph 67 of the Amended Settlement Agreement, Genworth warrants that it is currently solvent, that the payment of the Cash Damages awards, fees, and costs in this Settlement will not cause GLIC or GLICNY to become insolvent, and that Genworth *will not use these Settlement Costs to justify future rate increases*. ECF No. 43-2, page 30 of 86. Objections that the costs of the Settlement will lead to higher premiums should thus be overruled. *See* Dowler Objection, ECF No. 45 at 1; Arrowsmith Objection, ECF No. 55 at 1; Dimiduk Objection, ECF No. 67 at 1.

> ## C.    The Objections to Attorneys' Fees and Service Awards Should be Overruled.

> ### 1.    The attorneys' fees are earned and justified.

Eleven Class Members object to the requested attorneys' fees. The Howards object to the attorneys' fees being paid because they see no benefits to the Disclosures or Special Election Options in the Settlement. ECF No. 37 at 1–2. Ms. Black argues the fee arrangement is "highly unethical" because attorneys' fees are based on a percentage of the Cash Damages payments, which she argues "will be dwarfed many times over by the reduction of benefits and the ever-increasing cost of care." ECF No. 46 at 3. Ms. Dimiduk objects to the requested attorneys' fees because she does not yet know if she will benefit from the Settlement. ECF No. 67. Several Class Members also object to the amount of attorneys' fees because the case was filed less than one year ago or because this case is based on two similar cases that preceded it. *See* Berg Objection, ECF No. 44 at 2; Moore Objection, ECF No. 54; Lang Objection, ECF No. 51 at 19–24; Bos Amended Objection, ECF No. 58 at 1. The Langs object that the requested attorneys' fees are "beyond the

pale." ECF No. 51 at 19. They argue the lodestar multiplier is not warranted "considering the discounted value of this settlement" compared to the *Skochin* and *Halcom* settlements. *Id.* To the extent the Court uses the percentage method, the Langs argue "the structure of these settlements makes quantification of settlement value challenging" and that if Class Counsel's $224–$609 million settlement projections are used, those numbers should be "offset for enormous reductions in policy holders' coverage that come with their elections under the settlement." *Id.* If the value is not offset, the Langs argue, "the so-called 15% recovery is simply a number drawn out thin air." *Id.* at 20. They quote the Advisory Committee Notes to Rule 23 emphasizing that "one fundamental focus [of Courts reviewing a fee request] is *the result **actually** achieved* for the class members . . . ." *Id.* at 20–21. Further, given the claimed uncertainty in the Settlement's value, the Langs urge the Court to use the lodestar method, or at least employ a lodestar cross-check. Under either lodestar method, the Langs aver that a 9.8 multiplier is not common and not justified by the results in this Settlement when compared to the *Skochin* and *Halcom* settlements. *Id.* at 21–24.

While this case was premised on a similar theory to the *Skochin* and *Halcom* cases, this case required its own significant work that was independent of the work done on the prior cases.[11] Also, while this case was filed in January 2022, a significant amount of work was done pre-filing. The Declarations submitted with Class Counsel's Fee Brief detail what was done to ensure this Class was adequately represented throughout this litigation. *See* Penny Decl. at ¶¶ 9–10.

---

[11]    *See* Memorandum of Law in Support of Class Counsel's Application for an Award of Attorneys' Fees and Expenses and Service Awards to the Named Plaintiffs, ECF No. 42 at 3–4, 10–12, and 14–17 ("Fee Brief"); Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement, ECF No. 40 at 19–21 ("Final Approval Brief"); and the Declaration of Brian D. Penny in Support Of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement; and (2) Class Counsel's Application for an Award of Attorneys' Fees and Expenses and Service Awards to the Named Plaintiffs, ECF No. 43 at 3–5, 9–10 ("Penny Decl").

As to the amount of fees requested and the value of the Settlement's benefits, Class Counsel submitted a Declaration in support of their motion for final approval that modeled potential elections and the Cash Damages payments that would result therefrom. While that modeling illustrated potential Cash Damages payments of between $224–$609 million, the figures are merely illustrations and do not determine Class Counsel's fee. Class Counsel's fees will be 15% of the Cash Damages payments **actually received by each Member of the Class who selects a Special Election Option containing Cash Damages**, **capped** at $13 million. The fee request is contingent on the actual value obtained by each Class Member, which is perfectly aligned with the Advisory Committee's Notes to Rule 23 cited by the Langs. The 15% figure is thus not a number "pulled from thin air," and in fact is quite low when compared to other contingent fee percentages awarded by Courts in this Circuit.[12] Even if the Cash Damages payments end up on the very low end of the illustrations, $13 million would represent less than 6% of the Class's total cash recovery, and those fees will be paid separately from the Cash Damages payments, meaning none of the Class Members' recoveries will be reduced at all to pay the fees. On the high-end illustration of $609 million, the requested fee would amount to roughly 2% of the Class's cash recovery and it will never be more than 15% under any scenario. These percentages are well within the range of reasonableness, even for a mega fund settlement. *See* Fee Brief at 6–7, 13–14.[13]

A lodestar cross-check does not replace the percentage method. *See In re MicroStrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 787 (E.D. Va. 2001). Rather, it is meant to ensure there is some balance between the amount of the fee and the recovery. One would naturally expect that

---

[12]    *See* Fee Brief at 6–7, 13–14.

[13]    As explained above in Section II.B.1, there is no reason to "offset" the value of the cash damages payments by the reduced benefits that come with reduced premiums in the Settlement.

where the fee is a low percentage of the recovery, the resulting lodestar multiple would be on the high end and vice versa. Here, under even the most conservative estimate, the fee will represent a very low percentage of the recovery. This, in turn, warrants a multiple on the very high end, just as it did in *Skochin* and *Halcom* under similar circumstances.

Regarding the use of the lodestar cross-check, this Court has twice employed this method and both times found Class Counsel's similar multipliers reasonable in light of the results achieved and the work performed. To the extent the Langs argue that a similar multiplier is not warranted here because they believe the results obtained are inferior when compared to the prior settlements, the Langs are simply making an inapt comparison. As described above, the facts and merits of this case were different from and more challenging than the prior cases. The relevant comparison is not the *Haney* Settlement value compared to *Skochin* and *Halcom*, but rather the *Haney* Settlement value compared to the merits of *Haney*. As explained herein and in Class Counsel's Fee Brief, those results are quite favorable, and the fee has been earned based on those results and the amount of work and expertise needed to obtain them. *See, e.g.*, Class Counsel's Fee Brief at 14–20. Each of the Objections to the attorneys' fees should be overruled.

Finally, Mr. Bos suggests that the attorneys' fees should be arbitrarily reduced by 50% with the difference used to increase all proposed settlement amounts and that Genworth be required to pay "25% of the recoveries they experience from retiring or reducing targeted policies for risk pools involved in this settlement agreement as determined by an independent actuary[.]" ECF No. 58 at 2. But this is not a common-fund settlement and attorneys' fees are paid separately. Thus, reducing fees would not automatically increase Cash Damages Payments. Even so, reducing attorneys' fees by $6.5 million, spread evenly across all 352,000 Class Members, would result in only an additional $18.47 per Class Member, not a meaningful sum even if the reduction to

attorneys' fees was warranted, which it is not.  As to the second part of his suggestion, benefit reductions reduce Genworth's tail risk, meaning they result in improvements to Genworth's reserves relative to its liabilities.  To the extent a reduced tail risk to Genworth will result in an improved ability to pay future claims, a reduced need for future rate increases, or both, that will **benefit** all Policyholders (and thus, all Class Members).  Further modifications to this Settlement structure, including the payment of attorneys' fees, Cash Damages, or the voluntary benefit reductions by Class Members, simply are not warranted.

### 2.    Named Plaintiffs have earned their service awards.

Four Class Members filed two Objections to the requested service awards for the Named Plaintiffs.  The Howards object that "it is impossible to know whether the proposed $15,000 per class plaintiff is reasonable or unreasonable."  ECF No. 37 at 2.  The Bergs object that the payment of service awards generally presents a conflict of interest.  ECF No. 44 at 2.  The Fourth Circuit disagrees with the Objectors, finding that service awards are proper to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *See Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015).  As this Court noted in *Skochin* and *Halcom*, courts in this Circuit have approved service awards as high as $25,000, and awards as high as $50,000 have been granted in other cases.  *See Skochin v. Genworth Fin., Inc.*, 2020 WL 6536140, at *10–11 (E.D. Va. Nov. 5, 2020).  As explained in more detail in Class Counsel's Fee Brief and the declarations of the Named Plaintiffs, the Named Plaintiffs have earned their service awards through their diligent representation of the Class and their willingness to prosecute this case even though it required them to disclose sensitive health and financial information.  Fee Brief at 21–24; Named Plaintiff Declarations, ECF Nos. 43-10–43-14.  These awards are warranted and the Objections to them should be overruled.

D.     **Additional Objections**[14]

1.     **Berg Objection**

The alleged "deception" the Bergs complain of—Genworth's representation at the time of purchase (2007) that it had never raised premiums on any of its LTC policies (*see* ECF No. 44 at 1)—not only falls outside of the Class Period (which begins January 1, 2013) but was also a true representation at the time it was made.  In any event, Plaintiffs have not alleged that Genworth had plans to raise premiums on the Class Policies at the time the Bergs purchased their policies, nor is Class Counsel aware of any such plans at that time.  A claim for intentional misrepresentation (or even negligent misrepresentation) based on future rate increases that Genworth (and the rest of the LTC industry) did not foresee in 2007 is not part of this lawsuit, nor does it appear that it could have been.  Since there is no cognizable claim in this case that dates back to the formation of the Bergs' policies, Class Counsel could not have obtained a full refund of their premiums even if this case had proceeded to trial.  The Settlement is not inadequate for failing to provide such a benefit.

For the same reason, the Bergs' related objection that the Class should include inactive policyholders fails.  The Bergs argue the Class should include all policyholders who ever paid a premium "because all policy holders were subjected to the same deception . . . starting from the day they agreed to purchase their policy."  ECF No. 44 at 2.  But there are no Special Election Options available to policyholders who no longer have in-force policies, and Disclosures concerning Genworth's plans for future rate increases and its financial condition are not relevant

---

[14]    Class Counsel is aware of a letter sent to the Claims Administrator by Jerry Dean that purports to be an Objection to the Settlement.  According to Genworth's records, however, Mr. Dean is not a member of the Class and thus has no standing to object to the Settlement.  Nevertheless, Class Counsel attached Mr. Dean's letter to the declaration of Brian D. Penny filed contemporaneously with this brief.  *See* Penny Decl. Exhibit 6.  Even if the Court were to consider Mr. Dean's letter to be a valid objection, Class Counsel believes all of Mr. Dean's complaints are addressed herein.

to any decision they could make regarding their lapsed policy.  A Class definition that includes inactive policyholders would be inappropriate, in part because it would include within the Class Policyholders who were not allegedly harmed.  The Bergs' Objection should be overruled.

### 2.    Dowler Objection

The Dowler's "proposals for continuing negotiations" to avoid a "windfall" to Genworth are neither necessary nor appropriate.  *See* ECF Nos. 45 and 47.

First, the Dowlers argue for a more traditional common-fund settlement structure like that in *Wedding v. Cal. Pub. Emps. Ret. Sys.*, No. BC 517444 (Cal. Super. Ct., Los Angeles Cnty.), but that structure would not address the harm Plaintiffs alleged Genworth caused (omission of material disclosures), nor would it place the Policyholders in the same position they occupied prior to the alleged fraud.  Also, the settlement structure in *Wedding* required all class members to cede their policies in exchange for a refund of premiums; if a class member wanted to maintain their LTC policy, they were required to affirmatively opt-out of the settlement.  Critically, that proposed settlement has since been **terminated** by the parties because 30% of the class opted-out of the settlement (compared to the 0.00053% opt-out rate here).  In Class Counsel's informed judgment, any settlement that requires Policyholders to surrender their policies would not be a good result and is unlikely to be popular with most Class Members.

Second, the Dowlers suggest creating a new option whereby the Class Member could maintain their current benefits and obtain a $5,600 Cash Damages payment.  ECF No. 47 at 2.  As explained above, and as recognized by the Court when approving the *Halcom* settlement, Class Members who maintain their current benefits after receiving the Disclosures were not financially damaged by being deprived of the Disclosures in the past because they would not have made a different decision about their premium payments even with the Disclosures.  Thus, no financial

damages are warranted in the Settlement for those Class Members.  The Dowlers' Objection should be overruled.

### 3.    Podoll Objection

Michael Podoll's objection that awarding flat Cash Damages treats Class Members "equally" but not "equitably" (*see* ECF No. 48 at 1–2) ignores, as explained above, that the merits of this case were not as strong as they were in *Skochin* or *Halcom*, and it is highly unlikely Genworth would have agreed to a multiplier structure for Cash Damages, let alone a 4x multiplier. *See* Final Approval Brief at 19–21.  Again, Genworth's internal rate action "plans" for this Class's policies (Choice 2) were significantly shorter and less concrete and substantial than they were in *Skochin* (Choice 1) and *Halcom* (PCS I and 2).  Further, since this Class is larger than the *Skochin* and *Halcom* Classes **combined**, Class Counsel was aware that Genworth—and many Class Members—preferred a flat damages payment to streamline the notice and administration of this Settlement.  Class Counsel used this leverage to negotiate a flat Cash Damages payment amount that they believed was approximate or even more generous than what could have been obtained by using a version of the *Skochin* methodology, while also, critically, providing greater clarity to all Class Members at the time of Class Notice regarding the size of the Cash Damages payments.  In doing so, Class Counsel used data regarding average premium rates for this Class to ensure that the flat Cash Damage payments were more than adequate based on the strength of Plaintiffs' claims.  All things considered, Class Counsel was able to deftly negotiate Cash Damages payments using a new methodology to achieve a result that is approximate to, if not better, than would have been achieved using the old paradigm, while also streamlining settlement administration and improving the Class Notice.

Mr. Podoll's additional objection that the Settlement does not account for benefit reductions that predate the Settlement and its Disclosures is inapt; if a Class Member previously

reduced their benefits based on what they could afford, **not based on the Disclosures obtained in the Settlement regarding future rate increases**, then those benefit reductions were not caused by the alleged lack of Disclosures but rather the affordability of premiums at the time.  If Plaintiffs went to trial and tried to establish financial damages, those damages would need to be tied directly to Policyholders' inaction resulting from the alleged lack of full disclosures.  Perceived "damages" related to the rate increases themselves, or premium and benefit reductions caused by anything other than the alleged lack of disclosure, would not have been compensable under Plaintiffs' litigation claims.  Moreover, even if a Class Member made a reduction in the past that was not induced by the lack of full disclosure, if the Disclosures cause them to make a further reduction, then they will receive Cash Damages payments in the Settlement to account for the impact the **Disclosures** had on their coverage election.  As noted above, there are a number of inconvenient facts and legal doctrines that Plaintiffs must contend with here, and the Settlement obtains maximum relief in the face of those numerous constraints.

### 4.    Hays Objection

The Hayses raise two objections.  ECF No. 49.  First, they object that there is "no meaningful settlement option that realistically addresses inflation[.]" *Id.* at 1.  While noting there is one Special Election Option that includes a 1% inflation protection benefit, they cite several statistics regarding the increasing cost of long-term care that exceeds 1% annually. *Id.*  Second, they argue that the options offered do not provide "meaningful future benefit(s) in continuing to maintain adequate coverage with help on premiums."  *Id.* at 2.  They cite statistics from online sources to opine that the Special Election Options will not provide for complete coverage of LTC needs.  *Id.*

As explained above in response to Mr. Podoll's Objection, the current Options offered in the Settlement are intended to meet the premium reduction needs of most Class Members that will

select an Option.  While it may be true that a Policyholder who reduces their benefits may not have benefits that would cover 100% of their long-term care needs, this is not a critique of the Settlement, but rather a reflection of the increasing cost of long-term coverage.  Further, Policyholders with full benefits have the option to keep them.

The Hayses conclude their Objection by suggesting another option be added that uses the "2020 annual premium rate as a starting premium" and then caps premium increases at 5% per year until Genworth had collected $7,000 in increased premiums.  Thereafter, they suggest, increases would no longer be capped.  *Id.*  This option, like many others that could be hypothesized, is unrealistic and untenable under the settlement structure.  With respect to the specific option proposed, it would roll-back prior, Regulator-approved rate increases and cap future rate increases.  Both of these remedies would invade the rate setting province of each State Insurance Regulator and is the very sort of relief that would be precluded by the filed rate doctrine.  More generally, as noted above, Class Counsel carefully assessed and agreed to a slate of options that was both workable and consistent with the goals of the Settlement of allowing Policyholders to reduce or stop paying their premiums (by reducing their benefits) in light of the Disclosures and compensate them for having not made that premium reduction sooner.  That other options could be conceived— however feasible they may or may not be—is not a basis to object to the settlement as devised.  To the extent that the Hayses, or any other Class Member, wish to advocate for fixed or level premiums going forward, that is a matter for consideration by their State Regulators in reviewing rate increase requests.  But it is not part of this case, whether in the relief sought in the Complaint or that agreed to in the Settlement.  The Hays's Objection should be overruled.

5.    **Lang Objection**[15]

a.    **All Members of the proposed Settlement Class have been injured and thus have standing.**

Recycling a failed objection to the *Halcom* settlement, the Langs speculate Choice 2 Policyholders in Virginia and Massachusetts lack injury, and thus standing, because they have already been afforded certain disclosures about Genworth's future rate increase plans.  ECF No. 51 at 8–13.  But they offer no evidence that the referenced rate action letters from *Halcom* (PCS 1 and 2) were identical to the Langs' rate action letters (as Choice 2 Policyholders); indeed, the Langs' declarations state that they were unable to locate certain rate action letters but "they specifically recall that the correspondence **did not** inform us of the full extent Genworth's planned rate increases."  *See* ECF No. 51-1 at ¶8 and ECF No. 51-2 at ¶8.

Instead of providing evidence to support their Objection, the Langs **assume** that Choice 2

_____

[15]    While each of the Langs' objections lack merit and should be overruled independent of any other consideration, Class Counsel feels compelled to add that the Langs' law firm, the Bandas Law Firm, has been repeatedly admonished by courts throughout the country for being "professional objectors" who frequently attempt to "hijack" class action settlements in order to extort legal fees.  *See, e.g.*, *Brown v. Wal-Mart Stores, Inc.*, 2011 WL 12523823, at *1 (Ill. Cir. Ct. Sep. 14, 2011) (striking a class action objection filed by the Bandas Law Firm and denying motion for *pro hac vice* admission, stating "Bandas [the firm's founding partner] is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hardworking counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees.'"); *Edelson, PC v. Bandas Law Firm PC*, 2019 WL 272812, at *1–2 (N.D. Ill. Jan. 17, 2019) (enjoining entire Bandas Law Firm from seeking admission to practice in any state or federal court unless the *Edelson* injunction is attached to the *pro hac vice* motion, based on reputation as professional objectors).  Here, the Langs' attorney, Robert Clore, purports to be "direct[ing] the Langs' representation," which other courts have admonished may not be used to circumvent injunctions applying to Mr. Bandas and his firm, particularly if Mr. Bandas is involved with this Objection but has not sought admission in this Court.  *See Garber v. Off. of Comm'r of Baseball*, 2017 WL 752183, at *6 (S.D.N.Y. Feb. 27, 2017) (noting that Bandas has a reputation for "us[ing] attorneys as 'local counsel' without full disclosure of his track record and to shield himself from potential disciplinary action associated with frivolous objections").  In any event, courts have admonished Mr. Clore as well.  *See, e.g.*, *Cole v. NIBCO, Inc.*, No. 3:13-cv-07871 (D.N.J. Apr. 5, 2019), ECF No. 223 (denying *pro hac vice* application of Robert Clore based on his affiliation with the Bandas Law Firm).

Policyholders in Virginia and Massachusetts were given the same disclosures regarding future rate increases that were provided to the PCS I and PCS II policyholders in *Halcom*, under the further assumption that Regulators in those States "ostensibly required" such disclosures be made to all policyholders (including Choice 2 Policyholders) in their States. *Id.* at 9–10. Based on these unsupported assumptions, the Langs conclude that if Genworth already made these disclosures to some Members of the Class, then those Policyholders do not have standing. *Id*. at 12. The failure to provide any evidence or specific facts to support the Langs' objection is fatal. *See 1988 Tr. For Allen Children*, 28 F.4th at 520 (objections must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them). At the very least, these assumptions could and should have been tested by the Langs' counsel before filing such an objection, but clearly were not. In any event, had the Langs' counsel tested these "assumptions," they would have confirmed they are inaccurate, and that this Objection should be overruled for all the same reasons it failed in *Halcom*.[16]

Regulators in Virginia and Massachusetts (or elsewhere) have not required Genworth to provide the same Disclosures, in the same manner or with the same Options, provided in this Settlement and specifically the Special Election Letter. First, the Langs completely ignore the Disclosures required by this Settlement regarding Genworth's need to obtain future rate increases to be able to pay future claims or those relating to Genworth's current financial condition. Moreover, even the disclosures the Langs cite from the *Halcom* objection relating to future rate increases are **not** the same Disclosures required in the Settlement. For example, while the

---

[16] Before this same objection in *Halcom* was essentially abandoned and then withdrawn, the Court, after having entertained considerable argument on this objection, had already stated that it intended to approve the Settlement. *See Halcom v. Genworth Life Insur. Co.*, No. 3:21-cv-00019-REP, Transcript of March 3, 2022 Conference Call, 5:11-14.

Massachusetts Insurance Commissioner previously required Genworth to disclose what percentage increase it would need to avoid future rate increases (*id.* at 10), as explained in *Halcom*, that disclosure is **different** from the Disclosure required by this Settlement of what Genworth is **actually** planning to seek in future rate increases. *See* Halcom Reply Brief at 11. Additionally, while the Virginia Regulator required Genworth to disclose an approved 63% increase over a three-year period in 2013, Genworth did not disclose what **other future rate increases it planned** to seek in Virginia, which is the information Plaintiffs sought here and what this Settlement requires.

Moreover, none of the prior disclosures referenced in the *Halcom* objection were as clear, complete, or comprehensive as those offered in this Settlement; none are combined with the chance to make Special Election Options that provide enhanced coverage or Cash Damages payments; and **none** were made prior to administration of the *Skochin* settlement. All Class Members are thus similarly situated for the majority of the Class Period, and the Langs' Objection should be rejected for all the same reasons it failed in *Halcom*.

Additionally, even if Virginia and Massachusetts Class Members lacked standing (they do not), the Langs' assumption that their and other Class Members' settlement value is "diluted" by including those Class Members is patently wrong. *See* ECF No. 51 at 13. The Special Election Options available to each Policyholder are individualized, and the characteristics of the Options, including the associated Cash Damages, are not affected in any way—as they might be in a common-fund settlement—by the participation or non-participation of any other Policyholders. Thus, even if Class Members who were allegedly not damaged were included in the Class (which they are not), and such Class Members obtained a Cash Damages Payment or enhanced paid-up benefit, it would have no bearing whatsoever on the Langs', or any other Class Member's, Options or monetary recovery in the Settlement. In other words, the Langs and other Class Members will

receive the same Disclosures, the same Special Election Options (depending on their current benefits), and the same amount of Cash Damages (depending on their elections) **regardless** of whether Virginia and Massachusetts Policyholders are included in the Settlement.  Because Virginia and Massachusetts Policyholders allegedly suffered the same type of harm as every other Class Member, Class certification is not defeated.  *See* ECF No. 51 at 13.

As a fallback, the Langs claim that if Virginia and Massachusetts Policyholders have suffered damages, "they have marginal claims at best" and should thus be subclassed with separate representation.  ECF No. 51 at 13.  But again, all Policyholders in all States were deprived of the full set of Disclosures for the majority of the Class Period.  Even if Policyholders who may have a shorter damages periods were included in the Class, that would not require separate representation or subclassing because it would not create any intraclass conflict.  For example, the inclusion of Virginia and Massachusetts Policyholders did not reduce the Class's bargaining power in any way, nor does it dilute the relief offered to the other Class Members.  In fact, it is Class Counsel's opinion that by being able to appropriately include all Policyholders in the Settlement, the Class's bargaining position was enhanced because Genworth was able to obtain global peace for this Class as a result of the Settlement.  This Objection should be overruled.

### b.    Policyholders in NFO status are adequately represented.

As explained above, it is not proper or reasonable to compare the value of Settlement Options, including for Policyholders who previously elected a NFO, in this case to those made available in *Skochin* or *Halcom* because the conduct alleged, timing, and characteristic of rate increase plans, and consequently the strength of the claims in those cases is not the same.  Yet the Langs argue that while they, and others like them who have already elected a non-forfeiture option, "have stronger claims than the rest of the class because they can more easily establish reliance,"

their benefits have "plummet[ed] from *Skochin* and *Halcom* relative to the rest of the Class," specifically that for NFO Status Class Members, their potential Cash Damages payment is $1,000 as opposed to $2,500 in *Halcom*.  ECF No. 51 at 16.[17]

The Langs' claims are not stronger than the rest of the Class; if anything, they are weaker. Because the Langs elected a NFO **prior** to getting the Disclosures, they made the decision to stop paying premiums **before** learning of Genworth's plans to seek even more increases in the future, and before receiving the full Disclosure about Genworth's credit rating and its ability to pay future claims.  In other words, their decision to cease paying premiums was made based on the current rate increase they faced with the associated information then disclosed and was not hindered by having less information.  Reliance on the absence of the Disclosures for the Langs and other NFO Status Class Members, and resulting damages, would therefore be more challenging to prove.  By already electing the NFO, the Langs no longer pay premiums, meaning they are no longer subject to future premium increases, nor are they paying more premiums between the time they made that NFO election and the time their Special Election Letter will arrive.  Thus, they have less potential financial damages than Policyholders who are still paying premiums and still subject to future premium rate increases.

Moreover, the Langs have mitigated their potential damages by having already elected the NFO, which excused them from paying premiums and, thus, from future premium increases.  It bears noting while electing the NFO a year earlier would have saved the Langs $2,056.32 in premiums, their paid-up NFO benefit would have been reduced by that same amount.  *See* ECF No. 51 at 7–8.  While the Langs aver they could have earned interest on the premiums they would

---

[17]    The Langs omit that in *Skochin*, the Cash Damages payment for the Special Election Option that provided Cash Damages to NFO Status class members was $1,000.

not have paid had they elected the NFO sooner, the $1,000 Cash Damages payment available to each of them more than makes up for that. To further illustrate the fallacy of the Langs' argument, two policyholders in *Halcom* made the exact **opposite** argument from the Langs: that the relief offered to Class Members in non-forfeiture status is **better** than that offered the rest of the Class because NFO Class Members are not required to change any of their current benefits to receive Cash Damages. *See Halcom* Reply Brief, ECF No. 86 at 33.

If the Langs believe their claims are stronger than the rest of the Class and that they are entitled to more than the $1,000 Cash Damages payment, then they were free to opt-out and bring their own lawsuit to test the actual strength of their claim. And to be clear, the Parties would welcome that and hereby consent to the Langs doing so. The Langs' Objections should be overruled.

### 6. Belkin Objection

While the substance of Jane Belkin's Objection is opposed in sections II.B.3 & 4, there are two additional deficiencies with her Objection. First, Ms. Belkin, through her attorney and fellow Class Member (though not purporting to object himself) Jeffrey Belkin, objects without further explanation that "(1) the relief provided for the class is not adequate and (2) the proposal does not treat class members equitably relative to each other." ECF No. 53 at 1. These Objections fail Rule 23's requirement that all objections "state with specificity the grounds for the objection" and should be rejected for that reason alone. *See* Fed. R. Civ. P. 23(e)(5)(A). Second, Ms. Belkin purports to join in "all similar objections," including Mr. Bos's Objection. A Class Member is not permitted to simply join all other Objections; rather, as cited above, each Class Member must state their own Objections with specificity. Ms. Belkin's Objection is thus both meritless and deficient under Rule 23 and should be overruled.

### 7.    Moore Objection

Because class action settlements may, and frequently do, release concealed or hidden claims related to the facts alleged, Richard Moore's objection to the scope of the Release is unsupported.  *See* ECF No. 54 at 1; *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 2022 WL 3043103, at *7 (E.D.N.Y. Aug. 2, 2022); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2017 WL 2559230, at *10 (S.D.N.Y. May 22, 2017); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 2212780, at *8 (N.D. Cal. May 17, 2017), *aff'd*, 746 F. App'x 655 (9th Cir. 2018); *Wittstadt v. Hosch*, 2016 WL 7157417, at *2 (D. Md. Dec. 8, 2016); *In re Platinum & Palladium Commodities Litig.*, 2015 WL 10853179, at *3 (S.D.N.Y. Feb. 27, 2015); *In re Royal Ahold N.V. Secs. & ERISA Litig.*, 437 F. Supp. 2d 467, 470 (D. Md. 2006).  For example, the court in *In re Volkswagen* recently held that:

> The district court did not err by approving the settlement because it released Volkswagen from "any and all claims, . . . whether or not *concealed or hidden*," by class members arising from its installation of the defeat devices at issue. The "concealed or hidden" phrase that Kangas complains of is boilerplate that appears in many class settlement releases. *See, e.g.*, *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1010 (9th Cir. 2012); *Torchia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 264 (E.D. Cal. 2014). Read in context, the phrase—listed next to modifiers such as "foreseen or unforeseen," and "suspected or unsuspected"—appears to cover only claims of which class members are not yet aware, not claims that Volkswagen has actively or fraudulently concealed. Moreover, the release is limited in scope: it includes only claims related to the defeat devices at issue and expressly does not release personal injury or wrongful death claims. Approving the settlement with this release was not an abuse of discretion.[18]

---

[18]    Plaintiffs have located a single case where a state trial court refused to approve a class action settlement because the release language was overly broad due to, among other things, the inclusion of the release of "hidden or concealed" claims.  *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 345, 348 (Del. Ch. 2006).  In that case, the court, as a matter of its own discretion and specific to the facts of the case before it, directed the parties to strike the release of "hidden or concealed" claims because that release could operate only to release claims that defendants had affirmatively concealed from plaintiffs.  *Id.* at 348.  As *UniSuper* was speaking to the unique facts of that particular case, its holding is limited to those facts and does not stand for the broader proposition that a class action settlement may not release "hidden or concealed" claims.

Here, the Release is similarly limited in scope and only releases claims that "relate to claims alleged, or that have a reasonable connection with any matter of fact set forth in the Action including, but not limited to, any claims relating to rate increases on Class Policies." The "hidden or concealed" language refers to claims of which Class Members may not yet be aware. The Release also has an explicit carve-out for "express and intentional misrepresentations in the Disclosures or representations made by the Genworth Released Parties or Class Counsel about the Disclosures," such that any purported concerns regarding concealed intentional or fraudulent conduct are not present. Accordingly, the release of concealed or hidden claims is appropriate.

Finally, Mr. Moore notes that in reading the Complaint he "got the impression that Class Counsel believes that Defendants have a long-standing, long term plan for premium increases" and if so, Class Counsel should have required that "crucial" information be disclosed. *Id*. at 1–2. On this, Class Counsel agree with Mr. Moore:  information about Genworth's internal plans for future rate increases is precisely what will be disclosed in the Disclosures to be provided in each Class members' Special Election Letter. The Moore Objection should be overruled.

**8.    Friedman et al. Objection**

David Friedman, James Perry, Thomas Toman, the Ebstynes, and the Dudleys, through their attorney Benjamin Vernia, object to the Settlement, raising two issues:  (1) the Special Election Options are inadequate and unreasonable when compared to the prior *Skochin* and *Halcom* settlements (addressed above in section II.B.2); and (2) the proposed Settlement Class does not adequately represent the interests of Class Members who are over the age of 75.

With regard to their second objection, the Friedman Objectors' attorneys recycle—in several places verbatim—an objection by Ralph Ferrara to the *Skochin* settlement that was overruled. Parroting the Ferrara objection, the Friedman Objectors argue that Class Members who are 75 or older are differently situated than the rest of the Class since, given their age and increasing

health issues, these Class Members are allegedly "uninsurable" and thus cannot obtain alternative LTC insurance. This Court rejected that objection in Skochin after extensive briefing, argument, and analysis, reasoning that the materiality of the allegedly non-disclosed rate increase information was the same for the entire Class, regardless of age. Skochin, 2020 WL 6532833, at *22–24. The Court's reasoning in overruling Mr. Ferrara's objection applies equally here.

The Friedman Objectors' proposed solution—freezing premium rates for Policyholders 75 or older—is precluded by the filed rate doctrine and thus could neither be demanded at trial nor awarded by the Court. Even assuming a premium freeze was regulatorily and actuarially possible, Genworth would not agree to such terms. Indeed, a negotiated settlement need only be fair, reasonable, and adequate; accommodation of every Class Member's objection is not necessary. The Friedman et al. Objection should be overruled.

### 9.    Davis/Freedlander Objection

Gary Davis and Lorraine Freedlander's objection that they must decide whether to opt-out of the Settlement before being afforded the Disclosures was already overruled by this Court in Skochin. ECF No. 61 at 2; Skochin, 2020 WL 6532833, at *15–16. In correctly overruling that objection, this Court explained that "[a]lthough understanding the magnitude of projected future rate increases is important in deciding which option to pursue when presented with [the Special Election Options], it is not information that is necessary in deciding whether . . . to opt out of the class action and proceed on one's own with a fraud claim." Id. at *15. Class Counsel underscores that the value of Disclosure about Genworth's future rate action plans is **in the context of Class Members determining whether to reduce or cease paying their premiums**, i.e., in the Special Election Letter providing the Special Election Options. In that respect, providing this information now—subject to change if and when the Special Election Letters are sent—would not achieve the purpose of the Settlement and, indeed, likely would cause confusion amongst a substantial portion

of the Class Members.  This Objection should be overruled for the same reason.

### 10.    Haslett Objection

John Haslett, an independent insurance broker, is familiar to both Genworth and Class Counsel because, beginning with the *Skochin* settlement, he has inundated the Parties with hundreds of emails (at last count, over 600 total) expressing opinions, demanding information, and otherwise criticizing Genworth, Class Counsel, and the settlements.  While much of Mr. Haslett's thirty-page, single-spaced Objection is spent lamenting State Regulator's approval of LTC rate increases and the LTC insurance industry's poor handling thereof, his few substantive objections should be overruled.  ECF No. 62.[19]

### a.    The California Department of Insurance's statement submitted in the *Skochin* litigation does not bear on the fairness of this Settlement.

Mr. Haslett appears to believe that the California Department of Insurance ("CDI") objected to the *Skochin* settlement—it did not.  *See*, *e.g.*, ECF No. 62 at 2–3, 5, 7, 12, 24 and 29. He also does not seem to be aware that the CDI determined that its concerns with the *Skochin* Settlement were fully addressed by modifications the parties agreed to make to the *Skochin* Special Election Letters.[20]  Mr. Haslett further ignores the portion of the CDI's letter that **supported** certain aspects of the *Skochin* settlement, including the Cash Damages payments and Disclosures.

---

[19]    Mr. Haslett also submitted an "Addendum" that "provide[s] minor edits and corrections of typos" on pages 22–24 of his Objection.  ECF Nos. 63 and 63-1.

[20]    After receiving the CDI's letter in *Skochin*, the parties were given a chance to discuss those concerns with the CDI and make any warranted changes.  Following those conversations, the parties submitted a revised template Special Election Letter that incorporated the CDI's edits and provided an update to the Court on interactions with the CDI and other States' insurance departments that also requested certain edits to the Letters.  At the last hearing on Final Approval of the *Skochin* settlement, the CDI confirmed that their concerns had been addressed by the parties. *See Skochin*, Transcript of September 11, 2020 Hearing, 10:7-11:1, ECF No. 209.

Genworth and Class Counsel have utilized the changes requested by the CDI in *Skochin* in both *Halcom* and this Settlement, and the CDI has not requested any further modifications to the Special Election Letters or communications with policyholders.  The CDI and all other State Regulators have been notified of both this Settlement (in multiple forms, including the statutorily required CAFA notice and by separate, direct outreach by Genworth, enclosing the Special Election Letter and requesting comment) and the *Halcom* settlement, and none have objected to, intervened in, or disapproved of the Settlement.  Mr. Haslett's allegation that State Regulators have somehow shirked their duties to Policyholders is unsubstantiated, as numerous State Regulators responded to both settlements with thoughtful questions and valuable input where they felt it was necessary, and the Parties have heeded that input and made requested modifications.[21]  This is precisely how the drafters of CAFA intended the notice requirement to work—and how this Court ordered the parties to proceed in *Skochin*—for the benefit of the Court and Class Members alike. To the extent this portion of Mr. Haslett's filing constitutes an objection, it should be overruled.

    **b. Mr. Haslett's Objection about the Settlement's Special Election Options not being "actuarially sound" misses the mark in multiple respects.**

Mr. Haslett's objection that the Special Election Options are not "actuarially sound," have not been "actuarially tested," or have not been reviewed by an independent actuary misses the entire point of this Settlement.  *See*, *e.g.*, ECF No. 62 at 5–6, 29.  Class Counsel did not—and could not—negotiate the actual premiums that result from the election of each Special Election Option.  States require that LTC insurance premiums be filed with the State Regulator before any such rate can be charged.  In this Settlement, the lowered premium resulting from each Reduced

---

[21] Genworth contemporaneously is filing a report of the feedback that it has received from state regulators about this Settlement.

Benefit Special Election Option will be calculated using the rate tables that have already been filed with and permitted by each State's Regulator for the coverage levels resulting from each Policyholder's election. Doing so avoids the supposed need for Regulators to review and approve of the premium rates resulting from the Reduced Benefit Special Election Options—because they have already done so. Finally, the Cash Damages payments for each Special Election Option do not require actuarial review or justification because they are not based on the "value" of any coverage that is reduced by selecting them but are rather meant to provide compensation for the alleged financial harm to Class Members from not receiving the Disclosures sooner.[22]

### c. Data from the *Skochin* settlement has not been withheld from Regulators or the Court.

Mr. Haslett also incorrectly claims that Genworth and Class Counsel are hiding the *Skochin* election data from Regulators, Policyholders, and the Court. ECF No. 62 at 2–3, 5, and 9.[23] Not so. Indeed, the Declaration of Genworth's Interim Leader for LTC in Force and Vice President & Actuary for Long Term Care Strategy and Analytics, Nick Sheahon, already submitted in this case, **disclosed those very election results**. *See* Penny Decl. Ex C (Sheehan Decl.), ECF No. 43-3 at 2, n.2. Genworth has never refused to provide such information to Regulators, and any Regulator that has requested the *Skochin* data has been provided it. In sum, nothing is being or has been

---

[22] As an independent LTC insurance broker, Mr. Haslett is paid a commission based on a percentage of the premiums paid on every Genworth policy he has sold to his clients, and therefore he has a vested financial interest in Policyholders maintaining their full benefits and paying higher premiums—*i.e.*, not reducing their premiums as this Settlement provides. *See also 1988 Tr. for Allen Child.*, 28 F.4th at 521 ("[T]he district court, at all times, remains a fiduciary of the class" and "must protect the class's interests from . . . frivolous objectors (who may impede or delay valuable compensation to others).").

[23] Henry and Anna Dowler make a similar objection that information regarding the *Skochin* elections is being withheld from the Class. ECF No. 45.

hidden from the Court, Class Members, or Regulators.

Mr. Haslett's complaint that the potential *Haney* Settlement Cash Damages illustrated in the Sheahon Declaration are not more directly tied to the *Skochin* elections for similar Special Election Options is also unwarranted. *Id.* As noted by several Class Member Objections, these Special Election Options in this case are not exactly the same as they were in *Skochin*, nor are the demographics of the Class Members or the underlying economics of the Choice 2 policy block and its resulting rate increase history. There is no requirement—or compelling reason—to assume that election results (*i.e.*, the number of Policyholders who elect each Option) will be identical to those in *Skochin*. As in the prior cases, the Parties have illustrated potential Cash Damages in a reasonable and perhaps even conservative way. The same approach is warranted here.

Mr. Haslett further argues the *Skochin* settlement results should have been scrutinized by the Virginia SCC Bureau of Insurance ("VA BOI") to somehow "improve" the *Haney* Settlement, but he offers no explanation of how that exercise could have resulted in "improvements" to this Settlement, let alone why the *Haney* Settlement is somehow unfair in the absence of such an analysis. *Id.* at 3–4. Again, the VA BOI, like every other State Regulator, has been made aware of the details of the Settlement, and it has raised no concerns about the Settlement.

### d. Disclosures regarding the Penn Treaty insolvency are not necessary to make the Settlement fair, reasonable, and adequate.

Mr. Haslett assumes, without any evidence, that the *Skochin* claims rate would have been lower had Policyholders been informed about the existence of their respective State Guarantee Association ("SGA"), which generally provides a limited safety net when a health insurance company fails or becomes insolvent. ECF No. 62 at 10–11. He goes on to suggest that disclosures be made for a myriad of additional issues, such as an explanation of risk-based capital ("RBC") ratios, all the details of insolvency filings and concomitant SGA safety nets, the timeline of the

complete insolvency process, policy underwriting guidelines, State-specific SGA benefit levels, and the circumstances of other recent LTC carrier insolvencies. *Id.* at 12–14. Contradictorily and confusingly, Mr. Haslett then states that "[i]f the Court were to poll state regulators, it's unlikely that they would collectively support Class Members being proactively educated on State Guarantee Association benefit coverage[.]" *Id.* at 15. That is, Mr. Haslett actually provides a ground for overruling this particular objection.

The additional disclosures demanded by Mr. Haslett are not necessary. Genworth has warranted in the Settlement Agreement that paying the costs of this Settlement will not cause it to be insolvent. ECF No. 43-2, page 30 of 86. The additional disclosures Mr. Haslett requests (essentially a primer on all aspects of insurance company insolvency) would be complicated, extensive, confusing and could mislead a Class Member about Genworth's financial condition (and thereby undermine the straightforward Disclosure taken from the current A.M. Best financial rating). This objection should be overruled as well.

> e. **That policyholders from other insurance companies have maintained benefits amidst rate increases does not make the Settlement inadequate.**

Mr. Haslett suggests that Plaintiffs' theory of the case is flawed because "the entire LTC industry has experienced incredibly high premium increase absorption rates while maintaining full policy benefits and unless the Defendants' Haney absorption rate is materially varied from its peer group, how could this Court have determined that the alleged disclosure issue contributed to the problematic rate and benefit decisions that were thus influenced by the alleged lack of disclosures." ECF No. 62 at 17. As an example, he points to a specific group of Brighthouse Policyholders who have allegedly maintained their full coverage in the face of significant rate increases at a rate of above 90%. *Id.* He then argues that Regulators have failed Policyholders and that LTC carriers should be getting more rate increases and corresponding benefit reductions to bring their reserves

to level. *Id.* at 18–20. Mr. Haslett's point appears to be that Class Members would either not have reduced their benefits in the past with earlier Disclosures (*i.e.*, the Disclosures are immaterial), or that they will not be interested in selecting any of the Special Election Options because Policyholders are generally reluctant to reduce benefits when faced with rate increases.

In fact, more than 45% of Genworth policyholders have made some benefit reductions in response to prior rate increases. Historically, Genworth has seen approximately 15–25% of its policyholders making benefit reductions or electing a NFO in response to ordinary-course rate increases. Plaintiffs have alleged in each of the Genworth litigations that those numbers would have been higher if full disclosures regarding Genworth's plans for **additional** future rate increases were provided. Indeed, when those Disclosures were made to the *Skochin* Class Members, 28% of *Skochin* Class members made reductions in exchange for lower premiums. From Plaintiff's point of view, the material effect those Disclosures had on the *Skochin* policyholders essentially proved the materiality of the Disclosures for that class. But, if, as Mr. Haslett argues, *Haney* Policyholders would not have taken any action in response to the Disclosures, that would only demonstrate that Plaintiffs here had a weak case on the issue of materiality but were still able to achieve a meaningful Settlement. All of this is largely academic anyway—again, no Policyholders in this Settlement are forced to change anything about their policies, premiums, or benefits if they do not wish to do so in light of the new information in the Disclosures. This Settlement simply presents information and options that Class Members can take or leave at their option.

### f.    Mr. Haslett's Focus on BIO.

By objecting that the Settlement should inform Class Members about how their reduced premiums are recalculated following election of the various Special Election Options, Mr. Haslett has once again lost focus on the Settlement and what it does and does not provide the Class Members. ECF No. 62, at 21–24. This objection is based on Mr. Haslett's individual request to

Genworth for a custom quote for his revised premiums if he were to make changes to his own policy **outside of the Settlement**, specifically, if he dropped his 5% BIO.  *Id.* at 21.  He notes that under this scenario, for his particular policy at this particular point in time, his premiums would be reduced by 1.5%.  *Id.*  Mr. Haslett further states that when he asked Genworth to explain how his premium was calculated, Genworth stated: "For policies such as yours, when a policyholder elects to terminate their policy's Benefit Inflation Option and retain their increased Monthly Maximum, the new premium is calculated using the policyholder's original issue-age and the filed-and-approved rate or an original benefit level that matches the increased Monthly Maximum."  *Id.* In other words, his new premium would take into account the fact that his benefit pool (a function of the Monthly Maximum) has grown substantially from the time he initially purchased his policy. From this, he extrapolates that "[b]ecause the overwhelming majority of Haney Class Members would have absolutely no idea that the potential lapsing of their inflation protection **could** result in such a minimal reduction (*i.e.*, or potential relative premium increase, if applicable) in relative monetary premium value, the benefit unit recalibration process must be fully disclosed and brought to Class Members attention."  *Id*. at 22 (emphasis added).

Depending on each Policyholder's individual circumstances, including when they purchased their policy and what their current benefits are (including as a result of having inflated over time), each Special Election Option may provide a relatively greater or lesser impact as it pertains to the reduction of premium.  The Special Election Letter discloses as much:  "All of the settlement options available to you may not be of equal value."  ECF No. 33-1 at 65 of 86. Importantly, all premiums are based on approved rate tables, and premiums resulting from election of the Special Election Options are calculated in the same manner as new premiums resulting from benefit reductions, *i.e.*, based on regulatorily **approved** rate tables.

Moreover, the Special Election Letter also **already informs Policyholders of the same information that Genworth provided Mr. Haslett** as to how **his** premium would be recalculated. Under the heading "Adjustment to premium," the Special Election Letter explains:

> If you select a settlement option that eliminates an Inflation Benefit or otherwise reduces your coverage, for all options other than a reduced paid-up benefit option, your new premium will be determined as follows: **Your new premium will be the same as what it would have been (at the time your settlement option becomes effective and including all premium increases) if your policy had included the reduced benefits since it first took effect**.

*See* ECF No. 33-1 at 66. That is, as Genworth explained to Mr. Haslett and as the Special Election Letter will also explain, the new premiums following an election (whether a Settlement Special Election or an ordinary-course election) take into account the new benefit levels and recalculate premiums as if the policy existed as such at issuance. Again, this is the way all premiums are recalculated inside and outside the Settlement and the disclosures about how those premiums are calculated are based on current Regulator-approved content.

### g. The $6,000 Cash Damages payment is adequate.

Mr. Haslett also objects that Cash Damages payments that are capped at $6,000 for several of the reduced benefit Special Election Options may be an "inadequate" award for the "richest" policies (meaning those with the highest benefit levels). ECF No. 62 at 24. However, as explained in response to a similar objection from Mr. Podoll in section II.D.3 above, these Cash Damages payments are more than adequate in light of the alleged financial damages suffered and after taking into account the strengths and weaknesses of these claims.

### h. Alleged Partnership Plan issues do not make the Settlement inadequate.

Finally, Mr. Haslett objects that no entity representing the interests of "the Public portion of Class Partnership policies" has intervened in this case. ECF No. 62 at 25–26. He notes that in some States, "noninsurance regulators [such as state health departments] [control] state LTC

Partnership Programs," and he therefore suggests the Court "direct various state health agencies to intervene within Haney to represent the interests of Class Member Partnership policy interests." *Id.*

Obviously, it is not the Court's role to determine every entity that might be tangentially impacted by every proposed class action settlement and then force those entities to intervene. Rather, CAFA's notice provisions require that the defendant notify the "Appropriate State Official" of any proposed class action settlement that impacts a potential "class member" that resides in their State. 15 U.S.C § 1715(a)(2) and (b). The "Appropriate State Official" is defined as "the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant, or who licenses or otherwise authorizes the defendant to conduct business in the State[.]" 15 U.S.C. § 1715(a)(2).

Here, the "Appropriate State Officials" are unquestionably the State Insurance Regulators, and Genworth has given full notice to each such Regulator as required by CAFA. *See* Notice by Genworth Life Insurance Company and Genworth Life Insurance Company of New York of Compliance with 28 U.S.C § 1715, ECF No. 29. It is then up to those State officials to decide whether to intervene or take other action (including notifying interested third parties, if any) relating to the proposed Settlement. In fact, the notice provisions in CAFA go on to state, "Nothing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials." 15 U.S.C. § 1715(f).

Mr. Haslett again provides the basis for overruling his own objection. He states that **he** "conveyed [his] concerns over Appendix C [the Special Election Options] and Partnership Class eligibility during the Skochin settlement to selected regulators," yet still complains about the perceived lack of "adequate Public sector representation appear[ing] to intervene on behalf of that

particular constituency to my understanding and knowledge." ECF No. 62 at 28.  There is no need for the Court to "force" further responsibilities upon the States considering that the States have declined to take the steps requested by Mr. Haslett himself.  This and each of Mr. Haslett's other objections to the Settlement lack merit and should be overruled.

### 11.    Mack Objection

In addition to his objection to the attorneys' fees, addressed in Section II.C.1 above, Michael Mack objects that "[t]here are no 'good choices' for the policy holders that have purchased these policies in good faith from a 'very reputable' company at the time of purchase" and he suggests an Option be added to the Settlement that would return to the Policyholder "half of the policy value at this time."  *Id.* at 1–2.  The fact that Mr. Mack might prefer other options not made available in this Settlement does not render the Settlement unfair or inadequate.  *See* ECF No. 64; *see Skochin*, 2020 WL 6532833, at *18 (noting that, in the end, the question is not whether everyone in the settlement is completely satisfied, but whether the settlement is a fair, adequate, and reasonable resolution of the claims asserted).  In fact, there are several good choices for Class Members who, upon review of the Disclosures, prefer to reduce or cease their premium payments and obtain commensurate Cash Damages as a result.  Class Counsel further notes that Mr. Mack offers no basis for why half of Policyholders' "policy value" should be returned; he does not articulate what he means by "policy value" (*e.g.*, premiums paid, benefits accumulated, something else); he does not address how that proposal relates to the Plaintiffs' claims in this case or the relief they sought.  Again, that other options could be conceived or, or would be preferred by certain Class Members, does not make the Settlement unfair, unreasonable or inadequate.

Mr. Mack also complains that there is no aspect of the Settlement that will constrain future rate increases.  ECF No. 64.  The reality, and the very premise of this litigation, is that future rate increases are and will be necessary.  The Settlement provides Class Members with additional

important information about Genworth's plans to seek such increases so that they can plan for and, if appropriate, adjust their benefits and their premiums. But it cannot constrain future rate increases, which is the province in State Regulators.  Mr. Mack's Objection should thus be overruled.

### 12.    Dimiduk Objection

Kathryn Dimiduk objects to the Settlement by letter dated September 30, 2022.  ECF No. 67.  In addition to her objection to the attorneys' fees, addressed above in Section II.C.1, she notes that she recently reduced her benefits in response to a rate increase and she objects to not knowing about the Settlement and its options before she reduced her coverage.  She further objects to having to decide whether to remain in the Settlement without knowing what settlement options she'll be afforded if the Settlement is approved.  *Id.*

Notice of the Settlement was delivered as soon as practicable and pursuant to the Court-approved schedule.  While the timing might have been not exactly as Ms. Dimiduk preferred, as part of its ongoing business, Genworth administers approved rate increases on an ongoing and regular basis in accordance with schedules driven by each State's regulatory process.  Regardless of when Notice of the Settlement was mailed, it is unavoidable that some Policyholders would be faced with rate increases shortly before the Class Notice arrived.  This does not make the Settlement or Class Notice inadequate.  With regard to Ms. Dimiduk's objection that she must decide whether to opt out of the Settlement before her Special Election Letter is generated and mailed, that objection mirrors several from the prior settlements, all of which were rejected as well. *See Skochin*, 2020 WL 6532833, at *13–17.  This objection should be overruled for the same reasons.

## III.    CONCLUSION

For the reasons set forth above and in Plaintiffs' Final Approval Brief and Fee Brief, and the Declaration of Brian D. Penny in Support of the same, the Court should approve the Settlement as fair, reasonable, and adequate, and award attorneys' fees and service awards in accordance with the Amended Settlement.[24][25]

DATED: November 3, 2022                PHELAN PETTY PLC

                                        /s/ Jonathan M. Petty

                                        JONATHAN M. PETTY (VSB No. 43100)
                                        MICHAEL G. PHELAN (VSB No. 29725)
                                        3315 West Broad Street
                                        Richmond, VA  23230
                                        Telephone:  804/980-7100
                                        804/767-4601 (fax)
                                        jpetty@phelanpetty.com
                                        mphelan@phelanpetty.com

                                        GOLDMAN SCARLATO & PENNY, P.C.
                                        BRIAN DOUGLAS PENNY
                                        Eight Tower Bridge, Suite 1025
                                        161 Washington Street
                                        Conshohocken, PA  19428
                                        Telephone:  484/342-0700
                                        484/342-0701 (fax)
                                        penny@lawgsp.com

---

[24]    If necessary, at the appropriate juncture, the Court should require appeal bonds to protect the Class from unnecessary appeals. "Appeal bonds are often required on appeals of class action settlements or attorneys' fee awards because the appeal effectively stays the entry of final judgment, the claims process, and payment to all class members." *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2018 WL 11203065, at *8 n.4 (E.D. Va. Oct. 9, 2018) (ordering all class action objector appellants, including the Bandas Law Firm, to file a motion stating what appeal bond amount the court should set).

[25] A [Proposed] Final Judgement and Order of Dismissal with Prejudice and a [Proposed] Order Awarding Attorneys' Fees and Expenses to Class Counsel, and Service Awards to Named Plaintiffs are attached as Exhibits B and C.

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART A. DAVIDSON (*pro hac vice*)
BRADLEY BEALL (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
bbeall@rgrdlaw.com

BERGER MONTAGUE PC
SHANON J. CARSON
GLEN L. ABRAMSON
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:  215/875-3000
215/875-4604 (fax)
scarson@bm.net
gabramson@bm.net

*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2022, I filed the foregoing pleading or paper through

the Court's CM/ECF system, which sent a notice of electronic filing to all registered users.


/s/ Jonathan M. Petty
_____

Jonathan M. Petty (VSB No. 43100)
PHELAN PETTY, LLC
3315 West Broad Street
Richmond, VA  23230
Telephone:  804/980-7100
804/767-4601 (fax)
jpetty@phelanpetty.com

*Counsel for Plaintiffs*