**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| **FRED HANEY, MARSHA MERRILL,** ) <br> **SYLVIA RAUSCH, STEPHEN SWENSON,** ) <br> **and ALAN WOOTEN, Individually and on** ) <br> **Behalf of All Others Similarly Situated,** ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> **vs.** ) <br> ) <br> **GENWORTH LIFE INSURANCE** ) <br> **COMPANY and GENWORTH LIFE** ) <br> **INSURANCE COMPANY OF NEW** ) <br> **YORK,** ) <br> ) <br> **Defendants.** ) <br> ) | **Civil Action No. 3:22-cv-00055-REP** <br><br> <u>**CLASS ACTION**</u> |

<u>**SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S NOVEMBER 17 AND 21,**
**2022 ORDER REGARDING CLASS MEMBER GARY DAVIS**</u>

Pursuant to the Court's November 17 and 21, 2022 Orders (ECF Nos. 94 & 98), Named

Plaintiffs and Defendants (collectively, the "Parties") jointly submit this supplemental brief in

further response to the oral argument made by Class Member Gary Davis ("Mr. Davis") at the

Final Approval Hearing of the Class Action Settlement (the "Settlement").

<u>**Introduction**</u>

At the November 17, 2022 Final Approval Hearing, Mr. Davis raised an objection that, in

connection with Genworth's already approved and ongoing rate actions, he had modified his

policy before he knew there was a potential Settlement that might provide him other options.

Specifically, Mr. Davis complained that he received a rate action letter and made benefit and

premium reduction decisions after the Settlement had been preliminarily approved but before he

was notified of the potential Settlement through the required Class Notice.  He claimed that had

he known of the potential Settlement, he may not have reduced his benefits in response to the rate action and suggested that he may have waited to make an election in the Settlement if it were approved—though he did not actually claim that he would make such a Special Election.

However, Mr. Davis's rate action letter expressly notified him that he could reverse his rate action benefit reduction within 60 days of its confirmation by Genworth—*i.e.*, well beyond the time when he received the Class Notice.  Indeed, Mr. Davis was sent confirmation of his election (triggering the 60-day reversal period) *after* he was sent the Class Notice.  Thus, after being formally notified of the preliminarily approved Settlement, Mr. Davis could have reversed his rate action benefit reduction and been in the exact same position in which he claims he should have been.  But he did not do so.

**This is also true of nearly all of the other Class Members who made an election based on a rate action letter received after Preliminary Approval but before receiving the Class Notice.  Indeed, only 241 Policyholders—or 0.07% of the Class of 352,641—received a rate action letter after Preliminary Approval of the Settlement, made a choice to reduce benefits and premiums, and had their 60-day reversal right expire before they received the Class Notice.**  Notably, none of these 241 Class Members objected to the Settlement on the ground that Mr. Davis raised at oral argument.  And Genworth is not aware of any of these Class Members—not even Mr. Davis—complaining to Genworth about having made an election prior to receiving the Class Notice.

As the Court recognized, the Parties followed the requirements of Rule 23 and provided Notice as directed by the Court.  Mr. Davis nevertheless argues that an additional, earlier "pre-notice" should have been sent to certain Class Members, like him, that would have alerted him to the proposed Settlement.   Such "extra" notice is not required under Rule 23 and, in this case,

2

would have been impractical and likely would have caused more issues than it sought to resolve. The Class Notice was provided to Class Members "in a reasonable manner" and constituted "the best notice that is practicable under the circumstances," as required by Rule 23. Mr. Davis's objection should be overruled.

## I.    Mr. Davis Could Have Reversed His Election and Addressed the Very Issue He Claims to be Concerned About.

At the Final Approval Hearing (though not in his written objection), Mr. Davis argued that he was disadvantaged because he decided to reduce his benefits (as well as his premiums) in connection with a rate action letter he received and a benefit reduction election he made after the Settlement had been preliminarily approved by the Court[1] but prior to his receipt of Class Notice on or about August 1, 2022. But a review of the underlying facts proves that Mr. Davis suffered no prejudice whatsoever by electing to reduce his premiums and benefits shortly before receiving Class Notice.

Mr. Davis was sent his rate increase letter on May 29, 2022. (*See* Ex. 1[2] at 1.) This letter included options for Mr. Davis to reduce his benefit and premium to mitigate the effect of the premium rate increase. He then requested and was sent, on July 11, 2022, additional options to reduce his benefits and premiums in connection with the rate increase. (*See* Ex. 2.) Mr. Davis signed a benefit election form and mailed it to Genworth on July 25, 2022. (*See* Ex. 3.) The Class Notice was then sent to Class Members by First-Class Mail on August 1, 2022. (ECF No.

---

[1] May 2, 2022 Preliminary Approval Order (ECF No. 31).

[2] All exhibits are attached to the Declaration of Michael Duvall, which is attached as Exhibit A. Exhibits 1-4, 7, and 11 are being filed under seal for the reasons in the accompanying Notice.

81-1 at ¶ 7.)  Genworth mailed him confirmation of his election by letter dated August 4, 2022—

*i.e.*, *after* Class Notice had been mailed to him.  (*See* Ex. 4 at 1.)

Importantly, Mr. Davis had been advised, in the "Important Information Regarding This

Premium Increase" section of his rate action letter, of the **Time Frame to reverse decision**

(emphasis in original):

> If you opt to reduce your benefits or cancel your coverage, your request to reverse
> must be in writing, signed by you, and received by us no more than 60 days of our
> written confirmation of your reduction/cancellation.

(Ex. 1 at p. 3 of 3 of "Important Information.")

Thus, Mr. Davis—far from being "stuck" with the election he had voluntarily made when

he was sent the Class Notice (on August 1, 2022) and that was confirmed to him *after* he was

sent the Class Notice—actually had until October 3, 2022 (more than two months *after* the Class

Notice was mailed to him) to reverse his election and put himself in the position he claimed at

the Final Approval Hearing he supposedly wanted to be in.

Mr. Davis, who is an experienced lawyer, therefore did not (and could not) dispute that

he could have reversed the election he now purportedly regrets after he received the Class

Notice.  (*See* Final Approval Hr'g Tr. at 141:23–142:4 (Mr. Davis admitting that he was advised

that he could reverse his election for a considerable period following Class Notice but claiming

that a page entitled "Important Information Regarding This Premium Increase" "is not a place

that you would look for that language")); *see Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228,

1237 (4th Cir. 1996) ("Upon receipt of proper notice, the insured has the duty to read the notice,

and the insurer is not responsible for an insured's failure to do so.").  But Mr. Davis, after

receiving the Class Notice, never asked Genworth if he could reverse his prior election.

Mr. Davis also did not dispute that, even without "reversing" his prior benefit reduction, he will still be able to elect from the Special Election Options and obtain the corresponding Cash Damages payment if the Settlement is approved. (*See, e.g.*, *id.* at 120:23–121:7.)[3]  In sum, Mr. Davis's contention that he is in a worse position vis-à-vis the Settlement because he made a (reversible) election prior to receiving Class Notice is simply not true, and completely undermines the premise of his objection. *See In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 152 (E.D. La. 2013) ("Those objections that lack factual, scientific, or legal support are deficient and are hereby rejected because they do not aid the Court in its evaluation of the settlement[.]").

**II.     The Timing and Manner of Class Notice Fully Complied with Rule 23.**

As for the Court's question regarding whether Class Members who would be sent rate action letters between the Preliminary Approval Order and Class Notice should have been immediately alerted of the pending Settlement, the Parties *did* previously consider Genworth's ongoing, in-process rate action letters when they proposed the substance, manner, and timing of the Class Notice.  Considering all of the circumstances, including the significance of *Final* versus *Preliminary* Approval, the requisite effort to compile a complete and accurate Class List, the importance of providing Class Members with sufficient detail about the Settlement to inform their decision-making, and that Policyholders have a 60-day right to reverse elections made at the time of a rate action, the Parties' Notice proposal and the Court's approval thereof was assuredly compliant with Rule 23.  *See Skochin v. Genworth Fin., Inc.*, 2020 WL 6532833, at

---

[3] Paradoxically, Mr. Davis has not indicated that he actually wants to reverse his prior election or to elect a Special Election Option in the Settlement.  In fact, he has indicated that he would *not* elect a Special Election Option—even if he had never made his rate action election.  Given this, it is entirely unclear how he plausibly claims any harm.

5

*11 (E.D. Va. Nov. 5, 2020) (overruling objections to the class notice and holding, "In essence, notice must provide class members with enough information to make an informed choice regarding the proposed settlement.") (citing *In re Serzone Prod. Liab. Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005) (finding the form and method of class notice was compliant with FED. R. CIV. P. 23(c)(2)(B) where, as here, distribution of notice was handled by a firm specializing in legal notification plans, and included mail, publication, and website notification months in advance of the opt-out deadline)); ECF No. 33-1 at PageID# 1014–1024 (the 11-page Class Notice sent to over 352,000 Class Members).

In evaluating the totality of these circumstances, it is important to remember that Genworth sends all of its rate action letters to policyholders pursuant to rate increases that have been reviewed and approved by the appropriate State Insurance Regulator.  The timing of the rate action letters, in turn, follows the *rolling* implementation schedule approved by the State Insurance Regulator, consistent with the underlying policy contracts.

For example, on September 9, 2021, the Pennsylvania Department of Insurance (DOI) partially approved Genworth's request for rate increases on Choice 2 policies.  *See* Ex. 5 at 1. The rate filings that the Pennsylvania DOI reviewed and approved expressly provided, "The requested rate increase will apply to policies on their billing anniversary date, following a 60-day policyholder notification period[.]"  Ex. 6 (May 2021 Choice 2 Actuarial Memorandum submitted to the Pennsylvania DOI) at p. 5 of 13; Ex. 5 (SERFF Filing) at 2 (approving rate increase implementation).  That an approved rate increase applies *on each policy's billing anniversary date* is in turn required by the policy contracts themselves.  *See, e.g.*, Ex. 7 (Davis Policy) Declarations page (stating that any premium increase will be implemented on the Policyholder's policy anniversary date).  The advance notice *to each policyholder* of such a rate

increase (60 days for the recent Pennsylvania Choice 2 increase) likewise is driven by the policy

contracts, as well as by State regulation.  *See, e.g.*, Ex. 7 (Davis Policy) Declarations page

(stating a rate increase notice will be sent at least 45 days before the effective date of the rate

increase); 31 PA. CODE § 89a.108 (requiring long-term care insurers to provide rate increase

notices at least 45 days in advance of implementation).[4]

Consistent with the rate filing approved by the Pennsylvania DOI, the underlying policy

contracts, Pennsylvania insurance regulation, and NAIC guidelines, Genworth sent Pennsylvania

Choice 2 Policyholders, including Mr. Davis, rate increase notices for the approved rate increase

on a *rolling* basis.  *See e.g.*, Ex. 1 (May 29, 2022 Ltr. to G. Davis) at 1 (notifying Mr. Davis, by

letter dated May 29, 2022, that his rate increase would take effect on his next billing anniversary

date, August 4, 2022); *see also* Ex. 8 (June 15, 2021 Cover Letter to PA Dept. of Ins.) at 1; Exs.

9–10 (Sample Pennsylvania Policyholder Notification Letters).

The Parties were aware and considered that these rate action letters would therefore be

sent to certain Policyholders between Preliminary Approval and Class Notice, but also had to

consider the time and effort involved in constructing an accurate Class List and providing a

Notice that would achieve the purposes of Rule 23.  In fact, it was a tremendous effort to

effectuate mailing of the Class Notice itself to a Class of this magnitude in the time allotted by

---

[4] Further, the National Association of Insurance Commissioners (NAIC) also recommends that long-term care insurers such as Genworth send their rate action letters on a rolling basis, so that each policyholder receives their letter in the time period that the information about a pending rate increase is most pertinent.  *See* NAIC Long-Term Care Insurance Mode Regulation § 10(E); NAIC Long-Term Care Insurance Reduced Benefit Options (EX) Subgroup, "Guiding Principles to Ensure Quality Consumer Notices of Rate Increases and Reduced Benefit Options" (Dec. 4, 2020) (recommending that long-term care insurers make rate increases effective on each policyholder's billing anniversary date and send rate action letters at least 45 days in advance of each policyholder's anniversary date).

the Preliminary Approval Order.  *See* Azari Dec. in Support of Final Approval (ECF No. 43-8)
¶ 13 (Settlement Administrator detailing the process involved to generate a Class List for mailing
to 352,146 Class Members).  Due to similar logistical challenges, it would not have been
practicable for Genworth to identify which potential Class Members might be facing a rate
increase in the period between Preliminary Approval and Class Notice, create and format
additional letters with a Court-approved "pre-notice" statement, and ensure that those letters
were delivered to Policyholders in a timely fashion in relation to their rate increase.

    Most importantly, such "pre-notice" notice likely would have caused significant
confusion among Class Members.  A brief statement that the Parties had reached a Settlement
that *might* be approved, without the additional information contained in the 11-page Class
Notice, would have had the potential to inadvertently mislead Policyholders into making
important decisions about their benefits and premiums largely in reliance on their *assumptions*
about the Settlement being finally approved—without the benefit of all of the important
information spelled out in the Class Notice.  For example, a Policyholder who otherwise would
have decided to reduce their premiums—but did not in anticipation of the potential Settlement
relief—may have then claimed, if the Settlement did not materialize or materialized in a way
different than they expected, that they were misled into continuing to pay premiums on an
assumption that they should not have been prompted to make.

    Moreover, issuing such a notice prematurely, with only partial information relating to the
Settlement, to only a fraction of Class Members, would have been particularly problematic
because the recipients would not have been able to avail themselves of the instrumental
informational resources the Parties worked to put into place in connection with Class Notice,
such as the Settlement website and Class Counsel's dedicated Call Center—neither of which

were (nor could have been) live until August 1, 2022.  *See* Azari Dec. (ECF No. 43-8) ¶¶ 20–22 (detailing setup of website and toll-free telephone number); Penny Dec. in Support of Final Approval (ECF No. 43) ¶ 17 (detailing establishing and engagement of Call Center).  Indeed, it is apparent that the Parties and the Court successfully *avoided* such confusion by *not* sending "pre-notice" notice:  with the exception of Mr. Davis and one other Objector who actually received her rate increase letter before Preliminary Approval,[5] no other Class Member objected on the same or similar bases as Mr. Davis.

Instead, as Rule 23 contemplates, the most appropriate place and manner to explain to Policyholders the existence of the potential Settlement and what it might entail was in the Class Notice itself that provided the appropriate context and caveats to Preliminary Approval, as well as identified resources such as the Settlement Website and Class Counsels' Call Center.  (*See* ECF No. 33-1 at PageID# 1014–1024.)  That Class Notice, *inter alia*, also repeatedly advised Class Members that their decisions about their coverage, including reducing benefits or premiums in response to rate action letters, could impact their ability to claim Special Election Options if the Settlement is finally approved.[6]

---

[5] While Objector Kathryn Dimiduk (ECF No. 67) also purported to raise this issue, she was sent a rate action letter on April 1, 2022—*i.e.*, one month *before* the Preliminary Approval Order. (*See* Ex. 11 at 1.)  Moreover, Ms. Dimiduk, like Mr. Davis, did not lose the ability to elect any Special Election Options by having reduced her premiums and her benefits prior to Class Notice. Her Objection therefore lacks foundation as well.

[6] *See* ECF No. 33-1, Appendix E at PageID# 1020 ("The actual Special Election Options available to you will depend upon many factors including, but not limited to, your current policy status and benefits . . . ."), *id.* at 1022 ("Changes to your policy status or coverage (including lapse or termination) may impact whether you are in the proposed settlement class and/or whether Special Election Options will be available to you."), *id.* at 1023 ("**If you reduce your coverage, including in response to a rate increase on your policy, your reduction in coverage may affect the Special Election Options that otherwise may become available to you under this settlement.**  As a Policyholder, you have options to reduce your coverage that are separate from the Special Election Options that may become available to you under this

In sum, the Parties recognized and considered that time cannot be frozen during the period required to prepare for the dissemination of Class Notice and obtain Final Approval of the Settlement, and that Class Members may elect to modify their coverage or may simply decide that they no longer want to pay for long-term care insurance during that time.  Considering those circumstances, the Parties proposed a timing and manner of Class Notice that was the best under the circumstances, as required by Rule 23.  *See* Fed. R. Civ. P. 23(c)(2)(B); *In re Serzone Prod. Liab. Litig.*, 231 F.R.D. at 231 ("Rule 23(c)(2) requires that notice to the class must be 'the best practicable under the circumstances, including individual notice to all member[s] who can be identified through reasonable effort.'").  Nothing different was required or appropriate.

## III.   The Timing of Class Notice Had the Potential to Impact Only a Negligible Number of Rate Action Election Decisions, and Any Such Policyholders Were Not Harmed in Any Event.

As discussed at the Final Approval Hearing, Genworth has analyzed the number of rate action letters sent to Class Members between Preliminary Approval (May 2, 2022) and Class Notice (August 1, 2022), the number of elections made by such Policyholders to reduce or stop paying their premiums and reduce their benefits in response to the rate increase, and, of those electing Policyholders, how many were past the time they had to reverse their election upon receiving Class Notice.  As noted above, the bottom line number is very small:  according to

---

settlement.  For example, if there is a premium rate increase on your policy, you will have options for reducing your coverage.  Those options will be different from any Special Election Options that may become available under this settlement and do not include the possibility of a cash damages payout.  If you select an option to reduce your coverage separate from the Special Election Options that may be available under this settlement, you may eliminate or reduce the availability of any future Special Election Options or the value of any corresponding cash damages payments that may be available.  Whether one of these options or any Special Election Option will best meet your needs will depend on your specific circumstances.") (emphasis in original).

Genworth's analysis of its best available data at this time, only 241 Class Members, or approximately 0.07% of the entire Class, made such an election that could not have been reversed during the indicated time period.

The total number of Class Members for whom Genworth received and entered an election to reduce or stop paying their premiums and reduce their benefits after Preliminary Approval but before Class Notice (again, according to Genworth's analysis of its best available data at this time) is 3,471 (out of a total of 40,927 rate increase letters sent during this time), or 1% of the Class. Significantly, **virtually all of these electing Class Members could have reversed their elections after they received the Class Notice**.

As alluded to during the Final Approval Hearing, *all* of Genworth's rate action letters inform policyholders that, if they make an election to reduce their benefits, they will have 60 days from the date on which Genworth confirms that election to reverse the election. *See, e.g.*, Ex. 1 (May 29, 2022 Ltr. to G. Davis, "Important Information Regarding This Premium Increase"), p. 3 of 3 (entitled, "**Time frame to reverse decision**") (emphasis in original); Exs. 9–10 (Sample Pennsylvania Policyholder Notification Letters). Given this 60-day reversal window, of the 3,471 Policyholders (1% of the Class) for whom Genworth received and entered elections during the subject time period, 3,230 of them (93.1%) had the ability to reverse that election through August 8, 2022—one week after Class Notice. Thus, an extremely limited portion of the Class—241 Policyholders or 0.07% of the Class—was even hypothetically impacted by having made an election during the relevant time period.

Further, none of these 241 Class Members objected to the Settlement on the ground that they were unable to reverse their election or were somehow deprived of the Settlement relief. Importantly, *all* 241 Class Members are still eligible for Special Election Options in the

11

Settlement (whether Paid-Up Benefit, Reduced Benefit, or Non-Forfeiture Status Special Election Options).  And *all* of these Class Members have already benefited by having paid *lower* premiums than they would have paid by choosing to reduce their benefits when they did.[7]  As such, none of them was actually harmed by the sequencing of their rate action letters, elections to reduce benefits and premiums, and the Class Notice.

In closing, during the discussion of this topic at the Final Approval Hearing, the Court indicated, "If there's a problem that affects hundreds of thousands of people that may affect the settlement itself, then I may have to deal with it in a different way."  (*See* Final Approval Hr'g Tr. at 117:25–118:2.)  There is, in fact, no such problem, and the timing at the center of Mr. Davis's alleged issue potentially could have impacted, at most, approximately 241 Class Members (not hundreds of thousands), none of whom were or have even claimed to have been actually harmed.  The Parties submit that no further action is warranted.

## Conclusion

On balance, the Parties undertook their best efforts to advise Class Members of the pending Settlement, at the appropriate juncture, with the important information for that purpose. The Parties appreciate that some Class Members, during the period between Preliminary Approval and Class Notice, also had to make decisions in the ordinary course of their lives and take into account the mix of information they had at that time.  Considering the totality of the

---

[7] Hypothetically, if these 241 Policyholders were to attempt to reverse their benefit and premium reductions, a significant problem could present itself:  whether those Policyholders would have to retroactively repay premiums that they previously chose to reduce or stop paying.  Were they not so required, or were their rate increases "paused," State insurance laws concerning non-discrimination could be violated, as certain Policyholders would be allowed to maintain their benefits at lower premium rates than those approved and implemented for other similarly situated Policyholders.  *See, e.g.*, 40 PA. STAT. ANN. § 477a.

circumstances—and especially the regulatory-driven timeline for rate action notifications and the reversal period detailed above—the manner and timing of the Class Notice was fully compliant with Rule 23, and no additional "pre-notice" notice to Mr. Davis or any other Class Member was required.

DATED: November 23, 2022

_____ / s/ _____

MCGUIREWOODS LLP
BRIAN E. PUMPHREY (VSB No. 47312)
HEIDI E. SIEGMUND (VSB No. 89569)
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1000
Fax: (804) 775-1061
bpumphrey@mcguirewoods.com
hsiegmund@mcguirewoods.com

DENTONS US LLP
REID L. ASHINOFF (*pro hac vice*)
DREW MARROCCO (VSB No. 38955)
MICHAEL J. DUVALL (*pro hac vice*)
CATHARINE LUO (*pro hac vice*)
SAMANTHA FAHR (*pro hac vice*)
HALEY GRISSOM (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 768-6700
Fax: (212) 768-6800
reid.ashinoff@dentons.com
drew.marrocco@dentons.com
michael.duvall@dentons.com
catharine.luo@dentons.com
samantha.fahr@dentons.com
haley.grissom@dentons.com

***Counsel for Defendants***

13

DATED: November 23, 2022                  Respectfully submitted,


_____/s/_____
PHELAN PETTY PLC
JONATHAN M. PETTY, VSB No. 43100
BRIELLE M. HUNT, VSB No. 87652
3315 West Broad Street
Richmond, VA 23230
Tel: (804) 980-7100
Fax: (804) 767-4601
jpetty@phelanpetty.com
bhunt@phelanpetty.com

GOLDMAN SCARLATO & PENNY, P.C.
BRIAN DOUGLAS PENNY (*pro hac vice*)
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel: (484) 342-0700
Fax: (484) 342-0701
penny@lawgsp.com

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART A. DAVIDSON (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000
Fax: (561) 750-3364
sdavidson@rgrdlaw.com

BERGER MONTAGUE PC
GLEN L. ABRAMSON (*pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215)875-4604
gabramson@bm.net

***Counsel for Plaintiffs and the Settlement Class***

14

## CERTIFICATE OF SERVICE

I certify that on the 23rd day of November, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send a notification of such filing to all counsel of record.  I also caused the foregoing to be sent by email to Mr. Davis at gmdavislaw@gmail.com.

_____/s/_____
MCGUIREWOODS LLP
HEIDI E. SIEGMUND (VSB No. 89569)
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1000
Fax: (804) 775-1061
hsiegmund@mcguirewoods.com

*Counsel for Defendants*
