IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FRED HANEY,
et al.,

    Plaintiffs,

v.                     Civil Action No. 3:22cv55

GENWORTH LIFE INSURANCE
CO., et al.,

    Defendants.

MEMORANDUM OPINION

This matter is before the Court on Gary Davis and Lorraine Freedlander's objection (ECF No. 61), SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S NOVEMBER 17 AND 21, 2022 ORDER REGARDING CLASS MEMBER GARY DAVIS (ECF No. 99), Kathryn Dimiduk's SUPPLEMENT TO OBJECTION ECF67 (ECF No. 102), SUPPLEMENTAL RESPONSIVE BRIEF IN SUPPORT OF OBJECTIONS DOCKETED AT ECF # 61 BY GARY M. DAVIS AND LORRAINE FREEDLANDER (ECF No. 110), REPLY IN SUPPORT OF THE PARTIES' SUPPLEMENTAL BRIEF (ECF NO. 99) AND IN RESPONSE TO CLASS MEMBERS GARY DAVIS AND LORRAINE FREEDLANDER'S SUPPLEMENTAL RESPONSIVE BRIEF (ECF NO. 110) (ECF No. 119), and JOINT RESPONSE TO CLASS MEMBER KATHRYN DIMIDUK'S SUPPLEMENT TO OBJECTION ECF67-DIMIDUK TO HANEY VS GENWORTH CASE (ECF NO. 102) (ECF No. 118). The Court first heard Davis and Dimiduk's oral objections in a hearing

on November 17, 2022, and, after the parties, Davis, and Dimiduk filed supplemental briefings, the Court heard testimony and argument on the objections on December 13, 2022.

Having considered all of the submitted information and for the reasons set forth on the record during the hearing on December 13, 2022, as well as the reasons set forth below, Davis' and Freedlander's objection (ECF Nos. 61 and 110) and the remaining portion of Dimiduk's objection (ECF Nos. 67 and 102) will be OVERRULED.

## BACKGROUND

### I.   Procedural History: The Class Action Complaint and the Claims

To resolve the Davis, Freedlander, and Dimiduk objections, it is necessary to understand the claims asserted in the Class Action Complaint (ECF No. 1) ("Complaint") because it is those claims, not other claims that might have been asserted, that are being resolved by compromise. And, of course, any relief that might be awarded in the event of success at a trial is circumscribed by the claims that would have been tried. Thus, relief achieved by settlement must be measured in perspective of what relief was sought in the Complaint and what relief was conceptually available based on the claims that were asserted therein.

### A.   The Complaint (ECF No. 1)

Fred Haney, Marsha Merrill, Sylvia Rausch, Stephen Swenson, and Alan Wooten ("Class Representatives"), individually and on

2

behalf of a proposed class of Genworth Choice 2, Choice 2.1, California CADE, California Reprice, and California Unbundled policyholders as of January 1, 2013 (collectively "Plaintiffs" or "class members"), filed this class action against Defendants Genworth Life Insurance Company ("GLIC") and Genworth Life Insurance Company of New York ("GLICNY") (collectively "Genworth" or "Defendants"). Compl. ¶ 170. Before the Complaint was filed on January 28, 2022, the parties engaged in three-days of mediation and extensive discovery that resulted in a Memorandum of Understanding ("MOU") that set "forth the material terms of an agreement-in-principle to be incorporated into a formal Settlement Agreement for the Court's approval." ECF No. 28 ¶¶ 4-7. The Complaint asserts two claims. COUNT ONE alleges a claim of fraudulent inducement by omission. COUNT TWO is a claim for declaratory relief under 28 U.S.C. § 2201.

### B.   The Factual Backdrop for the Class Claims

Plaintiffs each have Choice 2, Choice 2.1, California CADE, California Reprice, or California Unbundled Long Term Care Insurance policies issued by Genworth. Long Term Care ("LTC") insurance is intended to defray the cost of home care, assisted living care, nursing home care, and other specialized skilled facility care required when an individual can no longer perform the basic activities of daily life. Compl. ¶ 4.

3

Plaintiffs allege that, since 2013, Genworth has steadily and substantially increased the premiums on its LTC insurance policies. Compl. ¶ 3. When Genworth learned that there were substantial deficiencies in its reserves going forward, it sought at least six waves of significant premium rate increases to compensate for the deficiency. Id. ¶ 156. Plaintiffs also allege that, to avoid reporting a current negative loss recognition testing margin, Genworth relied almost entirely on billions of dollars in future rate increases to plug the hole in its reserves. Id. ¶ 15.

However, say the Plaintiffs, Genworth's plan for substantial future rate increases was never shared with Genworth's LTC policyholders. Id. ¶¶ 157-59. Rather, it is alleged that Genworth told policyholders only that it was "possible" that a premium rate would increase in the future, without telling policyholders that Genworth actually had significant holes in its reserve and that Genworth planned to significantly increase premiums over the next few years. Id. ¶¶ 24-29. Plaintiffs allege that Genworth only partially disclosed material information when communicating the premium increases to its LTC policyholders and that, without the undisclosed information, Plaintiffs could not make informed decisions in response to their policy option renewals. Id. ¶ 3.

In other words, it is alleged that the undisclosed information was material to decisions that LTC policyholders made respecting

4

whether, and to what extent, to renew or retain their LTC coverage; that the undisclosed information was necessary to make accurate the disclosed information; and that, therefore, the omissions made the disclosed information fraudulent. It is also alleged that Genworth intended that policyholders would rely on the knowingly inadequate disclosures in making the election among their policy choices.

Generally speaking, the choices given to policyholders respecting whether, and to what extent, to maintain LTC policies were to: (1) maintain the existing LTC coverage and pay the increased premium; (2) reduce the LTC coverage and pay a lower premium; or (3) opt for a paid up LTC policy. Plaintiffs maintain that, had they known the scope and magnitude of Genworth's plans for future rate increases, they would have made different policy option elections than they actually made. Compl. ¶ 200.

### C. The Claims

In COUNT ONE, the Complaint presents a claim for fraudulent inducement by omission. Compl. at 53-57. In particular, the Complaint alleged:

> 197. <u>By failing to adequately disclose material information about Genworth's rate increase action plans</u>, current reliance on its planned future increases actually being approved, and the <u>risks to Genworth's solvency</u> if such increases were not approved, and the impact those needed future rate increases already had on the Company's financial rating,

Genworth <u>withheld material information</u> from Plaintiffs and the Class.

198. Genworth <u>intended</u> that Plaintiffs and the Class Members <u>rely upon the incomplete information</u> it did provide in the hope that policyholders would make policy elections that were in Genworth's best interest and not the policyholder's best interest.

199. As a result, Plaintiffs and the Class members were unaware of the scope and magnitude of Genworth's entire rate increase action plan when they made their renewal elections. They were also unaware of Genworth's reliance on this rate action plan, which included significant increases on other LTC policies, to build adequate reserves to pay Genworth's future claims.

200. Without a complete picture of Genworth's massive rate increase plan, Plaintiffs and the Class Members made certain elections in response to each rate increase announcement. Had they known the full scope and magnitude of Genworth's rate action plans, and the Company's reliance on massive rate increases in the future to remain viable, they would have made different policy option elections.

Compl. ¶¶ 197-200 (emphasis added). The relief sought in COUNT ONE is:

(a) a finding that Genworth withheld material information from Plaintiffs and the Class regarding its plans for future rate increases; its reliance upon obtaining at least some portion of future rate increases to be able to pay future claims; and the impact that need for additional rate increases has already had on Genworth's financial rating;

(b) <u>injunctive relief in the form of an adequate and corrective disclosure</u> to Plaintiffs and the Class that reveals the

> omitted information, and <u>the right to
> make new policy renewal elections</u> in
> light of the new disclosures;
>
> (c)  if Genworth is found to have omitted
> material information, then <u>rescission of</u>
> Plaintiffs' and the Class' <u>policy
> renewals</u> each year since Genworth first
> made those omissions; and
>
> (d)  <u>return of premiums</u> paid for each year a
> renewal of the policy was rescinded.

Compl. ¶ 202 (a-d) (emphasis added). The Complaint also says that,

as to COUNT ONE:

> 213.  To avoid doubt, if the above relief is
> obtained, <u>Plaintiffs and the Classes (sic)
> seek to be placed in the same position they
> were in before Genworth made the
> aforementioned omissions</u>, meaning they would
> still have the same guaranteed renewable LTC
> policies they had prior to the omissions, <u>and
> must then decide whether to maintain their
> respective policies</u> in light of the current
> premiums that would be due, or what level of
> coverage they prefer in light of the new
> premiums they would be charged.

Compl. ¶ 203 (emphasis added).

In COUNT TWO, the Complaint presents a claim under the

Declaratory Judgment Act, 28 U.S.C. § 2201. The Declaratory

Judgment claim is based on the same factual assertions as form the

basis for the fraudulent inducement claim in COUNT ONE. But in

COUNT TWO, the Plaintiffs are asking that the Court "declare

Genworth had a duty to disclose that information" so that "a

corrective disclosure to all class members providing this

information would be required." Compl. ¶ 207.

7

Then, the Complaint presents a PRAYER FOR RELIEF that is not tethered specifically either to COUNT ONE or COUNT TWO. That section of the Complaint seeks:

B.   That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.   That Plaintiffs and the Class they represent be awarded compensatory, consequential, and general damages in an amount to be determined at trial;

D.   Injunctive relief as is warranted;

E.   Costs and disbursements of the action;

F.   Pre-and post-judgment interest;

G.   Reasonable attorneys' fees; and

H.   Such other and further relief as this Court may deem just and proper

Compl. at 58 (emphasis added).

D. The Previous Suits

To fully comprehend the claims in this case, it is necessary to understand the two kindred suits that preceded this one. In the first case, Skochin v. Genworth Life Ins. Co., No. 3:19cv49, the plaintiff class comprised a different set of Genworth's policyholders, but the claims they brought were essentially of the same type as those presented in this case but related to different LTC policies and time frames. The parties in Skochin engaged in extensive discovery, and Genworth moved to dismiss the claims under Fed. R. Civ. P. 12(b)(6). 3:19cv49, ECF No. 39. The Court granted

8

the motion to dismiss as to one count of the AMENDED COMPLAINT in that case but denied it as to three other counts. 3:19cv49, ECF No. 79. The parties eventually reached a settlement agreement with terms similar to those proposed here. The second case, Halcom v. Genworth Life Ins. Co., No. 3:21cv19, was filed two years after Skochin, just as Skochin approached its resolution. Halcom too involved LTC policies but of different types and for different time frames. Having tested the strength of their respective claims and defenses in the Skochin litigation, the parties in Halcom were able to engage in significant informal discovery and several rounds of mediation. By the time the complaint was filed in Halcom, the parties had already more or less agreed to the terms of a settlement. Just as in Skochin, the parties reached a settlement agreement with similar terms, and that litigation came to a close in June 2022.

While there are significant similarities between this case and Skochin and Halcom, it is also important to note the differences because those differences significantly affected the settlement terms in this case. Plaintiffs in Skochin and Halcom included Choice I, PCS I, and PCS II policyholders. Those types of policies were subject to a Multi Year Rate Increase Action Plan ("MYRAP") that Genworth failed to disclose to the policyholders, leading to cumulative rate increases of 250% or more over a decade. The policies at issue in the current case were not subject to the

9

MYRAP or any comparable long-term rate increase plan. Instead, the rates were evaluated closer to an annual basis, which is the key difference between this case and Skochin and Halcom.

## II. Preliminary Approval and Notice

After engaging in a period of discovery to confirm, and augment, what had been learned in Skochin and Halcom, Class Counsel filed PLAINTIFFS' MOTION TO DIRECT NOTICE OF PROPOSED SETTLEMENT TO THE CLASS (ECF No. 26), which the Court granted on May 2, 2022. ECF No. 31. On July 6, 2022, the parties submitted an Amended Settlement Agreement (ECF No. 33-1) to amend the final Release to mirror Halcom. ECF No. 33 at 2. The Court preliminarily approved the Amended Settlement Agreement on July 7, 2022, and directed that notice be sent to the Class. ECF No. 34. The Notice, which was sent on August 1, 2022, explained the policy election options afforded to class members, how they could communicate with Class Counsel about the Amended Settlement Agreement, their rights and options thereunder, how they could examine certain information on a website that was set up as part of the settlement process, and their right to object to the proposed settlement and opt out of the proposed case. Class members were also informed that they could contact independent counsel of their choice for advice.

As required by the Class Action Fairness Act, 28 U.S.C. § 1715, on April 11, 2022, notice of the proposed settlement and the terms thereof were sent to the appropriate state representatives

in each of the 50 states and the District of Columbia as well as to the Attorney General of the United States. DEFS.' NOTICE OF COMPLIANCE WITH 28 U.S.C. § 1715 (ECF No. 29). That notice afforded the various governmental entities a full and adequate explanation of the settlement terms and the procedures necessary for them to participate in this case.

Class Counsel has represented that they have spoken to almost 4,300 policyholders who had questions about the Amended Settlement Agreement. ECF No. 40 at 22. Over the course of the sixty days allotted in the Notice, 187 policyholders opted out of the Settlement Agreement and 19 objections were filed by 31 Class Members, including Davis, Freedlander, and Dimiduk. No state regulatory authorities filed any objection.

On November 17, 2022, the Court held a hearing to give objectors the opportunity to explain their objections and for counsel to the parties to respond. During the hearing, Davis, appearing on behalf of himself and his wife, Freedlander, objected to the Amended Settlement Agreement because, after the Agreement had been preliminarily approved by the Court but before he received the Class Notice, Davis received an LTC insurance renewal letter from Genworth which required him (and Freedlander) to agree to a premium increase or to reduce his coverage. ECF No. 96 at 97:14-99:2. Davis and Freedlander called Genworth to discuss the premium increase, but no one disclosed that a settlement was in the works,

11

so they elected to reduce their coverage. Id. at 99:2-100:15. Davis argued that he (and similarly situated individuals) who chose to reduce their coverage weeks before receiving notice of the settlement after its preliminary approval should be compensated because they suffered an injury. Id. at 102:18-25. In response, Genworth argued that Davis had sixty days after making his election to reverse it, so he could have changed his decision to reduce his benefits after he received notice of the settlement. Id. at 137:20-138:15. To further develop the record on this point, the Court ordered supplemental briefing. Id. at 142:22-24; ECF Nos. 99, 110, and 119. Dimiduk (ECF No. 67) made a similar objection, arguing that she had to make an election decision after she received a premium increase letter but before she knew of the lawsuit. ECF No. 96 at 154:5-156:12. The Court ordered that Dimiduk file a supplemental objection, id. at 156:17-22, which she did. See ECF No. 102. Plaintiffs and Defendants filed a joint response on December 8, 2022. ECF No. 118. At the hearing on December 13, 2022, the Court heard testimony and further argument on both objections.[1]

---

[1] At the November 17, 2022, hearing, John Hilliard (ECF No. 97) made a similar objection to those made by Davis and Dimiduk, arguing that he was not able to make an informed decision in response to a rate increase letter without more information from this settlement. ECF No. 96 at 149:13-150:19. At the November 17 hearing, there was confusion as to whether Hilliard was a member of the Class, id. at 150-153; however, the parties have clarified that Hilliard is indeed a class member. ECF No. 95. At the December 13, 2022, hearing, Hilliard indicated that he had nothing further to add and only wanted to ensure that the class administrator and

III. **The Terms of the Settlement**

To understand the objections to the Amended Settlement Agreement, it is necessary to understand the terms of the Amended Settlement Agreement itself. In broad terms, as explained by Class Counsel, the Amended Settlement Agreement "directly addresses [the] alleged harm by providing Class Members with additional Disclosures about future rate increases, and then allowing them options" to either maintain their current benefits or "restructure their benefits and premiums in light of those Disclosures, if they so wish." ECF No. 40 at 2 (emphasis added). The pertinent terms of the Amended Settlement Agreement are discussed below.

As provided in the Amended Settlement Agreement dated July 6, 2022 (ECF No. 33-1), the parties agree to a payment structure similar to those agreed upon in Skochin and Halcom, and Genworth agrees to a preliminary settlement approval process in which the Court certifies the class solely for purposes of a class settlement. ECF No. 33-1 ¶ 45(a). Class members will receive a "special election letter" from Genworth, which will allow recipients to choose between keeping their current plan or "elect[ing] from a selection of paid-up reduced benefit options and/or reduced benefit options . . . some of which also entitle

_____

Genworth had his correct address for the Special Election Letters. ECF No. 133 at 108:2-4, 109:13-19. Accordingly, Hillard's objection is considered withdrawn and is not discussed in this Memorandum Opinion.

Class Members to damages payments." Id. ¶¶ 46(a)-(b). Class members who make no elections will simply retain their current policies. Id. ¶ 48(a).

Class members who are not in non-forfeiture status, and "excluding Class Members whose level of benefits are below the level of benefits available in the defined options," will receive the following election options (ECF No. 33-1 at App. C(I)):

- First Paid-Up Benefit Option: A paid-up benefit of lifetime paid-in premiums minus (1) benefits received to date, and (2) $10,000. And, in addition, a $10,000 cash damages payment.

- Second Paid-Up Benefit Option: A paid-up benefit of 1.5 times the difference between the class member's paid-in premiums to date minus claims paid to date. This option does not include a damages payment.

- Reduced Benefit Options (RBOs): For qualifying class members, options that reduce their policy benefits while also awarding them a $6,000 damages payment. A catchall RBO for otherwise non-qualifying members whereby they receive a benefits reduction and a damages payment of $1,000.

- Fully Paid-Up Options: Class members who are in fully paid-up status may choose between: (1) Paid-up benefits equivalent to premiums paid in, less $10,000 and less benefits received, in addition to a $10,000 damages payment; or (2) a reduction in benefits and a damages payment of $6,000.

- Non-Forfeiture Status Option: Retention of current paid-up benefits and a damages payment of $1,000.

ECF No. 33-1 at App. C. At the November 17, 2022, hearing, counsel for Genworth informed the Court that an agreement (referred to as "the Objectors' Settlement Agreement") had been reached between Plaintiffs, Genworth, and a group of objectors, including Michael

Podoll (ECF No. 48), Jane Belkin (ECF No. 53), and Dr. David Friedman, James Perry, Thomas Toman, Doug and Bonnie Ebstyne, and William and Linda Dudley (ECF Nos. 56, 69, and 73). The Objectors' Settlement Agreement modified two of the Special Election Options, added a new Option, contained a release provision and agreement to withdraw the objections, and provided attorneys' fees and incentive awards for the objecting parties. ECF No. 106. The Court approved the Objectors' Settlement Agreement on January 11, 2023. ECF No. 130. Accordingly, the Objectors' Settlement Agreement produced the following three changes to the Special Election Options in the Amended Settlement Agreement:

- An option was added for class members with qualifying inflation benefits to receive a reduction in their overall benefits but retain the inflation protection and receive a damages payment of $3,000.

- Expanded the eligible members for the catchall RBO option and increased the damages payment from $1,000 to $1,200.

- Increased the damages payment for the non-forfeiture status option from $1,000 to $1,150.

ECF No. 106 at 4-6.[2]

The Amended Settlement Agreement is further conditioned on approval by state insurance regulatory bodies. The Agreement provides that information about the Special Elections Letters will

---

[2] These changes have been incorporated into a Second Amended Settlement Agreement (ECF No. 109-1) which will be the controlling document that the Court will approve if it approves the overall settlement.

be sent to each state's regulatory body, with Genworth retaining the right to decide how to proceed in the event that a regulator raises an objection or concern. Id. ¶ 49(a).[3]

The Amended Settlement Agreement further provides for attorney fees equivalent to 15% of damages payments with a cap of $13 million. ECF No. 33-1 ¶ 55(a). Importantly, these fees are over and above the damages payments to class members and are not taken out of those payments. For example, for every $1,000 in damage payments, the class member gets the full $1,000 and the attorneys get a separate payment of $150. Expenses are capped at $50,000 and likewise will not be deducted from payments to class members. Id. ¶ 56. The Class Representatives will receive incentive payments of $15,000 each. Id. ¶ 57. The remaining terms (fee to settlement administrator, non-disparagement, etc.) have no notable provisions. The release provision in the Haney settlement mirrors the modified version of the final release provision in Halcom, which was submitted by the parties in response to the Court's concerns about the prior release language.

It is against this background that the remaining objections will be considered.

---

[3] Pursuant to the Court's Order, Genworth sent this notification on April 11, 2022, ECF No. 29, and there were no objections. ECF No. 82. Since there were no objections by any state regulator, the provision that offers class members a $100 compensation is irrelevant. Id. ¶ 49(g) (triggered "[o]nly in the event that a State Regulator objects . . .").

16

## IV. The Objections

### A. Davis and Freedlander's Objections

In their initial written objection (ECF No. 61), Davis and Freedlander presented two arguments. First, they objected to the fact that they would have to decide whether to opt out of the settlement before receiving "specific information regarding the size of future rate increases." ECF No. 61 at 2. Second, Davis and Freedlander objected to the lack of relief for class members who decided to maintain the same coverage rather than choose a Special Election Option. Id.

During the November 17, 2022, hearing, Davis raised an additional objection, arguing that he suffered damage by receiving a premium increase letter after the settlement was preliminarily approved but before receiving notice of the settlement. ECF No. 96 at 98:17-99:6. Davis and Freedlander say that, without knowledge of the pending lawsuit and settlement, they decided to reduce their coverage when they might have made a different decision had they known that a settlement was in the works. Id. at 99:10-100:20. The Court ordered additional briefing on this portion of Davis's objection and heard argument on it during the December 13, 2022, hearing.

### B. Dimiduk's Objection

During the November 17, 2022, hearing, Dimiduk raised a similar objection, arguing that she had to make an election

17

decision after she received a premium increase letter but before she knew of the lawsuit and settlement. ECF No. 96 at 154:5-156:12. The Court ordered that Dimiduk file a supplemental objection in order to better comprehend her argument. Id. In her supplemental objection (ECF No. 102), Dimiduk detailed how she received a rate increase letter on April 1, 2022, and elected to decrease her coverage in the beginning of June 2022 to avoid paying an increased premium. ECF No. 102 at 1. Dimiduk recites that she was not informed of the lawsuit or settlement at the time she decided to decrease her coverage. Id. at 2. Dimiduk was given an opportunity at the December 13, 2022, hearing to further explain her objection. Dimiduk also filed an objection during the notice period. ECF No. 67. The majority of those objections were previously overruled in the MEMORANDUM OPINION (ECF No. 122) filed December 12, 2022, and the remaining objection to the attorneys' fees will be addressed in a separate opinion, so they are not discussed here.

### C. Parties' Responses

On November 23, 2022, Plaintiffs and Defendants filed a joint SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S NOVEMBER 17 AND 21, 2022 ORDER REGARDING CLASS MEMBER GARY DAVIS (ECF No. 99) that made three arguments in response to Davis's objection concerning the timing of his rate increase letter. First, the parties argue that Davis had sixty days from the time that he elected to reduce his coverage to reverse that decision and that failure to exercise

18

that right forecloses his objection. ECF No. 99 at 4; ECF No. 100-1 at 10 (sealed). Because Davis mailed his benefit election form on July 25, 2022, and class notice was sent on August 1, 2022, the parties contend that Davis could have reversed his election decision after learning of the lawsuit and settlement but chose not to and that he still can elect a Special Election Option with a cash damages payment, so "he is not in a worse position vis-à-vis the Settlement." ECF No. 99 at 3-5.

Second, the parties assert that the timing and manner of class notice fully complied with Fed. R. Civ. P. 23. ECF No. 99 at 5. The parties state that they considered Genworth's process of continuously sending rate increase letters when deciding how to distribute notice but ultimately decided that the manner that they chose took into account "the significance of Final versus Preliminary Approval, the requisite effort to compile a complete and accurate Class List, the importance of providing Class Members with sufficient detail about the Settlement to inform their decision-making, and that Policyholders have a 60-day right to reverse elections made at the time of a rate action." Id. at 5-7. The parties emphasize that sending "a 'pre-notice' notice likely would have caused significant confusion among Class Members" in that class members would have received incomplete information concerning the settlement and made incorrect assumptions about the settlement's approval. Id. at 8.

19

Lastly, the parties argue that only a negligible number of class members were impacted by the decision to wait three months after preliminary approval to give notice of the settlement. ECF No. 99 at 10. In total 3,471 class members received a similar letter to Davis after the settlement was preliminarily approved (May 2, 2022) but before notice had been sent (August 1, 2022) and elected to reduce or stop paying their premiums and reduce their benefits. Id. at 11. However, only 241 of these class members made an election that could not have been reversed after receiving notice. Id. The parties argue that "none of these 241 Class Members objected to the Settlement on the ground that they were unable to reverse their election or were somehow deprived of the Settlement relief." Id. Further, the parties contend that all of this group, including Davis and Freedlander, are still eligible for at least some of the Special Election Options and that they have already benefited from paying lower premiums. Id. at 11-12. Accordingly, the parties contend that no class member was harmed for not receiving a pre-notice notice of the settlement. Id. at 12.

The parties also made similar arguments in response to Dimiduk's objection but emphasized that Dimiduk received her rate increase letter a month before preliminary approval of the settlement, so it would have been premature and inappropriate to send "pre-notice notice" for a potential settlement "that might never even be reached, let alone be approved." ECF No. 118 at 5.

## LEGAL FRAMEWORK

A district court may approve a class action settlement agreement only after complying with the procedures set forth in Fed. R. Civ. P. 23(e). Rule 23(e) provides for three stages and two separate hearings to effectuate the settlement approval process. At the first stage, the parties must present the proposed settlement to the court for the court's preliminary approval, and, if the class has not yet been certified, for conditional class certification. In the second stage, assuming that the class action settlement was approved preliminarily, notice must be sent to potential class members describing the terms of the proposed settlement, class members must be given an opportunity to object or to opt out of the settlement, and the court then must conduct a fairness hearing at which class members may appear and support or object to the settlement. At the third and last stage, the court must take into consideration all of the information before it and determine whether "final approval" of the settlement is merited.

Fed. R. Civ. P. 23(e) provides that "[t]he claims, issues, or defenses of a certified class-or a class proposed to be certified for purposes of settlement-may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(d). A class settlement can be approved "only after a hearing and on a finding" that the proposed class-action settlement is "fair, reasonable, and adequate." See In re MicroStrategy, Inc.

Sec. Litig., 150 F. Supp. 2d 896, 903-04 (E.D. Va. 2001). When
determining whether to approve a class action settlement, the court
will first consider whether the process leading to the settlement
was fair and then turn to whether the terms provided within the
settlement are adequate. See Jiffy Lube Sec. Litig., 927 F.2d 155,
158-59 (4th Cir. 1991).

The Fourth Circuit has set a multifactor standard to assess
whether a class action settlement is "fair, reasonable, and
adequate." The "fairness" evaluation centers on the settlement
process itself. Whitaker v. Navy Fed. Credit Union, No. 09cv2288,
2010 WL 3928618, at *2 (D. Md. Oct. 4, 2010). In making this
determination, a court should consider:

      (1)   the posture of the case at the time
           settlement was proposed;

      (2)   the extent of discovery that had been
           conducted;

      (3)   the circumstances surrounding the
           negotiations; and

      (4)   the experience of counsel in the area of
           [the] class action litigation.

See In re Jiffy Lube Sec. Litig., 927 F.2d 155, 159 (4th Cir.
1991). The "adequacy" evaluation focuses on the substance of the
settlement. Whitaker, 2010 WL 3928616, at *2. In assessing the
adequacy of the proposed settlement, a court must consider:

      (1)   the relative strength of the plaintiffs'
           case on the merits;

> (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial;
>
> (3) the anticipated duration and expense of additional litigation;
>
> (4) the solvency of the defendant[ ] and the likelihood of recovery on a litigated judgment; and
>
> (5) the degree of opposition to the settlement.

See In re Jiffy Lube Sec. Litig., 927 F.2d 155, 159 (4th Cir. 1991). The reasonableness, fairness, and adequacy analysis of the overall settlement will be made in a separate order, but the basic principles must be kept in mind when assessing the objections.

A lack of objection to the settlement by class members, and the absence of (or a limited number of) opt outs from the class, are evidence of low opposition to the settlement and weighs in favor of its approval. See In re Mills Copr. Sec. Litig., 265 F.R.D. 246, 257-58 (E.D. Va. 2009). However, under Fed. R. Civ. P. 23(e), the Court must protect unnamed class members from "unjust or unfair settlements affecting their rights." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 623 (1997).

Class members, of course, have a right to object to the proposed settlement terms; and, thus, they are entitled to present their objections before the court decides whether to approve the proposed settlement. See Fed. R. Civ. P. 23(e)(5)(A) ("Any class

member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection."). An objector to a class settlement first "must state the basis for its objection with enough specificity to allow the parties to respond and the Court to evaluate the issues at hand." 1988 Trust for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co., 28 F.4th 513, 521 (4th Cir. 2022). If the objector meets his or her burden, then "the parties propounding the settlement, in addition to bearing the initial burden . . ., must show that the objection does not demonstrate that the proposed settlement fails one of [the] requirements" under Fed. R. Civ. P. 23(e). Id. A district court may require an objector "to specify and support its objection, while keeping the ultimate burden on the proponents of the settlement to demonstrate its fairness." Id. An objector is generally entitled "to be heard, to examine witnesses and to submit evidence on the fairness of the settlement." Flinn v. FMC Corp., 528 F.2d. 1169, 1173 (4th Cir. 1975).

In deciding whether to approve a settlement, the court must account for the "strong judicial policy in favor of settlement to

conserve scarce resources that would otherwise be devoted to protracted litigation" when considering class members' objections. Robinson v. Carolina First Bank NA, No. 7:18-cv-02927, 2017 WL 719031, at *8 (D.S.C. Feb. 14, 2019).

## DISCUSSION

### I. Davis, Freedlander, and Dimiduk's Objections Respecting the Toming and Content of the Rate Increase Letters

Davis, Freedlander, and Dimiduk's objections essentially question the fairness of sending rate increase letters to class members during the same time period as settlement negotiations and preliminary approval and whether Fed. R. Civ. P. 23 requires notifying class members of the settlement before the formal notice period.

The Court finds it does not. Rule 23 is based on the fundamental principle that all members of the class receive the same notice at the same time so they can make decisions on whether to be included in the settlement or not. This ensures that every person in the class is treated fairly and that no one receives an unfair advantage over other class members in terms of personal decisions that would be affected by the settlement. See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 613 (1997) ("Rule 23, governing federal-court class actions, stems from equity practice."). If notice of the settlement were to be sent only to the individuals in the same position as Davis and Freedlander, individuals in

Dimiduk's position would be unfairly positioned when it came to choosing a settlement option. And if class members in the same position as Dimiduk were given notice, it would then unfairly advantage class members who chose to decrease their coverage farther back in time. The lack of limiting principle creates a disparity between class members that is simply incompatible with the equity principles that underlie Rule 23.

Rule 23(c)(2) dictates how notice of a settlement is provided to a class. As the Court described in the MEMORANDUM OPINION filed on December 12, 2022 (ECF No. 122), Fed. R. Civ. P. 23 provides that:

> The notice must clearly and concisely state in plain, easily understood language:
> (1) the nature of the action;
> (2) the definition of the class certified;
> (3) the class claims, issues, or defenses;
> (4) that a class member may enter an appearance through an attorney if the member so desires;
> (5) that the court will exclude from the class any member who requests exclusion;
> (6) the time and manner for requesting exclusion; and
> (7) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). In essence, notice must provide class members with enough information to make an informed choice regarding the proposed settlement. In re Serzone Prods. Liab. Litig., 231 F.R.D. 221, 231 (S.D.W. Va. 2005). Thus, "due process does not necessarily require a global class action settlement

notice to contain detailed, comprehensive information about the law of class members' states." Hege v. Aegon USA, LLC, 780 F. Supp. 2d 416, 430 (D.S.C. 2011). Further, Rule 23(c)(2) does not dictate exactly what information must be included when giving notice to a class. Rather, "[t]he test for whether a given item must be included in a class notice is whether that information is such that 'a reasonable person would consider [it] to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.'" Good v. Am. Water Works Co., Inc., No. 2:14-cv-01374, 2016 WL 5746347, at *8 (S.D.W. Va. Sept. 30, 2016) (quoting In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1104 (5th Cir. 1977)). There is nothing in Rule 23 or case law provided to the Court that requires any other type of notice, including "pre-notice notice" or ad hoc notice, be sent out to the class. Sending "pre-notice notice" only to a sub-section of the Class would be inconsistent with the equitable principles animating Rule 23. And, sending a "pre-notice notice" to the entire Class is an option fraught with problems and a high risk or confusion. Moreover, there is nothing in Rule 23 that required pre-notice notice of the sort urged by Davis, Freedlander, and Dimiduk in the rate increase letters they received or the letters confirming their changes. In any event, the presence of the sixty-day reversal option strikes the proper balance between the circumstances faced by Davis, Freedlander, and

Dimiduk and the sending of the pre-notice notice. And, in fact, that provision forecloses the finding of harm upon which the objections are based.

Davis asserts two arguments addressed to the sixty-day reversal provision in the rate increase letter. First, he argues that the reversal provision should have been featured more prominently in the rate increase letter to alert him to its existence. ECF No. 133 at 46:12-18. Second, Davis argues that the formal class notice should have informed all class members of the reversal provision. Id. at 45:21-46:5. As to the first argument, the Court must presume that Davis and Freedlander read the rate increase letter in its entirety, including the provision about the sixty-day reversal period. Benner v. Nationwide Mut. Ins. Co., 93 F.3d 1228, 1237 (4th Cir. 1996). The provision was included on a document titled "Important Information Regarding This Premium Increase" that was sent with the rate increase letter under a bold heading stating "Time frame to reverse decision." ECF No. 100-1 at 8-10 (sealed). The reversal provision certainly was not hidden in the rate increase letter, so the Court cannot rule in Davis's favor on this ground. See Lee v. Fairfax Cnty. Sch. Bd., 621 Fed. App'x 761, 763 (4th Cir. 2015) (per curiam) (unpublished) (describing procedural unconscionability in part as concealing or misrepresenting information). Rather, presuming that Davis and Freedlander read the letter, the reversal provision was displayed prominently

enough to put them on notice as to its existence. Thus, there is no basis on which to find that more was required. As to Davis's argument that the formal notice should have reminded class members of the sixty-day reversal period, that information would not be considered material to the reasonable class member who was making a decision on whether to opt out or remain in the settlement, so it was not necessary to include it in the formal notice. Good v. Am. Water Works Co., Inc., No. 2:14-cv-01374, 2016 WL 5746347, at *8 (S.D.W. Va. Sept. 30, 2016) (quoting In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1104 (5th Cir. 1977)). And, indeed, to do so would have been confusing.

The resolution of these objections is consistent with the precept that not every class member must benefit equally from a settlement. Instead, the law requires that the Court determine whether the settlement is a fair, adequate, and reasonable resolution for the entire Class. In re MicroStrategy, Inc. Sec. Litig., 150 F. Supp. 2d 896, 903-04 (E.D. Va. 2001). For almost every class action suit, it is inevitable that some class members will not benefit as much as others, but courts must assess on balance whether the settlement benefited the class as a whole rather than focusing on individual class members. See, e.g., In re Genworth Fin. Sec. Litig., 210 F. Supp. 3d 837, 839 (E.D. Va. 2016). While Davis, Freedlander, and Dimiduk may not be fully satisfied with the relief they can receive from the Special

29

Election Options, the Amended Settlement Agreement will confer a substantial benefit on the Class as a whole. See ECF No. 122 at 47-50. Accordingly, Davis and Freedlander's and Dimiduk's objections on these grounds must be overruled.

## II. Davis and Freedlander's Remaining Objections

### A. Receiving Future Rate Increase Information Before Opting Out

Davis and Freedlander also object to the fact that they had to decide whether or not to opt out of the settlement before receiving information about future rate increases. ECF No. 61 at 2.

As explained in the MEMORANDUM OPINION (ECF No. 122) addressing similar objections, Fed. R. Civ. P. 23(e) requires notice of the proposed settlement (and consequent dismissal) of a class action to all members of the class. The rule is "meant to protect class members from the binding effect of a settlement in a class suit where the class members had no opportunity to object to the proposed settlement." Kevin D. Hart, Annotation, Propriety of notice of voluntary dismissal or compromise of class action, 52 A.L.R. Fed. 457 (1981). Notice afforded to class members "must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Hege v. Aegon USA, LLC, 780 F. Supp. 2d 416, 429-30

(D.S.C. 2011) (quoting <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797, 812 (1950)); Fed. R. Civ. P. 23(c)(2). Under the due process requirements of the Fifth Amendment, putative class members must be given "[r]easonable notice combined with an opportunity to be heard and withdraw from the class." <u>See</u> <u>In re Serzone Prods. Liab. Litig.</u>, 231 F.R.D. 221, 231 (S.D.W. Va. 2005). Further, as described above, Fed. R. Civ. P. 23 provides that:

> The notice must clearly and concisely state in plain, easily understood language:
> (1) the nature of the action;
> (2) the definition of the class certified;
> (3) the class claims, issues, or defenses;
> (4) that a class member may enter an appearance through an attorney if the member so desires;
> (5) that the court will exclude from the class any member who requests exclusion;
> (6) the time and manner for requesting exclusion; and
> (7) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). In essence, notice must provide class members with enough information to make an informed choice regarding the proposed settlement. <u>In re Serzone Prods. Liab. Litig.</u>, 231 F.R.D. at 231. Thus, "due process does not necessarily require a global class action settlement notice to contain detailed, comprehensive information about the law of class members' states." <u>Hege</u>, 780 F. Supp. 2d at 430.

There are no objections to the mode of notice or to the adequacy of its reach and distribution. Instead, the objections to

the adequacy of the Notice are based upon the adequacy of the substantive information provided in the notice or upon the generalized assertion that additional information should have been included within the Notice. Even the objections based on the perceived need to provide an additional opt-out or objection period come down to a complaint about the type of information that was provided in the notice. No matter how presented, these arguments all present the same issue: "that the Notice is defective because class members must decide whether to opt-out (or not) of the action before they know exactly what disclosures Genworth will make as part of the settlement, [or] exactly what elections they will have the ability to make." Skochin v. Genworth Fin., Inc., at *13. "And, it is reasonable to construe all of these objections as arguing that the [Amended] Settlement Agreement is defective for the same reasons." Id.

Just as in Skochin, the Notice and the Amended Settlement Agreement are complex. But, complexity alone does not render the Notice inadequate or defective. Nor does complexity alone render the Amended Settlement Agreement objectionable for being unfair, unreasonable, or inadequate.

The complexity arises, in the first instance, from the fact that the Amended Settlement provides a variety of remedial options to the class members. That, of course, is a recognition that with long-term care insurance, one kind of remedy does not fit all class

32

members even though their claims arise out of the same facts (i.e., misrepresentation by omission). That recognition, and the crafting of a settlement to take it into account, is not grounds to find either the Notice or the Amended Settlement Agreement inadequate. That is particularly so where, as here, the various options are outlined with such specificity as is currently available.

Just as in Skochin, the Court is satisfied that, with reasonable study, class members can understand the various options and can discern, from among them, which best fits their respective circumstances. In like measure, if no option fits a class member's circumstances, the member was allowed to opt out of the Settlement.

In assessing the adequacy of the Notice, as well as the fairness of the settlement itself, it is important that, according to the record, as of November 1, 2022, the Notice reached more than 99% of the more than 352,000 class members. ECF No. 81-1 ¶ 10. It is also significant that objections were lodged by 0.008% of the class and only 0.025% of the class opted out. See ECF No. 86 at 1 (noting that "there were only 19 Objections (by 27 class members)); ECF No. 81-1 ¶ 16 (noting that of the 352,146 potential class members, 187 individuals opted out). In other words, the overwhelming majority of the class did not complain that the Notice, albeit complex, was beyond comprehension or that the Amended Settlement Agreement was substantially unfair in requiring class members to opt out (or remain in) the settlement class before

33

they received the disclosures from Genworth, knew exactly what elections they had to make, or knew exactly what damages they might receive.

Here, as in In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg. Sales Practices & Prod. Liab. Litig., the fact that so few members of the class objected to, or opted out of, the settlement is a testament to the conclusion that the Notice was adequate as well as to the conclusion that the settlement is fair and reasonable. 952 F.3d 471, 485 (4th Cir. 2020). In other words, on this record, the Court concludes that the overwhelming number of recipients of the Notice found that neither it, nor the Amended Settlement Agreement it described, was objectionable either because the Notice did not adequately explain the settlement terms or because those terms were unfair or unreasonable or inadequate.

Moreover, it is not necessary that class members have an exact explanation of the settlement benefits that they will receive before they must decide whether to opt out. Indeed, many class settlements require class members to elect one remedy or another before opting out. See, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig., No. 1:17-MD-2800-TWT, 2020 WL 256132, at *2-3 (N.D. Ga. Jan. 13, 2020); In re Anthem, Inc. Data Breach Litig.,

327 F.R.D. 299, 331-32 (N.D. Cal. 2018); see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 328 (3d Cir. 1998).

In sum, the Notice adequately explains the class claims, the issues, and the defenses. It also defines the Settlement Class. It explains how and when class members may object to, or exclude themselves (opt-out) from, the settlement. Further, the Notice explains in considerable detail the Settlement terms. It gives class members sufficient information to make an informed choice whether to accept the Settlement, object to it, or opt-out of it.

"The test for whether a given item must be included in a class notice is whether that information is such that 'a reasonable person would consider [it] to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.'" Good v. Am. Water Works Co., Inc., No. 2:14-cv-01374, 2016 WL 5746347, at *8 (S.D.W. Va. Sept. 30, 2016) (quoting In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1104 (5th Cir. 1977)).

Genworth's plans for future rate increases, which will be disclosed to class members in the Special Election Letter, are certainly important in deciding which option to exercise, but that information is not known now, and, indeed, is not now knowable. It will become known near the time that the Special Election Letter will be sent. Thus, the question becomes whether the Disclosure

information, albeit important, must be given to class members before they must decide whether to opt out. That is only partly an objection to the adequacy of the Notice. It also is an objection to the fairness, reasonableness, and adequacy of the Amended Settlement Agreement.

But the response is the same whether the objection is treated as pertaining to the adequacy of the Notice or the fairness, reasonableness, and adequacy of the Amended Settlement Agreement itself. So, the point will be addressed here. Although understanding the magnitude of projected future rate increases is important in deciding which option to pursue when presented with specific options, it is not information that is necessary in deciding whether, on the one hand, to participate in a plan that will give the class member both the Disclosure of the likely future rate increases (when that is known) and the specified options available at the time the Disclosure is made; or, on the other hand, to opt out of the class action and proceed on one's own with a fraud claim.

It is fair and reasonable to require the opt-out decision before the details of the forthcoming Disclosure are made because the Disclosures will be accompanied by the right to make elections in light of the Disclosures. That is what this action is all about.

That is what the Plaintiffs say they were entitled to initially, and, as relief in this case, and, that is what the class is getting by virtue of the Settlement Agreement.

In other words, as to the fraud by omission claim, class members are given notice that the Amended Settlement Agreement, if approved, will give them the kind of information that, in the class claims, is allegedly needed to be able to decide upon the options that will be presented to them in the Special Election Letter. In addition, class members know that they will receive a cash payment and/or a paid-up policy.

Putative class members who considered these results insufficient were able to opt out and to pursue their claims individually. And, they had enough information to allow them to make that decision, notwithstanding that they do not know Genworth's specific plans for rate increases or the exact value of the paid-up benefit.

Armed with the knowledge that they will receive what they are entitled to (disclosures and new elections) under the policy and more (cash benefits and paid-up benefits), putative class members had sufficient information whether to take the settlement course or set sail on their own. No more is required.

The proposed alternative is to have Genworth distribute the special election letters and any other pertinent information and then allow class members to opt out if they do not like the options

made available to them. But the course posited by the Amended Settlement Agreement is what Genworth is willing to do. That course gives class members what they sued for and more. Class Counsel considers this course to be acceptable in perspective of the discovered evidence and an evaluation of the likelihood of success. No objector has shown Class Counsel's opinion to be erroneous or even flawed.

All things considered, the Notice is adequate under the applicable law and the objections to the Amended Settlement Agreement addressed in this section do not make its terms unfair, unreasonable, or inadequate. Accordingly, the objection on this ground will be overruled.

### B. Relief for Maintaining Coverage

Davis and Freedlander object to the lack of damages payment to class members who ultimately choose to maintain their current insurance benefit plan rather than choose one of the given settlement options. ECF No. 61 at 2.

In response, Class Counsel argues that the cash damages provided to class members who choose a Special Election Option "are intended to compensate Class Members who allegedly would have reduced their benefits, and thus premiums, sooner had Genworth earlier and more fully disclosed information regarding its plans for rate increases." ECF No. 86 at 18. To compensate for the harm of failing to disclose the rate increases, Class Counsel argues

that the Disclosures given to every class member is the "equitable remedy" that addresses the harm of "Genworth's alleged failure to timely and sufficiently disclose its plans for future rate increases." Id.

That is correct. The Complaint sought relief for Genworth's failure to disclose planned rate increases, see Compl. ¶¶ 134-169, and the equitable remedy for that harm would be to put class members in the position they should have been in, which is knowing the future rate increases before making an election on whether to maintain their current benefits or reduce them in exchange for a reduced premium. Cash damages would be inappropriate to those class members who receive the Disclosures and choose to maintain their current benefits because they were already made whole by the new disclosures and opportunity to revise their past benefits election. Contrastingly, class members who choose one of the Special Election Options are presumed to have chosen to reduce their benefits in the past if they would have received the disclosures prior to a rate increase. Thus, those class members are receiving a cash damages payment to compensate them for not having the ability to make that election sooner. Accordingly, Davis and Freedlander's objection on this ground will be overruled.

## CONCLUSION

For the foregoing reasons, and to the extent outlined above, the objections filed by Davis and Freedlander (ECF No. 61), including their oral objection at the November 17, 2022, hearing, and Dimiduk's objection (ECF No. 67), including her oral objection, will be overruled. The Court will address Dimiduk's outstanding objection to the Fees and Awards Motion in a separate opinion.

It is so ORDERED.

                              /s/        _Rep_
                              Robert E. Payne
                              Senior United States District Judge


Richmond, Virginia
Date: January **26**, 2023